## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **RODNEY B. ROBERTS,** | Civ. No. 15-7061 (KM) |
| **Plaintiff,** | |
| **v.** | **OPINION** |
| **COUNTY OF ESSEX, et al.,** | |
| **Defendants.** | |

**MCNULTY, U.S.D.J.:**

In the early morning hours of May 8, 1996, 17-year-old Sheronda Atwell was dragged to an empty lot in East Orange, New Jersey, and raped. Although it was dark and her assailant attacked her from behind, Ms. Atwell was later able to describe the perpetrator's sex, race, approximate age, height, and weight. According to police officers, she positively identified Rodney Roberts in a photo line-up. Roberts was arrested and charged with kidnapping and aggravated sexual assault. Within weeks of his arraignment, Roberts pled guilty to the kidnapping charge in exchange for a seven year sentence and dismissal of the aggravated sexual assault charge. At the conclusion of his sentence, Roberts was involuntarily civilly committed under the New Jersey Sexually Violent Predator Act. Roberts initiated post-conviction relief (PCR) proceedings. During those PCR proceedings, his counsel learned that immediately after the crime, a rape kit analysis had been performed at the hospital. Possibly as a result of his prompt guilty plea, Roberts's DNA had never been compared to any of the DNA found in the rape kit. Years later, once DNA analysis was finally conducted, Roberts's guilty plea was vacated and the indictment was dismissed.

Roberts then brought this action under 42 U.S.C. § 1983 seeking money damages from the police officers, the prosecutors, the public defenders, and supervisory personnel. Also named as defendants are the County of Essex, the Essex County Prosecutor's Office ("ECPO"), the City of Newark, and the Newark Police Department ("NPD"). He alleges that exculpatory evidence was withheld and mishandled, that he was improperly prosecuted for a crime he did not commit, and that his defense counsel committed malpractice by providing ineffective assistance in connection with the guilty plea and later PCR proceedings.

Now before the Court are motions to dismiss the complaint filed by the City of Newark (Dkt. No. 24); ECPO, Assistant Prosecutor Laurino, and Investigator Bolan (Dkt. No. 30); and Assistant Public Defenders Martone and Van Jura (Dkt. No. 35).[1] For the reasons set forth below, the motions are granted in part and denied in part.

**BACKGROUND**

For purposes of these motions, the major allegations of Roberts's Complaint may be summarized as follows.

Prior Convictions and Violation of Parole

In 1986, long before the events at issue here, Roberts was convicted of sexual assault. As a result of that conviction, Roberts was on parole on May 25, 1996, when he was arrested for theft. (Compl. ¶ 37) He failed to obtain release on bail.

On June 12, 1996, Roberts pled guilty to the theft charges. As a result of the theft, however, he was also charged with a violation of parole.

This Case

On May 8, 1996, Sheronda Atwell was walking in East Orange, New Jersey, on her way to her aunt's house. (Id. ¶ 18) As she approached

---

[1]     The Court previously denied the motion to dismiss filed by the County of Essex. (Dkt. No. 46) The remaining defendant, Detective Derrick Eutsey, later filed a motion to dismiss, not yet fully briefed, which the Court will treat separately.

Fairmount Cemetery, a male attempted to engage her in conversation. When she declined, he came up behind her, put his hand over her mouth, threatened her, and dragged her to an empty lot across from the cemetery. (*Id.* ¶¶ 19–21) In that empty lot, the assailant raped Ms. Atwell and ejaculated into her vagina. (*Id.* ¶ 21) When he was finished, the assailant ordered Ms. Atwell to stay down until he left and told her to "Remember Jeff." (*Id.*) After waiting five minutes, Ms. Atwell walked around the corner and asked someone to call the police. (*Id.*)

Police Officer Hill responded to the call. (*Id.* ¶ 23) He interviewed Ms. Atwell. Although it was a dark and rainy night and Ms. Atwell did not have a good opportunity to see the assailant's face, she described him as male, black, 20 years old, 5'7" and approximately 185 lbs. (*Id.*) Ms. Atwell was brought to United Hospitals Medical Center where a rape kit sampling was conducted. (*Id.* ¶ 24) Ms. Atwell's mother released the rape kit to the NPD. (*Id.* ¶ 25)

While Ms. Atwell was at the hospital, police brought a suspect (not Roberts) to her room, but she was unable to identify that person as her assailant. (*Id.* ¶ 26) On May 14, 1996, Detective Eutsey brought Ms. Atwell to the NPD's Sexual Assault Section to examine a photo array. (*Id.* ¶ 28) According to Det. Eutsey's report, Ms. Atwell began to cry uncontrollably upon viewing one of the pictures, and she identified the person in that picture as her assailant. (*Id.*) The photograph was a mugshot of Roberts taken ten years earlier, when he was 19 years old. Ms. Atwell reportedly signed and dated the photograph, but the photograph has since been lost. (*Id.* ¶ 30) Det. Eutsey's report of the photo ID was used to obtain warrants for Roberts's arrest. (*Id.* ¶¶ 34–35)

The Kidnapping and Sexual Assault Charges and the Guilty Plea

On June 26, 1996, Roberts was arraigned on the sexual assault and kidnapping charges and pled not guilty. (*Id.* ¶ 38) An appearance was scheduled before the Hon. Eugene J. Codey three weeks later on July 16, 1996. Before that appearance, Roberts was approached by Assistant Public Defender

Martone, who informed Roberts that he had been assigned to represent him. (*Id.* ¶ 39) Martone relayed the specifics of a plea agreement offered by the prosecutor's office: a plea of guilty to kidnapping in the second degree, in exchange for dismissal of the charge of aggravated sexual assault in the first degree. The deal included a recommended sentence of seven years on the kidnapping charge and three years on the theft charge, to run concurrently with the three years Roberts would serve on the parole violation. (*Id.* ¶ 40) Roberts accepted the plea deal. On July 16, 1996, before Judge Codey, he pled guilty to the kidnapping charge only. (*Id.* ¶ 46) On October 17, 1996, Roberts was sentenced in accordance with the terms of the plea deal, and the aggravated sexual assault charge was dismissed. (*Id.* ¶ 47)

Denial of Parole and Denial of Motion to Withdraw Guilty Plea

Roberts was denied parole by the New Jersey State Parole Board in 1998 and 2000. (Compl. ¶¶ 49, 50) Those denials took into account the allegations underlying the dismissed sexual assault charge. (*Id.*) Roberts appealed the second of those denials, arguing that the dismissed charge should not have been considered. The appeals board determined that the Parole Board was entitled to rely on the sexual assault as constituting part of the circumstances surrounding the kidnapping offense of conviction. (*Id.* ¶ 50)

On January 12, 2001, following the denial of his parole appeal, Roberts filed a motion to withdraw his guilty plea. (*Id.* ¶ 51) The motion argued that Assistant Public Defender Martone provided ineffective assistance when he allegedly advised Roberts that the dismissed sexual assault charge would not be used to penalize him in future proceedings. Judge Codey denied that application to withdraw the plea on January 18, 2001. (*Id.* ¶ 52)

Two years later, on June 24, 2003, the Parole Board again denied Roberts's application for release on parole. (*Id.* ¶ 53) Roberts appealed that decision, but on October 29, 2003, the denial was affirmed. (*Id.*) In its affirmance, the appeals board noted that the parole board was entitled to

consider all the circumstances, and "must consider the information provided by the Department of Corrections." (*Id.*)

Civil Commitment, New DNA Evidence, and Ms. Atwell's 2005 Recantation

Roberts alleges that in 2002, he asked the Attorney General to do a DNA analysis, but was informed that there was no DNA to test. (*Id.* ¶ 84)

During his incarceration, Roberts underwent a series of psychological evaluations. Those evaluations concluded that Roberts posed a moderate to high risk of recidivism and recommended that he be civilly committed as a sexually violent predator. (*Id.* ¶¶ 55–60) On May 19, 2004, the Attorney General's office filed a Petition for Civil Commitment to the Special Treatment Unit ("STU") under the New Jersey Sexually Violent Predator Act ("SVPA"). That petition relied on the 1986 and 1996 sex offenses, as well as two clinic certificates. (*Id.* ¶ 61) On June 1, 2004, Roberts was transferred to the STU and temporarily involuntarily committed as a sexually violent predator, pending a final hearing. (*Id.* ¶¶ 54, 66)

In preparation for the commitment hearing, Roberts's counsel, Assistant Public Defender Douard, interviewed the victim, Ms. Atwell. Ms. Atwell told Douard that she had never made a photo identification of her assailant and did not even know that someone had been arrested for the assault. (*Id.* ¶ 77)

The commitment hearing commenced on December 9, 2004, before Judge Perretti. It was at this hearing that Douard learned that a rape kit exam had been conducted within hours of the crime and an analysis had been conducted on that forensic evidence two months later, on July 18, 1996. (*Id.* ¶ 69) That July 18, 1996 report, Douard learned, noted the presence of sperm. The analyst requested blood and saliva samples from the defendant in order to perform a comparison. (*Id.* ¶ 82) Roberts's DNA, however, was never compared to any male DNA found in the rape kit. (*Id.* ¶ 69)

In December 2004, Douard wrote to Prosecutor Laurino requesting a DNA analysis. (*Id.* ¶ 88) On March 10, 2005, Investigator Bolan obtained a buccal (cheek) swab from Roberts. (*Id.* ¶ 89) Roberts's swab was submitted to the lab. Also sent to the lab for DNA testing was part, but not all, of the original rape kit from 1996. That part consisted only of the vaginal slides from the victim. It did not include the actual swabs or a control saliva sample (which would be used to confirm that the DNA designated as that of the victim was in fact Ms. Atwell's). (*Id.* ¶ 92) Laurino informed the forensic department that "everything that Newark P.D. had was sent to lab." (*Id.* ¶ 96) A lab report, dated August 29, 2005, concluded that all of the DNA on the vaginal slide was female. That result obviously excluded Roberts as the source of that particular DNA. (*Id.* ¶ 98)

On September 12, 2005, Ms. Atwell informed Investigator Bolan that she had a son who was born nine months after the rape. (*Id.* ¶ 102) Ms. Atwell requested a paternity test. Assistant Prosecutor Laurino, after discussion with Bolan, declined to have it done. On September 27, 2005, Ms. Atwell signed a statement affirming her earlier oral statement to Assistant Public Defender Douard that she had never performed a photo ID of her assailant and did not know anyone had been arrested. (*Id.* ¶¶ 78–79) (Two years later, on June 22, 2007, Ms. Atwell recertified the truth of that 2005 statement. (*Id.* ¶ 80))

PCR Proceedings

On February 15, 2006, Roberts filed a pro se motion for post-conviction relief and sought to withdraw his guilty plea. (Compl. ¶ 109) The PCR petition asserted that the victim had never identified her assailant and that he had been afforded ineffective assistance in deciding to plead guilty. (*Id.* ¶ 109) The motion was denied by the trial judge on the grounds that an identical motion had been denied in 2001 and that the current motion was time-barred. On appeal, however, that ruling was reversed and the matter was remanded so that Roberts could be assigned counsel to assist him on the issues of timeliness and the procedural bar. *See State v. Roberts*, 2007 WL 1468631, at

*1 (N.J. Super. Ct. App. Div. May 22, 2007). On remand, Assistant Public Defender Van Jura was assigned to represent Roberts.

In her July 23, 2007, brief to the court in advance of oral argument on the PCR motion, Assistant Prosecutor Clara Rodriguez represented to the court that the victim's swabs and the rape kit were submitted for DNA testing and that the August 29, 2005, DNA test results "did not provide conclusive results." (Compl. ¶ 114) At oral argument, Rodriguez stated that the August 29, 2005, DNA results were "inconclusive as to the seminal part of it" because what was found consisted only of female cells. (*Id.* ¶ 119) Van Jura, says Roberts, accepted the prosecution's position that the results were "inconclusive." Roberts faults Van Jura for not stressing that he was actually *excluded* as the contributor of DNA to the slide, which contained only female DNA. (*Id.* ¶ 121)

Judge Codey denied Roberts's PCR application on July 30, 2007. Judge Codey dismissed Ms. Atwell's 2005 and 2007 recantations as being "riddled with inconsistencies." He found them "inherently suspect and untrustworthy" because Ms. Atwell claimed that, after she was unable to identify her assailant in her hospital room, no one had ever contacted her again. That statement, wrote Judge Codey, was obviously suspect in light of evidence that she had gone to the ECPO precinct to provide a buccal swab, but did not recant her identification at that time. Ex. OO at p. 4. As for ineffective assistance of counsel, Judge Codey found that Roberts failed to demonstrate deficient performance or prejudice. There was no adequate showing that Martone provided unreasonable or inadequate advice; Roberts received a "very favorable plea bargain"; and he had never retracted the factual basis for the kidnapping conviction, which was based on the same incident that gave rise to the sexual assault charge. *Id.* at pp. 4–5.

The Appellate Division again reversed and remanded for a plenary evidentiary hearing. Judge Codey should have held such a hearing, the court held, to resolve the conflict between Ms. Atwell's alleged positive identification of Roberts in the photo array and her 2005/2007 recantations. The court also sought development of the record as to what advice Martone gave Roberts in

relation to the guilty plea. *State v. Roberts*, 2009 WL 2059583, *6–7 (N.J. Super. Ct. App. Div. Jul. 17, 2009).

Van Jura continued to represent Roberts on this second remand. (*Id.* ¶ 125) An evidentiary hearing was held before Judge Codey on October 27, 2009, and April 27, 2010. (*Id.* ¶ 126) During the hearing, Roberts testified that Assistant Public Defender Martone persuaded him to plead guilty by telling him that he had spoken to Ms. Atwell, who had positively identified Roberts as her assailant. Roberts also testified that the August 2005 DNA results were "inconclusive," that his DNA was not found in the slide, "but they couldn't rule me out because of the materials that they were testing had degraded to a certain degree, they couldn't make a full determination." (*Id.* ¶ 127) Investigator Bolan, in her testimony, recounted her 2005 consultation with Prosecutor Laurino about whether to perform a paternity test. (*Id.* ¶ 128) Martone denied under oath that he had told Roberts he had spoken with the victim or confirmed her identification of Roberts as the assailant. (*Id.* ¶ 134) At the hearing on October 27, 2009, Judge Codey directed Assistant Prosecutor Rodriguez to locate the missing biological evidence and ordered a paternity test on Ms. Atwell's son. (*Id.* ¶ 133) The paternity test determined that Roberts was not the father of Ms. Atwell's son. (Id. ¶ 107)

On May 19, 2010, Judge Codey again denied the PCR petition. (*Id.* ¶ 134) He found that the exclusion of Roberts as the father of Ms. Atwell's child did not exclude him as the rapist. Judge Codey found Martone to be a credible witness and accepted his testimony as true. (*Id.*)

That decision, too, was appealed. Roberts argued to the Appellate Division that Van Jura had been ineffective at the PCR stage because he failed to call Assistant Public Defender Douard or Investigator Price as witnesses. The Appellate Division agreed that Douard's testimony might have lent credibility to Ms. Atwell's recantations. *Id.* at *6. The Appellate Division "fail[ed] to see" why Van Jura argued that the 2005 DNA results were "inconclusive" when the 2005 report "on its face, excluded defendant's DNA." *Id.* Its decision, however, did

not rest solely on semantics; an effective attorney, said the Appellate Division, would have called an expert witness to clarify the significance of the DNA evidence. On March 8, 2013, the Appellate Division reversed and remanded for a further evidentiary hearing. *State v. Roberts*, 2013 WL 844573 (N.J. Super. Ct. App. Div. Mar. 8, 2013).

On remand, Roberts was assigned new counsel and the case was transferred to Judge Sherry Hutchins-Henderson. (*Id.* ¶ 140) Judge Hutchins-Henderson again directed Assistant Prosecutor Rodriguez to locate the complete rape kit. On June 17, 2013, Rodriguez reported that she had located the entire, original rape kit. (*Id.* ¶ 142) DNA testing was conducted. On October 24, 2013, the forensic unit reported that Roberts was excluded as a possible contributor of DNA. (*Id.* ¶ 147)

On November 21, 2013, based on this newly discovered evidence, Roberts's guilty plea was vacated and a new trial was ordered. (*Id.* ¶ 149) The prosecution opted not to retry the case. On February 20, 2014, the charges against Roberts were dropped and dismissed. (*Id.* ¶152) On March 10, 2014, the petition for civil commitment was dismissed, and on March 12, 2014, Roberts was released from the STU. (*Id.* ¶¶ 153, 154)

Procedural History

On September 24, 2015, Roberts filed the complaint in this action. (Dkt. No. 1) Roberts voluntarily dismissed the Newark Police Department as a defendant on December 3, 2015. (Dkt. No. 12) Following various extensions of time, certain defendants filed motions to dismiss.[2] In his opposition to the motions to dismiss, Roberts voluntarily dismissed certain counts against certain defendants. (*See* Dkt. No. 54, n. 2; Dkt No. 33 at 2 n.2)

---

[2]      The County of Essex moved to dismiss the complaint on November 25, 2015. (Dkt. No. 8) Roberts opposed that motion (Dkt. No. 19) and the County filed a reply (Dkt. No. 29). By Order dated April 7, 2016, this Court denied Essex County's motion to dismiss without prejudice to the reassertion of its arguments in the context of summary judgment after appropriate discovery. (Dkt. No. 46) Eutsey's motion to dismiss is still at the briefing stage, so all of the counts asserted against him remain in the case.

As a result of the foregoing dismissals, the counts of the complaint, and the defendants against whom they are asserted, are currently as follows:

First Count – 42 U.S.C. § 1983 Violation of the 4th Amendment for Malicious Prosecution, asserted against Defendant Eutsey

Second Count – 42 U.S.C. § 1983 Violation of the 14th Amendment for Fabricating/Falsifying Evidence, asserted against Defendants Eutsey, ECPO, Laurino and Bolan

Third Count – 42 U.S.C. § 1983 Violation of the 14th Amendment for Withholding Exculpatory Evidence, asserted against Defendants City of Newark and Eutsey

Fourth Count – 42 U.S.C. § 1983 Violation of the 14th Amendment for Mishandling Exculpatory Evidence, asserted against Defendants City of Newark and Eutsey

Fifth Count – 42 U.S.C. § 1983 Violation of the 14th Amendment for Denial of Procedural Due Process, asserted against Defendants City of Newark, Eutsey, ECPO, Laurino, Bolan

Sixth Count – 42 U.S.C. § 1983 Violation of the 1st and 14th Amendments for Denial of Access to the Courts, asserted against Defendants City of Newark, Eutsey, ECPO, Laurino, Bolan

Seventh Count – 42 U.S.C. § 1983 Supervisory Liability, asserted against Defendant ECPO and Laurino

Eighth Count – Malicious Prosecution, asserted against Defendant Eutsey

Ninth Count – Malicious Abuse of Process, asserted against Defendant Eutsey

Tenth Count – Fabrication of Evidence, asserted against Defendants Eutsey, ECPO, Laurino and Bolan

Eleventh Count – Mishandling Exculpatory Evidence, asserted against Defendants City of Newark and Eutsey

Twelfth Count – Withholding Exculpatory Evidence, asserted against Defendants City of Newark and Eutsey

Thirteenth Count – Negligence/Gross Negligence/Recklessness, asserted against Defendants City of Newark, Eutsey, ECPO, Laurino and Bolan

Fourteenth Count – Vicarious Liability, asserted against Defendants City of Newark, County of Essex and ECPO

Fifteenth Count – Professional Negligence/Legal Malpractice, asserted against Defendants Martone and Van Jura

## LEGAL STANDARD

FED. R. CIV. P. 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if it fails to state a claim upon which relief can be granted. The moving party bears the burden of showing that no claim has been stated. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). In deciding a motion to dismiss, a court must take all allegations in the complaint as true and view them in the light most favorable to the plaintiff. *See Warth v. Seldin*, 422 U.S. 490, 501 (1975); *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc.*, 140 F.3d 478, 483 (3d Cir. 1998); *see also Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) ("reasonable inferences" principle not undermined by later Supreme Court *Twombly* case, *infra*).

FED. R. CIV. P. 8(a) does not require that a complaint contain detailed factual allegations. Nevertheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief requires more than labels and conclusions, and formulaic recitation of the elements of a cause of action will not do.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, the factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, such that it is "plausible on its face." *See id.* at 570; *see also Umland v. PLANCO Fin. Serv., Inc.*, 542 F.3d 59, 64 (3d Cir. 2008). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing

*Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' … it asks for more than a sheer possibility." *Iqbal*, 556 U.S. at 678 (2009).

The United States Court of Appeals for the Third Circuit, interpreting the *Twombly/Iqbal* standard, has provided a three-step process for analyzing a Rule 12(b)(6) motion:

> To determine whether a complaint meets the pleading standard, our analysis unfolds in three steps. First, we outline the elements a plaintiff must plead to a state a claim for relief. *See* [*Iqbal*, 556 U.S.] at 675; *Argueta* [*v. U.S. Immigration & Customs Enforcement*, 643 F.3d 60, 73 (3d Cir. 2011)]. Next, we peel away those allegations that are no more than conclusions and thus not entitled to the assumption of truth. *See Iqbal*, 556 U.S. at 679; *Argueta*, 643 F.3d at 73. Finally, we look for well-pled factual allegations, assume their veracity, and then "determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679; *Argueta*, 643 F.3d at 73. This last step is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

*Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012).

## DISCUSSION

I.   **Claims against Assistant Prosecutor Laurino and Investigator Bolan**[3]

A. **Fabrication of Evidence (Counts 2 and 10)**[4]

In Counts 2 and 10, Roberts alleges that Laurino and Bolan falsified evidence, in violation of 42 U.S.C. § 1983 and state law. They allegedly did so by giving Assistant Prosecutor Clara Rodriguez two pieces of false information: (1) that the complete rape kit had been submitted to the laboratory for testing,

---

[3]   Counts 1, 8 and 9 have been voluntarily dismissed as against Newark, ECPO, Laurino, Bolan, Martone and Van Jura. *See* Dkt. No. 54 at 1 n.2; Dkt No. 33 at 2 n.2. Roberts also dismissed Counts 3, 4, 11, and 12 as against ECPO, Laurino and Bolan.

[4]   The allegations of Counts 2 and 10 refer directly to actions by Defendants Eutsey, Laurino, and Bolan only. Neither side's brief discusses these counts in relation to the City of Newark. I therefore treat these counts as having been asserted against those three individuals only. I generally discuss the City's vicarious liability under Count 14, the *Monell* count.

and (2) that the results of the test were inconclusive. Rodriguez relayed that information to the court during Roberts's PCR hearing. (Compl. ¶ 168) In her pre-hearing brief dated July 23, 2007, Rodriguez represented that "[t]he victim provided the samples on September 12, 2005. The samples and the sex crime kit in this matter were sent to the New Jersey State Police Laboratory for DNA analysis. The DNA examination did not provide conclusive results." (*Id.* ¶ 114) Then, at oral arguments on July 26, 2007, she relayed that the August 2005 DNA report was "inconclusive as to the seminal part of it" because the only cells found were female. (*Id.* ¶ 119)

First, Roberts suggests that the time line proves the falsity of Laurino and Bolan's statement to Rodriguez that the complete rape kit was tested in 2005 and that the 2005 analysis included comparison with the victim's swabs. (Compl. ¶ 168) The Complaint alleges that the "inconclusive" DNA report was dated August 29, 2005, a few weeks *before* Ms. Atwell gave a buccal swab on September 12, 2005. (*Id.* ¶¶ 98, 99) Indeed, Ms. Atwell's buccal swab was not submitted for testing until December 3, 2009. (*Id.* ¶ 107) Thus, says Roberts, Rodriguez's statements to the PCR court in July of 2007 that the victim's sample was tested could not have been correct.

Of course, these are allegations only, and even incorrect evidence does not equate to falsified or fabricated evidence. *See Halsey v. Pfeiffer*, 750 F.3d 273, 295 (3d Cir. 2014) ("[T]estimony that is incorrect or simply disputed should not be treated as fabricated merely because it turns out to have been wrong."). Indeed, the complaint itself could be wrong. In context, all involved might have been justified in not yet thinking that the August 29, 2005 DNA test was potentially exculpatory; by definition, a slide containing solely female DNA did not contain the DNA of the male rapist, whether Roberts or someone else, at all. We may even concede that it was not yet clear whether the female DNA on the vaginal slide was that of Ms. Atwell, the victim. But where ejaculation concededly took place, a partial analysis of the rape kit that produced only female DNA might have suggested that further inquiry was

required. All of these facts, and others, would go into a fact finder's determination of whether there was misconduct by Laurino and Bolan. But such a determination is premature at the pleading stage.

The complaint sufficiently alleges that the officers misrepresented the nature and scope of the analysis to Rodriguez, who made a representation in court that was more certain and categorical than the facts warranted. I will permit the parties to explore the truth, or not, of that allegation in discovery. The motion of Laurino and Bolan to dismiss Counts 2 and 10 is denied.

### B. Due Process Violation (Count 5)

In Count 5, Roberts alleges that Laurino and Bolan prevented him from accessing exculpatory DNA evidence and thereby violated his due process rights.

The starting point is *Arizona v. Youngblood*, 488 U.S. 51, 109 S. Ct. 333 (1988). There, the police failed to test semen samples and failed to refrigerate the victim's clothing, permitting the degeneration of any testable evidence. Reviewing a due process challenge to Youngblood's conviction on direct appeal, the Supreme Court determined that (1) the police did not have a constitutional duty to perform any particular tests on evidence and (2) absent a showing of bad faith, there is no denial of due process where the police fail to preserve potentially useful evidence. *Id.* at 57, 59.

In *Dist. Attorney's Office for the Third Judicial Dist. v. Osborne*, 557 U.S. 52, 129 S. Ct. 2308 (2009), the Supreme Court considered a Y*oungblood*-like issue in the special context of a post-conviction challenge. *Osborne* held that there is no substantive due process right to obtain post-conviction access to the state's evidence for DNA testing. Procedural due process rights, however, do extend to post-conviction proceedings, although these do not include the panoply of procedural protections that apply at the trial phase. Even after having pled (or been found) guilty and convicted, a defendant retains liberty

interests, but they are less extensive than those that attach to a person merely accused. Thus, "'when a State chooses to offer help to those seeking relief from convictions,' due process does not 'dictat[e] the exact form such assistance must assume.'" *Osborne*, 557 U.S. at 69 (citing *Pennsylvania v. Finley*, 481 U.S. 551, 559, 107 S. Ct. 1990 (1987)). Rather, post-conviction procedures are impermissible only if they "offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental," or "transgress[] any recognized principle of fundamental fairness in operation." *Id.* (citations omitted).

The Third Circuit has applied the *Youngblood / Osborne* due process analysis to the State's post-conviction conduct, and has under some circumstances upheld a challenge. In *Yarris v. County of Del.*, 465 F.3d 129, 142 (3d Cir. 2006), for example, the Court of Appeals, considering a Section 1983 action, determined that the police "consciously acted to frustrate [the defendant's] request for DNA testing," by letting evidence containing DNA sit in a bag, unpreserved, under someone's desk. That conduct, held the Court, established bad faith sufficient to constitute a due process violation. *Id.*

Taking this case law as my guide, I must deny the motion to dismiss. Here, the Complaint alleges that a rape kit exam was conducted at United Hospitals Medical Center within hours of the assault. Shortly thereafter, pursuant to a release form signed by Ms. Atwell's mother, the kit was transferred to the Newark Police Department. (Compl. ¶¶ 24, 25) The NPD sent the rape kit to the Newark Police Forensic Laboratory where it was analyzed, at least preliminarily, on July 18, 1996. (*Id.* ¶ 82) The results of that test showed seminal stains. The analyst requested samples from the defendant in order to make a comparison. (*Id.*) No such comparative test was done at the time. (I note that Roberts had pled guilty two days before.)

Eight years later, in 2004, learning of the existence of possible DNA evidence, Roberts's PCR attorney requested a DNA comparison. (*Id.* ¶ 88)[5] On March 10, 2005, Bolan collected a buccal swab from Roberts. (*Id.* ¶ 89) Investigator Bolan "submitted just one portion" of the rape kit (the vaginal slide), along with Roberts's buccal swab, to the Office of Forensic Sciences on March 22, 2005.[6] (*Id.* ¶ 90) (It is not clear how Bolan came into possession of the slide.) The reasons that only the vaginal slide was submitted for analysis remain obscure. The Complaint alleges that the Office of Forensic Sciences twice contacted Laurino about the rest of the swabs and slides that would have been in the original rape kit, and that Laurino promised to investigate. (*Id.* ¶¶ 92–95) The third time the Office of Forensic Sciences contacted Laurino, he allegedly told them that "everything the Newark P.D. had was sent to lab." (*Id.* ¶ 96) On August 29, 2005, a report was prepared which determined that the only DNA on the vaginal slide was female. That result, as far as it went, obviously excluded Roberts, since the slide did not contain any male DNA at all. The report also stated that it could not be determined if the female DNA belonged to Ms. Atwell. (*Id.* ¶ 98)

It was only in 2013, in response to the order of Judge Hutchins-Henderson, that Assistant Prosecutor Rodriguez located the rest of the rape kit. It is unclear precisely where and how the rape kit was found, whether within the "precinct" (which precinct is not clear), ECPO, or the New Jersey State Police Laboratory. (*Id.* ¶ 143) Nor is it clear why the kit could not have been located years before—for example, in response to the 2009 order of Judge Codey.

---

[5]     Roberts alleges that he personally contacted the Attorney General in 2002 requesting a DNA analysis. Roberts alleges he was told by an unnamed person at the Attorney General's Office that "there was no DNA to test." (Compl. ¶ 84)

[6]     At the PCR hearing in July of 2007, Assistant Prosecutor Rodriguez told the court that, back in 1996, only the Newark Police Department had a laboratory for DNA testing, but that in 2005 the New Jersey State Police laboratory was available. (*Id.* ¶ 119)

Roberts alleges that Laurino and Bolan are responsible for the missing rape kit, that they knew the complete kit was not submitted in 2005, and that they played a hide-and-seek game, delaying his exoneration. Maybe yes, maybe no, but I find that the allegations sufficiently state a claim of bad faith. Discovery should assist the parties in determining who had custody of the original rape kit between 1996 and 2007, why only portions of the rape kit were submitted for testing, and why it remained undisclosed in its complete form until 2013. Accordingly, the motion to dismiss is denied as to Count 5, which will proceed against Laurino and Bolan.

### C. Access to Courts (Count 6)

Count 6 alleges that the withholding of the exculpatory DNA evidence denied Roberts to access to the courts in violation of the 1st and 14th Amendments.

To state a claim for denial of access to the courts, a plaintiff must show "(1) he suffered an actual injury—that is, that he lost a chance to pursue a 'nonfrivolous' or 'arguable' underlying claim; and (2) that he has no other 'remedy that may be awarded as recompense' for the lost claim other than in the present denial-of-access suit." *Coulston v. Houtzdale*, __ F. App'x __, 2016 WL 3196684, at *2 (3d Cir. June 9, 2016) (citing *Christopher v. Harbury*, 536 U.S. 403, 415, 122 S. Ct. 2179 (2002)). The nonfrivolous, arguable underlying claim must be set forth in the complaint in such a way as to present "more than mere hope," and the complaint must also describe the remedy allegedly lost. *Monroe v. Beard*, 536 F.3d 198, 205–06 (3d Cir. 2008) (citing *Harbury*, 536 U.S. at 416–17).

The reasoning behind the second, "no other remedy" element seems to be as follows: The injury from an access-to-courts claim is the loss of a meritorious claim; if the merits of that lost claim are otherwise being litigated, and there is an effective remedy for them, the access-to-courts aspect becomes superfluous. *See Harbury*, 536 U.S. at 416 ("[T]he remedy sought must itself be identified to hedge against the risk that an access claim be tried all the way

through, only to find that the court can award no remedy that the plaintiff could not have been awarded on a presently existing claim.").

Roberts has alleged a nonfrivolous underlying claim: that he was denied effective access to DNA evidence that ultimately exonerated him. He has not sufficiently alleged that he has no other remedy besides the access to courts claim. Roberts can proceed on his underlying claims and may obtain a money judgment if they should be decided in his favor. But "[t]here is ... no point in spending time and money to establish the facts constituting a denial of access when a plaintiff would end up just as well off after litigating a simpler case without the denial-of-access element." *Id.* at 415.

Accordingly, Count 6 is dismissed without prejudice.

### D. Supervisory Liability of Assistant Prosecutor Laurino (Count 7)

Count 7 alleges that Laurino is vicariously liable for the acts of his subordinate, Investigator Bolan. "A defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). Thus a plaintiff must allege that the defendant supervisor directed the allegedly unconstitutional conduct, or at least that the supervisor actually knew of and acquiesced in it. *Id.*

The complaint's allegations as to Laurino are somewhat skimpy. Laurino was Bolan's supervisor. Laurino is alleged to have told the Office of Forensic Sciences in 2005 that the NPD had turned over everything it had, which allegedly was untrue. Also in 2005, Bolan and Laurino allegedly discussed whether to conduct a paternity test, and decided not to do so. (*Id.* ¶ 103) (The test was not conducted until four years later, pursuant to the order of Judge Codey.) These allegations indicate that Laurino, as supervisor, had some specific involvement in the Roberts PCR case and acted in concert with Bolan. They do not rest on simple *respondeat superior*. I consider also that the inner workings of the ECPO involve facts within defendants' exclusive control. The

18

allegations are sufficient to warrant discovery. The motion to dismiss Count 7, alleging supervisory liability against Laurino, is therefore denied.

### E. Negligence (Count 13)

In Count 13, Roberts alleges that Laurino and Bolan were negligent, grossly negligent, or reckless in failing to submit the complete rape kit for testing and in withholding or tampering with the DNA evidence. Under New Jersey law, to state a claim for negligence, a plaintiff must set forth that the defendant owed him a duty of care, that there was a breach of that duty, and that the plaintiff suffered damages which were actually or proximately caused by the breach. *See, e.g., Jersey Central Power & Light Co. v. Melcar Utility Co.*, 59 A.3d 561, 571 (N.J. 2013). In light of the allegations recounted with respect to Count 5, *supra*, I find that Roberts has sufficiently stated a claim for negligence against Laurino and Bolan. The motion to dismiss Count 13 is denied.

### II.    Claim Against the Assistant Public Defenders

Count 15 sounds in negligence and legal malpractice. Roberts alleges that two of his attorneys, Assistant Public Defenders Martone and Van Jura, provided ineffective assistance of counsel. Martone's negligent advice, Roberts alleges, led to his improvident decision to plead guilty in 1996. Van Jura's negligence in PCR proceedings, he alleges, led to his continued incarceration in the STU from 2007 to 2013.

#### i. Martone

##### 1. Threshold grounds for dismissal

Martone seeks dismissal of Count 15 on certain threshold grounds.

First, Martone argues that Roberts failed to comply with the notice requirements of the New Jersey Tort Claims Act, N.J.S.A. 59:1 *et seq.* ("NJTCA"). The NJTCA imposes certain requirements upon a plaintiff who wishes to sue a public entity or public employee. *See Beauchamp v. Amedio*, 164 N.J. 111, 121–22 (N.J. 2000) (NJTCA is designed to "provide the public entity with prompt notification of a claim in order to adequately investigate the facts and prepare a defense"). One such requirement is that the would-be

plaintiff serve a notice of claim within ninety days of the date on which the cause of action accrued. N.J.S.A. 59:8-8.

The court's first task, then, is to determine when the cause of action accrued. "A cause of action against an attorney who represented a defendant in a criminal matter does not accrue 'until the defendant receives relief in the form of exoneration,' and [] the grant of PCR falls short [of establishing accrual] if defendant is still subject to retrial and reconviction on the original charges." *Rogers v. Cape May Cnty. Office of Public Defender*, 31 A.3d 934, 939 (N.J. 2011) (citing *McKnight v. Office of the Public Defender*, 962 A.2d 482, 483 (N.J. 2008)). Thus exoneration occurs when an indictment is dismissed with prejudice, and not, for example, when a conviction is reversed and remanded for a new trial. *Rogers*, 31 A.3d at 941; *Cortez v. Gindhart*, 90 A.3d 653, 659 (N.J. Super. Ct. App. Div. 2014) ("For the accrual of a malpractice claim based on such an allegation [of public defenders' negligence], there is no injury unless and until the conviction is shown to be invalid, with some degree of finality.").

Here, Roberts's guilty plea was vacated and a new trial ordered on November 21, 2013. The charges against Roberts were not finally dismissed, however, until February 20, 2014. That is the earliest possible accrual date for Roberts's legal malpractice claim. The Notice of Claim was filed May 28, 2014, and supplemented on June 9, 2014. (Compl. Ex. A) The original notice of claim was therefore filed eight days after the 90-day time limit imposed by the NJTCA had expired.[7]

Late-filed notices may be permitted, at the discretion of the trial judge, where a plaintiff can demonstrate (1) "extraordinary circumstances" explaining his failure to timely file the notice and (2) that the public entity and/or employees have not been "substantially prejudiced" by the late filing. N.J.S.A. 59:8-9. The only reason in the record for this late filing (which was not very late) is that Roberts remained imprisoned; although his criminal conviction was

---

[7]     The petition for civil commitment was dismissed on March 10, 2014, but that dismissal was without prejudice.

vacated on February 14, 2014, his civil commitment was not vacated until March 10, 2014, and he was not actually released from the STU until March 12, 2014. (Compl. ¶¶ 153–54) For the first month of the 90-day NJTCA notice period, then, Roberts remained in the STU. That incarceration, though a civil commitment, constituted the major ongoing effect of the criminal charge, and it did not end until well within the 90-day notice period. Roberts, perhaps insufficiently attuned to the subtlety of being under lock and key yet not technically imprisoned, could be forgiven for thinking (if he thought about it at all) that the clock did not start to run until he was released. Furthermore, I see no substantial indication that a brief delay of eight days resulted in prejudice to any defendant.[8] Accordingly, I decline to dismiss the claim against Martone on this ground.

Martone also takes issue with the contents of the notice of claim. The notice of claim states that "Mr. Roberts was wrongfully imprisoned from 2003 until on or about March 12–14, 2014" and that Roberts "was finally released only after DNA evidence demonstrated that he had not committed a crime." (Compl. Ex. A) First Martone argues that the notice is ineffective against him because it does not specifically name him or refer to Roberts's 1996 guilty plea. Failure to include specific names is not fatal. *See, e.g., Henderson v. Herman*, 862 A.2d 1217, 1223 (N.J. Super. Ct. App. Div. 2004) (declining to dismiss plaintiff's complaint for failure to include specific names of dispatchers on notice of claim). Furthermore, I am not convinced that the failure to cite the 1996 guilty plea renders the notice unsatisfactory. A notice of claim is not required to meet some heightened specificity requirement; as the name implies, it is merely a notice, not a civil complaint. *Torrey v. New Jersey*, 2014 WL 941308, at *17 (D.N.J. Mar. 11, 2014). This notice of claim speaks of Roberts's

---

[8]     Nor am I persuaded that the doctrine of laches provides a basis for dismissal. It cannot be seriously argued that Roberts substantially delayed in bringing his malpractice claim, considering that the charges were dismissed against him as of February 20, 2014 and his claim was brought on September 24, 2015. Nor do the attorney defendants establish that they suffered any incremental prejudice in defending themselves.

wrongful incarceration, despite the fact that "he had not committed a crime." It requires no great leap to infer that he is contesting his counseled guilty plea. This should have been sufficient to put the Public Defenders' Office, and the Assistant Public Defenders involved, on notice of the general nature of Roberts's claims.

Third, Martone seeks dismissal of the claim on grounds of collateral estoppel. Collateral estoppel, or issue preclusion, has the following essential elements: (1) identical issue presented in the earlier and later actions, (2) final judgment on the merits, (3) same party, or one in privity, raising the issue in the later action, (4) a full and fair opportunity to litigate the issue in the earlier action, and (5) that the determination of the issue was essential to the final judgment. *See Alevras v. Tacopina*, 399 F. Supp. 2d 567, 571 (D.N.J. 2005) (citing *Matter of the Estate of Dawson*, 641 A.2d 1026, 1034–35 (N.J. 1994)).

Martone fails to establish that the issue as to which he seeks estoppel (the adequacy of his representation) was essential to a prior final judgment. It is true, as he says, that Roberts attacked the adequacy of his representation before Judge Codey at the July 26, 2007 PCR oral arguments, and that Judge Codey rejected Roberts's ineffective assistance arguments. Judge Codey's decision, however, was reversed by the Appellate Division. That reversal, although not specifically based on the ineffective assistance ground, rendered Judge Codey's decision non-final. The Appellate Division found the procedure to have been flawed, and remanded for an evidentiary hearing.

At least at the pleading stage, I have no sufficient basis to find that collateral estoppel bars a legal malpractice claim. I therefore decline to dismiss Count 15 as against Martone on this ground.

## 2. Failure to state a claim

Martone next argues that Count 15 should be dismissed for failure to state a claim. The malpractice alleged against Martone is that he led Roberts to believe that the sexual assault charge, which was being dismissed, would not be used to penalize him in future proceedings.

"A legal malpractice action is rooted in the tort of negligence." *Rogers*, 31 A.3d at 938. To state a claim for legal malpractice, New Jersey law requires the following elements: "(1) the existence of an attorney-client relationship creating a duty of care upon the attorney; (2) that the attorney breached the duty owed; (3) that the breach was the proximate cause of any damages sustained; and (4) that actual damages were incurred." *Cortez*, 90 A.3d at 658 (citations omitted). That duty of care, as it relates to the plea bargain process, requires a "standard of representation in that process that satisfies the Sixth Amendment." *Id.* at 659 (citing *Lafler v. Cooper*, __ U.S. __, 132 S. Ct. 1376 (2012)). Under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984), a defendant asserting that counsel failed to meet that standard of effective assistance must demonstrate (1) "that counsel's representation fell below an objective standard of reasonableness," or in other words, was "deficient," or outside "the wide range of professionally competent assistance," and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *See State v. Fritz*, 519 A.2d 336, 341–42 (N.J. 1987) (quoting *Strickland*, 466 U.S. at 687, 690, 694).

In general, counsel must advise a client as to any penal or direct consequences that will result from a plea, but need not advise a client about collateral consequences. That *Strickland* standard requires, for example, that counsel advise a client about the guilty plea's likely effect on future parole eligibility. *Hill v. Lockhart*, 474 U.S. 52, 57, 106 S. Ct. 366 (1985). This follows because denial of parole, being punitive, is part of the criminal law process and is therefore considered a direct consequence of the plea. The motion to dismiss is therefore denied as to Martone's alleged failure to warn Roberts that the dismissed charge would continue to affect his parole eligibility.

Civil commitment as a sexually violent offender, however, is considered a collateral consequence of a plea. *State v. Bellamy*, 835 A.2d 1231, 1238 (N.J. 2003). That said, the New Jersey Supreme Court has nevertheless placed a duty upon counsel to ensure that a defendant understands the possibility of

future civil commitment as a consequence of entering a guilty plea. *Id.* The Court's rationale is that the failure to so advise a client "deprives that defendant of information needed to make a knowing and voluntary plea." *Id.* at 1238–39. *Bellamy* was, however, granted only "pipeline" retroactivity; it applied only to cases active at the trial level or on direct appeal at the time when it was decided on December 11, 2003. Roberts's case long preceded that date, and Martone, assuming the truth of the allegations, did not fail to meet any standard that applied at the time.

Just as important is the fact that, at the time of Roberts's plea, the enactment of the SVPA lay two years in the future, in 1998. Failure to predict the future enactment of SVPA, and the defendant's hypothetical liability thereunder, does not fall short of any reasonable standard of representation. New Jersey state cases, not precisely binding but persuasive, have rejected ineffective assistance claims against counsel for failing to advise about the possibility of civil commitment pursuant to the SVPA in connection with guilty pleas that occurred before the law's enactment. *See State v. Lorenzo,* 2009 WL 465437, at *4 (N.J. Super. Ct. App. Div. Feb. 26, 2009) (noting that permitting ineffective assistance claims in such a situation puts an "impossible burden" on trial counsel); *State v. Malde,* 2009 WL 2834273, at *3 (N.J. Super. Ct. App. Div. Sept. 4, 2009) (rejecting ineffective assistance claim regarding failure of defense counsel to explain SVPA consequence of guilty plea because "a defense attorney is not required to advise a defendant of collateral consequences of a plea not then existing").[9] In the context of this civil action for damages, too, it demands too much of a public defender to advise a client of an as-yet nonexistent statute, where the defendant was pleading guilty to an offense that was not a predicate offense for that future statute, and where civil commitment

---

[9]    Nor is the defendant's decision to plead guilty and subsequent incarceration essential to civil commitment. The SVPA permits the Attorney General to seek commitment of any person if the Attorney General believes the individual may be a sexually violent predator. *State v. Jaffe,* 2009 WL 3850002, at *3 (N.J. Super. Ct. App. Div. Nov. 17, 2009) (citing *In re Civil Commitment of P.Z.H.,* 873 A.2d 595, 598 (N.J. Super. Ct. App. Div. 2005)).

under the statute was not reliant on the defendant's actually pleading guilty to a sex offense. As to the portion of Count 15 relating to the SVPA, then, the motion to dismiss is granted.

Accordingly, Count 15 is granted in part and denied in part as to Martone, without prejudice to the filing of an amended complaint that remedies the deficiencies identified here.

### ii. Van Jura

Roberts's claim of malpractice against Van Jura relates to Van Jura's representation of him in the civil commitment and PCR proceedings. Specifically, Roberts alleges that Van Jura was negligent in having stated at the PCR hearing on October 27, 2009, that the August 2005 DNA report was "inconclusive." (Compl. ¶¶ 121, 248) Roberts also alleges that Van Jura was negligent for failing to call Roberts's prior post-conviction counsel, Assistant Public Defender Douard, and Investigator Price as witnesses at the PCR evidentiary hearing to corroborate the circumstances surrounding Atwell's recantation story. (*Id.* ¶ 247) Had Van Jura called these witnesses, Roberts contends, Judge Codey would have found Ms. Atwell credible when she said she had not identified Roberts in a photo array.

Roberts contends that the Appellate Division has already endorsed his claims of deficiency. (*Id.* ¶ 249) Not quite. Although the Appellate Division raised these issues, it did not decide them; it remanded because it believed they merited an evidentiary hearing.

As for the portion of the claim alleging ineffective assistance for failing to call certain witnesses at the evidentiary hearing, I find that Roberts has sufficiently stated a claim. Van Jura's statement that the August 29, 2005, DNA report was inconclusive is a closer issue.[10] Nevertheless, as part of the larger picture, it may be significant.

---

[10]    As stated above, that report stated that the only DNA present on the tested slide (one portion of the complete rape kit) was female DNA from an unknown source (because there was no control sample from Atwell). So it was not "conclusive" as to the

Accordingly, Count 15 will proceed against Van Jura.

### III.   Vicarious *Monell* Liability of Newark and ECPO

The claims against the City of Newark and ECPO are premised on theories of vicarious liability. Count 14 states so explicitly. Other counts do so impliedly. They are asserted against the City of Newark and ECPO, but are based on actions taken by individual employees such as Det. Eutsey, who is an employee of the City of Newark, or Assistant Prosecutor Laurino and Investigator Bolan, who are employees of ECPO. To the extent that the claims survive against those employees, I must consider whether vicarious liability flows to Newark or the ECPO.

A municipality is not vicariously liable via *respondeat superior* for the constitutional torts of its officials. *Polk County v. Dodson*, 454 U.S. 312, 325, 102 S. Ct. 445 (1981) ("[S]ection 1983 will not support a claim based on a respondeat superior theory of liability."); N.J. Stat. Ann. § 59:2–10 ("A public entity is not liable for the acts or omissions of a public employee constituting a crime, actual fraud, actual malice, or willful misconduct."); *Hoag v. Brown*, 935 A.2d 1218, 1230 (N.J. Super. Ct. App. Div. 2007) ("[T]here can be no vicarious liability by a public entity for the intentional torts committed by its employees; that is, with respect to such intentional torts, the theory of respondeat superior does not apply.").

Rather, a plaintiff must show that any violation of his constitutional rights "implement[ed] or execute[d] a policy, regulation or decision officially adopted by the governing body or informally adopted by custom." *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996). "In other words, the [municipality] may not be held liable for constitutional torts under § 1983 on a vicarious liability theory rooted in respondeat superior but 'it can be held

---

identity of the assailant; logically, the assailant's (male) DNA was not on the slide at all.  It did not demonstrate that Roberts (or anyone else) was the assailant, and did not exclude Roberts (or anyone else) as the assailant. It did perhaps suggest, however, that the picture was incomplete and that more investigation of the rape kit would be required.

responsible as an entity when the injury inflicted is permitted under its adopted policy or custom.'" *Mulholland v. Gov't Cnty. of Berks, Pa.*, 706 F.3d 227, 237 (3d Cir. 2013) (citing *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990) and quoting *Beck*, 89 F.3d at 971).

"Policy is made when a decisionmaker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict." *Andrews*, 895 F.2d at 1480 (internal citations omitted). "An official has policymaking authority for *Monell* purposes when the official is responsible as a matter of state law for making policy in the particular area of county business in question, and the official's authority to make policy in that area is final and unreviewable." *Mulholland*, 706 F.3d at 237 (citing *Hill v. Borough of Kutztown*, 455 F.3d 225, 245–46 (3d Cir. 2006)).

"Custom" is a course of conduct which, although not formally authorized by law, is "so permanent and well-settled" as to virtually constitute law. *Andrews*, 895 F.2d at 1480 (internal citations omitted). "Custom ... may also be established by evidence of knowledge and acquiescence." *Beck*, 89 F.3d at 971.

A boilerplate allegation of municipal custom or practice will often be insufficient. A single incident involving a single officer—use of excessive force in an arrest-related tussle, for example—might well flow from individual fault only; it would not necessarily give rise to an inference that there was something wrong with municipal policy. Here, however, there is an alleged course of conduct extending over a decade. In Count 5, Roberts alleges that Newark and ECPO perpetuated a practice or custom of inadequate evidence management. (Compl. ¶ 188) The basis for this allegation is that the original, complete rape kit was missing between 1996 and 2007, and the entire kit was not produced until 2013; that only portions of it were located and submitted for DNA testing in 2005; and that this mismanagement delayed Roberts's exoneration for years. The test that was initially performed allegedly could not be conclusive (and was ruled inconclusive). That occurred because the slide samples were singled out for analysis, for reasons that are not satisfactorily explained. The entire rape

kit was not produced for many years, also for unexplained reasons. An inference that there was something wrong with (at least) the filing and storage system for rape kits is not inevitable, but it is not implausible, either.

Accordingly, I find that the Complaint adequately alleges a policy, practice, or custom implemented or executed by the City of Newark or ECPO. Discovery may or may not reveal such a policy, but I will permit such discovery to go forward. The motion to dismiss the complaint against the City and the ECPO on *Monell* grounds is denied.

## CONCLUSION

For the reasons set forth above, the motions to dismiss the Complaint brought by defendants (1) the City of Newark (Dkt. No. 24); (2) ECPO, Assistant Prosecutor Laurino, and Investigator Bolan (Dkt. No. 30); and (3) Assistant Public Defenders Martone and Van Jura (Dkt. No. 35) (together, the "Movants") are granted in part and denied in part.

In response, the Plaintiff has voluntarily dismissed the following counts against the Movants: Counts 1, 3, 4, 8, 9, 11, and 12. These are deemed dismissed.

In accordance with the foregoing opinion, the Court decides the motions as follows. Count 6 is dismissed only as against Assistant Prosecutor Laurino and Investigator Bolan. Count 15 is dismissed only as against Assistant Public Defender Martone, and only to the extent the claim is premised on a failure to warn of the potential for civil commitment. Those dismissals of Counts 6 and 15 are without prejudice to the filing of an amended complaint within 30 days.

The non-dismissed claims which remain as against the Movants therefore are as follows:

Count 2 (Section 1983 Fabrication of Evidence) against Laurino and Bolan

Count 5 (Section 1983 Due Process) against Laurino and Bolan

Count 7 (Section 1983 Supervisory Liability) against Laurino

Count 10 (Fabrication of Evidence) against Laurino and Bolan

Count 13 (Negligence) against Laurino and Bolan

Count 14 (Vicarious Liability) against ECPO and City of Newark

Count 15 (Legal Malpractice) against Martone (to the extent the claim is

premised on a failure to warn of parole consequences) and Van Jura

No opinion is expressed as to the pending motion to dismiss filed by Detective

Eutsey.

An appropriate order follows.

Dated:  August 12, 2016

_____

**HON. KEVIN MCNULTY, U.S.D.J.**