Mirel Fisch, Esq.
The Law Office of Anthony M. Grandinette
*Attorneys for Plaintiff*
114 Old Country Road, Suite 420
Mineola, New York 11501
(516) 877-2889

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
-------------------------------------------------------------X

RODNEY R. ROBERTS,                          Docket No. 15-cv-7061 (KM) (JBC)

                    Plaintiff,

              -against-

COUNTY OF ESSEX, CITY OF NEWARK,            **AMENDED COMPLAINT**
DETECTIVE DERRICK EUTSEY,
ESSEX COUNTY PROSECUTOR'S OFFICE,
ASSISTANT PROSECUTOR ROBERT D.              **JURY TRIAL DEMANDED**
LAURINO, INVESTIGATOR MICHELE R.
BOLAN a/k/a MICHELLE R. BOWIN,
ASSISTANT DEPUTY PUBLIC
DEFENDER CHARLES MARTONE, and
ASSISTANT DEPUTY PUBLIC DEFENDER
STEFAN J. VAN JURA,

                    Defendants.
-------------------------------------------------------------X

       Plaintiff RODNEY R. ROBERTS, by and through his attorneys, THE LAW OFFICE OF
ANTHONY M. GRANDINETTE, alleges as follows:


                     **JURISDICTION AND VENUE**

   1.   This action is brought pursuant to 42 U.S.C. §§ 1983, and 1988, the First, Fourth, and
Fourteenth Amendments to the United States Constitution, Due Process, and the Constitution and
laws of the State of New Jersey.

   2.   Jurisdiction is founded upon 28 U.S.C. §§ 1331, 1343, and 2202.

   3.   Plaintiff further invokes the supplemental jurisdiction of this Court to adjudicate pendant
state law claims, as well as pendent-party jurisdiction, pursuant to 28 U.S.C. § 1367.

   4.   Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).

1

## PARTIES

5.    Plaintiff RODNEY R. ROBERTS ("Roberts"), is a resident of Essex County, State of New Jersey.

6.    Defendant COUNTY OF ESSEX ("Essex County"), is a county within the State of New Jersey and the public employer of Detective Derrick Eutsey, Assistant Prosecutor Robert D. Laurino, Investigator Michele R. Bolan a/k/a Michele R. Bowin, who are named as defendants in this action, as well as other individuals whose conduct is at issue in this case.

7.    Defendant CITY OF NEWARK was at all relevant times the public employer of Detective Derrick Eutsey who is named as a defendant in this action, as well as other individuals whose conduct is at issue in this case.

8.    Plaintiff withdrew his claims against the Newark Police Department, and removed references to the Newark Police Department as a named defendant from the causes of action.

9.    Defendant DETECTIVE DERRICK EUTSEY ("Det. Eutsey") was at all relevant times an employee or retired employee of Defendants Essex County, City of Newark, and the Newark Police Department, and at all relevant times acted under color of state law and within the scope of his employment and in his individual capacity. Det. Eutsey is being sued in his individual and official capacities.

10.    Defendant ESSEX COUNTY PROSECUTOR'S OFFICE ("Prosecutor's Office") was at all relevant times the public employer of Assistant Prosecutor Roberts D. Laurino and Investigator Michele R. Bolan a/k/a Michelle Bowin, who are named as defendants in this action. Eleventh Amendment immunity does not apply as the Prosecutor's Office's employees named as defendants performed administrative tasks unrelated to their strict prosecutorial functions.

11.    Defendant ASSISTANT PROSECUTOR ROBERT D. LAURINO ("Laurino") was at all relevant times an employee of Defendant Essex County, and the Essex County Prosecutor's Office, and at all relevant times acted under color of state law and within the scope of his employment and in his individual capacity, however Laurino did not act in a prosecutorial function, and therefore is not entitled to absolute immunity. Laurino is being sued in his individual and official capacities.

12.    Defendant INVESTIGATOR MICHELE R. BOLAN a/k/a MICHELLE BOWIN ("Investigator Bolan") was at all relevant times an employee of Defendant Essex County, and the Essex County Prosecutor's Office, and at all relevant times acted under color of state law and within the scope of her employment and in her individual capacity. Investigator Bolan is being sued in her individual and official capacities

13.    Defendant ASSISTANT DEPUTY PUBLIC DEFENDER CHARLES MARTONE, Esq. ("Martone") was at all relevant times an Assistant Deputy Public Defender employed by the State of New Jersey Office of the Public Defender, and at all relevant times acted within the scope of his employment and in his individual capacity.

14.    Defendant ASSISTANT DEPUTY PUBLIC DEFENDER STEFAN J. VAN JURA, Esq. ("Van Jura") was at all relevant times an Assistant Public Defender employed by the State of New Jersey Office of the Public Defender, and at all relevant times acted within the scope of his employment and in his individual capacity.

## NEW JERSEY NOTICE OF CLAIM REQUIREMENTS

15.    Plaintiff filed a timely Notices of Claim against Essex County, Essex County Prosecutor's Office, City of Newark, Newark Police Department, and the Essex County Public Defender's Office, in compliance with the New Jersey Tort Claims Act. *See* Exhibit A.

16.    This action has been commenced within two years after the happening of the events upon which these claims arise, and six years within the happening of the events upon which the professional negligence and attorney malpractice claims arise.

## FACTUAL AND GENERAL ALLEGATIONS

17.    DNA evidence from a May 8, 1996 rape kit conclusive proved that Roberts did <u>not</u> rape a 17 year old girl on May 8, 1996. That rape kit was first analyzed on **July 18, 1996.** Despite that fact, Roberts was not released from the custody of the State of New Jersey until March 12, 2014 due to that alleged rape.

## THE CRIME

18.    On May 8, 1996, Sheronda Atwell ("Ms. Atwell"), age 17, left her home located at 109 South Burnett Street, in East Orange, New Jersey, at approximately 12:45 AM, and headed toward her aunt's house located on South 8th Street and South Orange Avenue, in Newark, New Jersey.

19.    At approximately 1:10 AM, while walking south on South 18th Street near Central Avenue in Newark, New Jersey, a male black unknown to Ms. Atwell, who was seated on a rock at that intersection, started talking to Atwell, and asked if he could walk with her. After Ms. Atwell stated that "no" he cannot walk with her, the male black attempted to engage Ms. Atwell in conversation several times, however she rejected his advancements.

20.    Ms. Atwell continued walking down South 18th Street, alongside Fairmount Cemetery, and the black male started following behind her. At or near the intersection of South 18th Street and 12th Avenue, the male black stated to Ms. Atwell that someone wanted to meet her across the street by the cemetery. When Ms. Atwell did not respond, the male black put his hand over Ms. Atwell's mouth and threatened her if she screamed. At this point, a car drove past the area, and the male black released Ms. Atwell and started walking away from her. However as soon as the car passed, the male black ran up behind Ms. Atwell, put his hand over her mouth, and ordered her to "shut up" and keep walking.

21.     The male black then dragged Ms. Atwell near an empty lot near the intersection of South 18th Street and 12th Avenue, across the street from Fairmount Cemetery. He ordered her first to bend over and pull her pants down, but then ordered her to lay down on the ground on her stomach. Ms. Atwell complied, at which time the male black ripped off her shoes, stockings, and underwear, and raped her. The male black was behind Ms. Atwell the entire time. He did not wear a condom and he ejaculated into Ms. Atwell. When he stood up, he ordered Ms. Atwell not to get up until he left the area otherwise he would "blow her head off," and then told her "Remember Jeff" as he ran away. Ms. Atwell remained on the ground for approximately five minutes, after which she put her clothing back on, and walked around the corner where she spotted an individual and asked him to call the police.

22.     Ms. Atwell was assault near an abandoned lot across the street from Fairmount Cemetery. The lighting conditions were poor and it had been raining that night, and Ms. Atwell did not have a good opportunity to view her assailant's face.

## ROBERTS' PROSECUTION ABSENT PROBABLE CAUSE
## AND HIS CONVICTION FOR KIDNAPPING

23.     Police Officer M. Hill, ID No. 7453 responded to the call. He interviewed Ms. Atwell, who described her assailant as male, black, age 20, 5'7" and weighing 185 lbs. *See* Exhibit B.

24.     EMS transported Ms. Atwell to United Hospitals Medical Center where Detective Kosa of the Newark Police Department Sexual Assault Rape Analysis Unit was notified, and a rape kit was conducted within two hours of the rape.

25.     That same day, Ms. Atwell's mother signed a Rape Evidence Kit release, authorizing the United Hospitals Medical Center to release the Rape Evidence Kit to the Newark Police Department "to aid them in the prosecution of the rapist." It was submitted to the Newark Police Department at 3:50 AM. *See* Exhibit C.

26.     While at the hospital, an unknown suspect was brought to Ms. Atwell's room, however she was unable to make an identification of her assailant.

27.     On May 14, 1996, Det. Eutsey responded to Ms. Atwell's home and brought her to the Newark Police Department Sexual Assault Section. He interviewed her, and provided her with a book containing mugshot photos. Ms. Atwell was emotional and started crying as she reviewed these mugshot photos, however she was unable to identify her assailant.

28.     Notwithstanding that Ms. Atwell was unable to identify her assailant from the photos shown to her by Det. Eutsey, Det. Eutsey intentionally created a false Continuation Report in which he stated that Ms. Atwell "began to cry uncontrollably as she stopped at a black & white photo of a black male" whom she positively identified as her assailant from May 8, 1996, and that Ms. Atwell signed and dated a photocopy of that photograph. Det. Eutsey falsely stated in his report that Ms. Atwell identified a photograph containing a picture of Roberts. *See* Exhibit D.

4

Despite repeated requests by Roberts' attorneys, this photograph has never been produced, to date, and defendants claim that it was "lost."

29.  Ms. Atwell initially described her assailant as 20 years old, 5' 7" and weighing 185 lbs. *See* Exhibit B at 1.

30.  Roberts' date of birth is July 25, 1966, and in May 1996, Roberts was 29 years old, 5' 6" and weighed 148 lbs. *See* Exhibit E at 1. He was previously arrested 1986, and therefore his last mugshot was previously taken ten years prior to May 8, 1996.

31.  Det. Eutsey knew or should have known that Ms. Atwell's initial description of her assailant did not match Roberts' physical description, and that Roberts' mugshot taken ten years earlier when he was 19 years old did not reflect how he appeared on May 8, 1996, when he was 29 years old.

32.  Det. Eutsey did not conduct a lineup, did not ask Ms. Atwell whether she recognized Roberts' voice, did not follow up to determine the results of the rape kit, or conduct any further investigation to determine whether Roberts was the assailant or whether he had an alibi. Det. Eutsey did not either investigate any other suspects.

33.  Det. Eutsey manufactured false evidence, reports, statements, warrants, and identification, and did so intentionally and/or in reckless disregard for the truth, then presented the ensemble to the courts, and eventually to counsel.

34.  On May 16, 1996, Det. Eutsey responded to the Newark Municipal Prosecutor's Office, and submitted his fabricated Continuation Report to Assistant Prosecutor Prosper Bellzia, which included the false statements regarding Ms. Atwell positively identifying Roberts as her assailant, so that an application could be made to obtain a warrant for Roberts' arrest.

35.  Det. Eutsey appeared before the Honorable Judge L. Cruz of the Newark Municipal Court, and after intentionally and/or recklessly misrepresenting the facts of the investigation to Judge Cruz and submitting the fabricated reports and statements, two warrants were issued for Roberts' arrest on May 17, 1996; one for aggravated sexual assault, and one for kidnapping. *See* Exhibit F. Without the false information, the warrants for Roberts' arrest would not have been issued because the false information was material to a finding of probable cause for the arrest warrants.

36.  The Prosecutor's Office did not present these charges to a grand jury, and therefore did not obtain an indictment against Roberts.

37.  On May 25, 1996, Roberts was arrested on an unrelated theft charge in East Orange City, Essex County, New Jersey. This arrest resulted in a parole violation from a prior 1986 conviction.Roberts plead guilty to theft in the third degree on June 12, 1996, but was not sentenced on that date. Roberts was not released on bail pending sentencing on the theft charges due to the sexual assault and kidnapping charges. *See* Exhibit G.

38.   On June 26, 1996, Roberts was made aware of the pending sexual assault and kidnapping charges, and was produced in the Newark Municipal Court to be arraigned on those charged. Roberts plead not guilty.

39.   On July 16, 1996, Roberts was transported to the holding cell area in the Essex County Courthouse, and was to appear before the Honorable Eugene J. Codey, Jr. ("Judge Codey"). Prior to appearing before the Court, Martone, approached Roberts in the holding cell area, and advised Roberts that he had been assigned to represent him on the sexual assault and kidnapping charges. Roberts had never met or spoken with Martone prior to meeting him in the holding cell area on July 16, 1996.

40.   Martone informed Roberts that the prosecutor offered the following plea agreement—in exchange for a guilty plea to Kidnapping in the Second Degree, the charge of Aggravated Sexual Assault in the First Degree would be dismissed, and the prosecutor would recommend that he be sentenced on the Kidnapping charge to seven years flat, to run concurrently with the three years he would be sentenced to for the parole violation. Additionally, as to The Theft charge he had already plead guilty to, he would be sentenced to three years flat for that charge, which would also run concurrently with the sentence for the parole violation. *See* Exhibit H; Exhibit I.

41.    Martone assured Roberts that the sexual assault charge would be removed from the record and dismissed with prejudice, and that it could not be used to penalize Roberts in any future proceedings.

42.   Roberts advised Martone that he was not guilty of the sexual assault or kidnapping, and that he would not accept the prosecutor's offer. Martone then left the holding cell area. He returned approximately 20-25 minutes later, and advised Roberts that he met with the victim, a girl named "Sheronda," who was in the courthouse, and that she told him she had positively identified Roberts as her assailant, and was prepared to do so again in open court that day. Martone further advised Roberts that Sheronda had identified him in a photograph, and that Martone's independent investigation confirmed her identity and the accuracy of the police reports.

43.   Roberts insisted that he did not rape or kidnap anyone, and that he was innocent of the charges. Martone asked Roberts whether he knew any women named Sheronda. Roberts knew three women by that name from the neighborhood. He informed Martone that approximately one year earlier, he was in a car with a girl named Sheronda whose last name he did not know, but that he sent her from the car when he learned she was underage. He told Martone that he had since seen this girl several times on the streets of his neighborhood, but that there had never been a problem between them. Martone represented to Roberts that the victim in this case is likely the same "Sheronda" whom Roberts had sent from his car the previous year.

44.   Despite the fact that Roberts repeatedly asserted that he was innocent of the charges, Martone advised Roberts that based upon his investigation and the victim's identification, the prosecutor had a solid case, Roberts would lose at trial, and he risked spending the rest of his life in prison if he did not accept the offer. Martone further advised Roberts that based upon Roberts'

criminal history, it was in his best interest to accept the offer, particularly given that he would be serving the first three years concurrently with the parole and theft sentences.

45.   Martone later testified that all the information he provided to Roberts at that initial meeting was relayed to him by the prosecutor's office immediately prior to meeting Roberts.

46.   Roberts accepted the plea agreement after the prosecutor agreed to place on the record that no one had been harmed during the kidnapping. The plea allocution to Kidnapping in the Second Degree consisted of the following questions and answers before Judge Codey:

DIRECT EXAMINATION BY DEFENSE ATTORNEY:

Q        Mr. Roberts, I call your attention to the 8th of May of this year in the city of Newark. At that time and place did you hold one -- an individual, age 17, with the initials S.A. against her will and prevent her from leaving with the intent to assault her?
A        Yes.
DEFENSE ATTORNEY:        No further questions Your Honor.
THE COURT: Okay. That's more than sufficient factual basis.
BY THE COURT:
Q        Did you move her anywhere?
DEFENSE ATTORNEY: From one location to another.
BY THE COURT:
Q        One -- one location to another?
A        Yes. Yes.
THE COURT: Okay. That -- that satisfies the elements of a kidnapping. . . .

*See* Exhibit I at 4-5. Before and after this plea allocution, Roberts had always maintained his innocence.

47.   On October 17, 1996, Roberts was sentenced by Judge Codey to the New Jersey State Prison, according to the terms of the pleas agreement—seven years for the kidnapping charge, to run concurrently to the sentence for the parole violation, and three years for the theft charge, also to run concurrently to the sentence for the parole violation. Judge Codey stated on the record that as to the kidnapping charge, "the victim on the kidnapping didn't get hurt, got released unharmed. That's why they kept it down to a second degree." The charge for aggravated sexual assault was dismissed at this time. *See* Exhibit J.

## ROBERTS WAS DENIED PAROLE DUE TO THE
## UNLAWFUL SEXUAL ASSAULT AND KIDNAPPING CHARGES

48.   On October 30, 1996, while in the custody of the New Jersey Department of Corrections, the New Jersey State Parole Board revoked Roberts' parole and ordered him to serve a parole eligibility term of 28 months.

49.   Roberts first appeared before the New Jersey State Parole Board for a parole release hearing on April 16, 1998. Roberts was denied parole given that his file maintained by the Department of Corrections indicated that he had "forced a 17 year old girl into a secluded area and forced her to have sex with him, stating that he defendant would blow off her head if she did not comply."

50.   On May 25, 2000, the New Jersey State Parole Board denied Roberts parole again based upon the alleged aggravated sexual assault, and established a twenty-seven month future eligibility term. Roberts appealed the decision, and on December 4, 2000, the denial was affirmed based upon the fact that

> the Parole Board must rely on the information provided by the Department of Corrections. According to that information, [Roberts] did force the victim to a secluded area and did force her to have sex with [him]. Although the Sexual Assault Charge was dismissed as part of the plea agreement, the circumstance of the offense do not change.

*See* Exhibit K.

51.   On January 12, 2001, Roberts filed a *pro se* motion to withdraw his guilty plea based upon Martone's ineffective assistance of counsel, and his misrepresentations that the sexual assault charge could not be used to penalize Roberts in any future proceedings.

52.   The matter was forwarded to the Office of the Public Defender on January 17, 2001 for the assignment of counsel, and was given a February 16, 2001 control date before Judge Codey. However on January 18, 2001, before a Public Defender had been assigned, Judge Codey denied Roberts' motion.

53.   On June 24, 2003, the New Jersey State Parole Board denied Roberts parole again based upon the alleged aggravated sexual assault, and established a fourteen month future eligibility term. Roberts appealed the decision, and on October 29, 2003, the denial was affirmed based upon the fact that Roberts would not accept responsibility for the rape, and that he "minimized [his] conduct." Furthermore, despite the fact that Roberts had not pled guilty to the sexual assault charge, "the Board noted that it must consider the information provided by the Department of Corrections." *See* Exhibit L.

54.   Roberts maxed out his criminal sentence, and on June 1, 2004, he was transferred to the Special Treatment Unit and involuntarily committed as a sexually violent predator pursuant to

N.J.S.A. 30:4-27.31. Assistant Deputy Public Defender John Douard, Esq. ("Douard") was assigned to represent Roberts in his Sexually Violent Predator's Act hearings.

## ROBERTS' CIVIL CONFINEMENT DUE TO THE
## UNLAWFUL SEXUAL ASSAULT AND KIDNAPPING CHARGES

55.   On October 1, 2001, while in the New Jersey State Prison, Roberts underwent a psychological evaluation. The purpose of the evaluation was to determine whether Roberts met the criteria for involuntary civil commitment. The Psychological Evaluation report dated October 18, 2001 stated that Roberts

> CONTINUES TO DENY RESPONSIBILITY FOR HIS BEHAVIOR, AS HE CLAIMS HE IS INNOCENT . . . DENIAL IS OPERANT, WITH LIKELIHOOD OF FURTHER ACTING OUT, IN THE EVENT THAT HE IS GIVEN THE OPPORTUNITY TO BE IN A SITUATION, WHRE IS HIS UNSUPERVISED.
> . . .
>
> THE RESULTS OF THE ACTUARIAL MEASURES THE HISTORY AND THE CLINICAL IMPRESSION MEET THE CRITERIA FOR CIVIL COMMITMENT.

*See* Exhibit M at 2.

56.   Therefore it was recommend that Roberts not be release based upon the fact that Roberts

> PRESENTS WITH MINIMAL CHARACTER CHANGE. HE CONTINUES TO BE A HIGH RISK OF REOFFENDING, AS HE HAS PERHAPS LEARNED TO VERBALIZE WHAT IS EXPECTED OF HIM, BUT SHOWS NO INSIGHT INTO THE MOTIVE THAT RESULTED IN HIGHLY CRIMINAL BEHAVIORS. HE REAMINS A HIGH RISK AT REOFFENDING.

*See id.* at 3.

57.   On May 25, 2003 Roberts was again underwent a psychological evaluation. The purpose of the examination was to determine whether he should be referred to the Special Offenders Unit for sex offender treatment. The Psychological Evaluation report dated the same day stated that

> **in light of the inmate's 1986 conviction the DISMISSAL of his 1996 SEXUAL ASSAULT CHARGE suggests that there was insufficient evident to force a plea bargain for a sexual offense conviction. Inclusion of the details of the 1996 sex offense**

**allegations in question may, therefore, have artificially elevated actuarial scores involved in this evaluation.**

*See* Exhibit N at 3.

58.   Notwithstanding, the "Conclusions" stated that

> (1) Results suggest a MODERATE to HIGH RISK for sexual recidivism within the next ten years. Therefore, this case will be referred to the DAG's office for further psychiatric evaluation to determine whether the inmate meets the criteria for commitment as a sexually violent predator.

*See id.* at 3-4.

59.   Accordingly, the case was referred to the Deputy Attorney General's office for further psychiatric evaluation to determine whether Roberts met the criteria for commitment as a sexually violent predator.

60.   On January 24, 2004, Roberts was again subject to a psychological evaluation. The purpose of this examination was to determine whether Roberts should be referred to the Deputy Attorney General's office for further assessment as to whether he should be civilly committed pursuant to N.J.S.A. This assessment was also provided to the New Jersey State Parole Board for consideration at Roberts' Parole Board hearing. The Psychological Evaluation report dated the same day stated the following:

> Clinical impression: Actuarial data suggest that this inmate is a MODERATE to HIGH risk to commit another sex offense in the next 15 years. . . .
>
> General impression is of an intelligent man with deeply antisocial values. He generally takes very little responsibility for his own behavior, instead choosing to focus on technical and legal issues. The sexual offenses evidence a willingness to disregard the rights of others in the interest of sexual gratification. He is a poor parole risk.
>
> . . . Consequently, it is recommended that this inmate be referred to the DAG's office for further assessment of his suitability for commitment as a Sexually Violent Predator.

*See* Exhibit O.

61.   Accordingly, on May 19, 2004, the Attorney General's filed a Petition for Civil Commitment to commit Roberts to the Special Treatment Unit pursuant to New Jersey's Sexually Violent Predator's Act. *See* Exhibit P.

62.    The Petition for Civil Commitment had annexed to it in support, Roberts' 1986 and 1996 judgments of convictions, and two Clinical Certificates of Involuntary Commitment of Sexually Violent Predators which certified that Roberts was a sexually violent predator in need of involuntary commitment.

63.    Dr. Vasudev N. Makhija, MD, examined Roberts on May 18, 2004. In his Clinical Certificate, Dr. Makhija's found the "[p]resence of deviant sexual fantasies/behaviors" in that Roberts had a "[w]illingness to disregard the rights of others in the interest of sexual gratification. . . . He denies any deviant sexual fantasies. However, records suggest difficulty controlling his impulses." Dr. Makhija's further found in his Clinical Certificate "denial/attitudes condoning offenses or distorted thinking" in that Roberts

> . . . Deni[es] of any wrongdoing in 1996 offense that resulted in charges of Aggrav-sexual assault & kidnapping. In fact offered legal arguments concerning the fact that he was not convicted of sex offense in 1996. During prior psychological evaluations, he had offered rationalization of reasons to explain why he was not guilty. He portrayed himself as a victim of unfortunate circumstance of the system.

*See* Exhibit Q at 6.

64.    Accordingly, Dr. Makhija concluded that Roberts

> suffers from a mental abnormality (as defined by the Act) or personality disorder that makes the person likely to engage in acts of sexual violence if not confined to a secure facility for control, care and treatment.

*Id.* at 8-9.

65.    Dr. Donald ('Rusty') Reeves, MD also examined Roberts on May 18, 2004. In his Clinical Certificate, Dr. Reeves found the "[p]resence of deviant sexual fantasies/behaviors" in that ". . . Although [Roberts] was not convicted of a sex offense in 1996, and denies he committed the offense, I do not believe him. He did plead guilty to kidnapping which suggests he accepted culpability." Dr. Reeves further found in his Clinical Certificate "[p]atterns of escalating frequency of offenses, impulsivity and compulsiveness" in that Roberts' ". . . second offense suggests he was motivated by wounded pride as well as opportunity. First offense was motivated by opportunity and probably also by criminal loyalty. He progressed from a group rape to raping by himself - indicating increased dangerousness." Dr. Reeves further found in his Clinical Certificate, "[d]enial/attitudes condoning offenses or distorted thinking" in that "He denies offenses and/or blames others for leading him into crime. For example, . . . 1996 offense: he denies the offenses [illegible] the victim concocted story in retaliation for his dropping her off far from home." Accordingly, Dr. Reeves concluded that Roberts

suffers from a mental abnormality (as defined by the Act) or personality disorder that makes the person likely to engage in acts of sexual violence if not confined to a secure facility for control, care and treatment.

*See* Exhibit R.

66.   Douard, moved to dismiss the Petition for Civil Commitment on May 25, 2004. A probable cause hearing was held the following day, for the limited purpose of determining "whether the documentation provided to the judge satisfies the statuary requirements for commitment." At the conclusion of the hearing, the court found that the State satisfied its burden, and granted the Attorney General's application to temporarily involuntarily commit Roberts to the State of New Jersey Special Treatment Unit pending a final hearing on the matter.

67.   Roberts maxed out his criminal sentence, and on June 1, 2004, he was transferred to the Special Treatment Unit and involuntarily committed as a sexually violent predator pursuant to N.J.S.A. 30:4-27.31.

68.   An initial commitment hearing was held over the following days before the Honorable Serena Perretti, J.S.C.--December 9, 2004, December 5, 2005, January 9, 2006, and January 17, 2006.

69.   On December 9, 2004, Dr. Zeiguer testified that a rape kit had been performed in 1996 and that "there was a positive semen stain the swabs from the vagina. And the chemist ask [sic] for a sample from a suspect to compare it." *See* Exhibit S at 1. Dr. Zeiguer further testified that "I have a laboratory report where they are inviting to obtain saliva or blood from the suspect." *Id.* at 2. Duoard then attempted to solicit testimony as to whether, if there was a DNA test which excluded Roberts, that would affect his opinion. However, given that Roberts' DNA had never been compared to the semen found in the rape kit, Judge Perretti precluded Dr. Zeiguer from answering that question. *Id.* at 2-3.

70.   After Duoard became aware of the fact that a rape kit had been performed in 1996 which contained untested seminal stains, he requested an adjournment so that Roberts' DNA can be compared to the semen found in the rape kit. Despite Roberts and Douard's request, defendants withheld this evidence and did not provide the New Jersey State Police Office of Forensic Sciences ("Office of Forensic Science") with the complete rape kit. Although Roberts provided a buccal swab on March 10, 2005 to Investigator Bolan, defendants waited a year to take Ms. Atwell's buccal swab. Even after Ms. Atwell's buccal swab was taken, defendants did not even use it to compare it to the DNA in the rape kit. This is discussed further at *infra* ¶¶ 86-100.

71.   On January 19, 2006, Judge Perretti found that

> In the statement, the victim details the offense, indicates that she was accosted on the street by the respondent who was a stranger to her, taken into an alley and raped.

>The respondent's story of the incident varies strikingly from the victim's statement. The kidnapping conviction is considered by the state's expert, Dr. Luis Zeiguer, as a sex offense.

*See* Exhibit T at 1-2.

>[t]here is evidence in the record that [Ms. Atwell] was taken by police after the alleged incident to a hospital where she was examined as a possible rape victim and tests were accordingly performed. A rape kit was made. **Recent D.N.A. analysis were inconclusive**. . . .  That a complainant would subject herself to such examination tends to lend credence to her complaint.
>
>In addition, it is indisputable that [Roberts] entered a guilty plea to the portion of the charge which alleged kidnapping with intent to assault. On the other hand, [Roberts'] denial is far-fetched.

*Id.* at 3-4 (emphasis added).

72.   Judge Perretti then committed Roberts to the State of New Jersey Special Treatment Unit as a sexually violent offender. Judgment was entered on January 25, 2006. Roberts' appeal was denied.

73.   Roberts participated in various treatment programs at the Special Treatment Unit. However, because Roberts did not rape Ms. Atwell, he refused to admit to doing so. Roberts was repeatedly found to deny the rape, appeared to be minimizing his alleged unlawful conduct, and focused instead on legal justifications for his acts and that fact that DNA evidence exonerated him.  Accordingly, the Multidisciplinary Treatment Team Reports, and Special Treatment Unit Treatment Progress Review Committee ("TPRC") continuously recommended that he be kept in "Phase (2) of the treatment," which prevented him from progressing through the treatment process which would have permitted him to be released from involuntary civil commitment.

74.   As a result, during the subsequent review hearings over the course of the years following the initial commitment hearing, Roberts was repeatedly found to be a sexually violent predator in need of involuntary civil commitment, and was therefore confined to the Special Treatment Unit against his will. As one court found, for example, Roberts "is in the very beginning stages of treatment, . . . he has a very long way to go at this point."

75.   The TPRC stated on April 19, 2012 that "[d]ue to the ongoing nature of [Roberts'] Post Conviction Relief efforts, no discernible modifications can be made to Mr. Roberts' current treatment plan or treatment trajectory. In the event that Mr. Roberts is deemed innocent of this offense, his risk to sexually recidivate will be re-evaluated. . . ." *See* Exhibit U.

**MS. ATWELL DENIES IDENTIFYING ROBERTS AS HER ASSAILANT**

76.   On or between September 20, 2004, and December 17, 2004, Douard, and Ronald Price, an investigator for the Office of the Public Defender ("Price"), interviewed Ms. Atwell regarding the May 8, 1996 rape. *See* Exhibit V.

77.   Ms. Atwell advised Douard and Price that after the assault she was taken to the hospital, where the police brought a suspect to her room and asked her whether she could identify him as her assailant. However, Ms. Atwell advised the police that she could not identify her assailant. Furthermore, she advised Douard and Price that she had never made a photo identification of her assailant, and that she did not even know that anyone had even been arrested for the assault.

78.   On September 27, 2005, Douard and Price interviewed Ms. Atwell again. Douard had prepared the following statement based upon what Ms. Atwell had advised them the year before:

> I, Sheronda Atwell, after being sexually assaulted on or about May 08, 1996, was taken to the hospital by police investigators. I remained there for ___ days. At some point while I was in the hospital, a police officer brought a suspect to my room and asked me if I could positively identify him as my assailant. I told the police officer I was not able to make a positive identification. [Sentence struck out and initialed by Ms. Atwell]. I was unaware that a suspect had been indicted for the assault.

*See* Exhibit W.

79.   Ms. Atwell signed the above statement, and then dictated the following additional statement, which Price handwrote on the same document:

> I did give as [sic] statement to the police, but please note that when I was taken to the police station shortly after the assault, I was shown photos of possible assailants & could not identify any as my assailant.
>
> After the events transpired & my visits to the police, no one ever got in contact with me until you (John Douard, ADPD & Ronald Price, Investigator) showed up last year.

*Id.*

80.   On June 22, 2007, Ms. Atwell re-certified the truth of her prior September 27, 2005 statement. *See* Exhibit X.

81.   On October 27, 2009, during the plenary hearing regarding Ms. Atwell's September 27, 2005 statement, she testified that she did not recognize Roberts, who was seated at the defense table in that courtroom, that she had never seen him before, and that she had never made a photo

identification of him or anyone else. She further stated that "I would like to make a statement. . . . I want to know why did you confess to something that you didn't do to me? . . ." *See* Exhibit Y.

## DEFENDANTS WITHHELD EXCULPATORY DNA EVIDENCE WHICH ULTIMATELY EXONERATED ROBERTS

82.   On May 29, 1996, 21 days after Ms. Atwell was assaulted, the Newark Police Forensic Laboratory received the rape kit, which had been conducted on May 8, 1996 within hours of the rape, from Detective White of the Newark Police Department Sexual Assault Rape Analysis Unit. *See* Exhibit Z at 1. It was examined on July 18, 1996, and it tested "positive" for "seminal stains." The forensic scientist who tested the materials in the rape kit stated in his Serology Report that the vaginal swab contained "moderate whole spermatozo + heads," and therefore made the following "**Comments:** Request samples of blood and saliva from the defendant for the purpose of comparison." *Id.* at 1-2.

83.   Despite the fact that the rape kit tested positive for seminal stains and that Newark Police Forensic Laboratory requested Roberts' DNA for comparison, seminal stains were not compared with Roberts' DNA.

84.   In 2002, Roberts contacted the Attorney General's Office and requested that a DNA test be conducted to rule him out as Ms. Atwell's assailant, however he was advised that there was no DNA to test.

85.   On September 16, 2004, Dr. Robert S. Carlson, Psy.D, prepared a report after examining Roberts, that according to the police records, a rape kit evaluation was performed in 1996.

86.   Dr. Zeiguer, one of the State's expert witnesses, testified on December 9, 2004 during the initial commitment hearing, that a rape kit had been performed and that "there was a positive semen stain the swabs from the vagina. And the chemist ask [sic] for a sample from a suspect to compare it," however that there was no indication that it had been done. He further testified that "I have a laboratory report where they are inviting to obtain saliva or blood from the suspect." *See* Exhibit S at 2.

87.   Accordingly, Douard wanted the DNA analysis to be conducted to conclusively exclude Roberts as the individual who raped Ms. Atwell. As a matter of trial strategy, prior to requesting the DNA analysis, Douard and Price interviewed Ms. Atwell on or between September 20, 2004, and December 17, 2004, who advised them that she had never identified her assailant. *See* Exhibit V; Exhibit W.

88.   Thereafter, on December 17, 2004, Douard wrote to Laurino, the Director of the Sexual Assault Response Team of the Essex County Prosecutor's Office, and advised him that although a rape kit was performed on Ms. Atwell, no DNA comparison had been made despite Roberts' request for a DNA test. He requested that a DNA test be performed and compared to the seminal stains preserved in the rape kit. *See* Exhibit AA.

89.   On March 10, 2005, Roberts executed a consent to take a buccal swab, and Bolan collected the buccal swab from Roberts that same day. *See* Exhibit BB.

90.   On March 22, 2005, Bolan submitted just one portion of Ms. Atwell's May 8, 1996 rape kit, along with Roberts' March 10, 2005 buccal swab, to the Office of Forensic Sciences for DNA testing. *See* Exhibit CC.

91.   That same day, Bolan called the Essex County Police Department Forensic Science Laboratory Section, and the following comments were recorded in a Communication Log:

> This case was originally examined by Newark P.D Lab in 1996
> "Post conviction" court ordered to re examine DNA evidence
>
> As per Joe Petersack – submission to include original rape kit, lab
> notes from Newark P.D and suspect's buccal swab

*See* Exhibit DD.

92.   On April 14, 2005, an Essex County Forensic Scientist contacted Laurino, and recorded the following in a Communication Log:

> Comments: Regarding items in case. Only item received from Crime
> Unit were the vaginal slides & buccal swabs from suspect. The kit
> did not contain the vaginal swab, genital swab or the victim's saliva
> control. He will look into it & get back to me.

*See* Exhibit EE.

93.   Despite Laurino's assurance that he would look into obtaining the complete rape kit, he did not do so.

94.   Rather, on April 18, 2005, the vaginal slides, and Roberts' buccal swabs, were resubmitted, however neither the complete rape kit, nor Ms. Atwell's buccal swabs, were submitted for comparison. *See* Exhibit FF at 1.

95.   On July 7, 2005, the same Essex County Forensic Scientist contacted Laurino again, and recorded the following comments in a Communication Log: "Regarding locating the vaginal swabs. He will look into it and get back to me." *See* Exhibit EE.

96.   On July 26, 2005, the same Essex County Forensic Scientist contacted Laurino again, and recorded the following comments in a Communication Log: "With regard to swabs, everything that Newark P.D. had was sent to lab. I advised him that we were going to scrape more of the slides to try to generate a profile – he agreed that this was okay." *See* Exhibit GG.

97.   Laurino however knew that the complete rape kit was *not* submitted to the Laboratory.

98.   On August 29, 2005, an Office of Forensic Sciences DNA Laboratory Report, was prepared, which stated the following:

> Rodney Roberts is excluded as a possible contributor to the DNA profile found in [the vaginal slide]. Barring a mutation, the source of the DNA profile found in [the vaginal slide] is female. . . . No conclusion can be reached concerning Sheronda Atwell as a possible contributor to the DNA profile obtained from the specimens examined without submission of her buccal swab control.

*See* Exhibit FF at 2.

99.   On September 12, 2005, Ms. Atwell came to the Essex County Prosecutor's Office to submit a buccal swab. Bolan collected the buccal swabs from Ms. Atwell, and submitted the swabs into the Essex County Prosecutor's Office property room. *See* Exhibit HH. Neither Investigator Bolan nor Laurino ever submitted this buccal swab to the Essex County Police Department Forensic Science Laboratory Section so that it can utilized to confirm that Ms. Atwell was the source of the vaginal slides Bolan submitted for testing on March 22, 2005.

100.   Rather, on October 6, 2005, Laurino forwarded a copy of the August 29, 2005 DNA Laboratory Report to Douard, knowing that the report was prepared *prior* to Ms. Atwell providing a buccal swab, and that Ms. Atwell's buccal swab was not submitted to the Laboratory for comparison despite the fact that defendants knew the report was useless without it. *See* Exhibit II.

101.   Laurino advised Roberts' attorneys that the results of the DNA test were inconclusive because although Roberts' DNA was not in the material that was tested, he could not be ruled out because the Laboratory could not make a full determination as the materials they were testing had degraded.

102.   While at the Prosecutor's Office on September 12, 2005, Ms. Atwell advised Investigator Bolan that nine months after the rape, on February 15, 1997, she had given birth to a son, I.A., whom she feared was the product of her May 8, 1996 rape. She asked Investigator Bolan that the Prosecutor's Office conduct a paternity test to determine whether their suspect fathered her child.

103.   Investigator Bolan consulted with Laurino, and they decided *not* to conduct the paternity test. Their claimed reason for declining to do the test, which would have proven, scientifically, that Roberts did not father the child Ms. Atwell gave birth to nine months after her rape, was because Ms. Atwell informed them that she had had a sexual relationship with an individual named Deion Way around the time she was raped, *see* Exhibit JJ, but, as she later testified, "that was after. It wasn't prior." *See* Exhibit Y at 8.

104.   A paternity test in 2005 would have excluded Roberts as I.A.'s father. Furthermore, defendants made absolutely no attempt to locate Mr. Way or any of his family members, or to ask Ms. Atwell how Mr. Way or any of his family members could be located, to conclusively determine who I.A.'s father was. Defendants did not even disclose to Roberts or his attorneys

that Ms. Atwell had a son whom she believed to be the product of her May 8, 1996 rape, and therefore precluded them from attempting to locate Mr. Way on their own.

105.  Assistant Prosecutor Clara M. Rodriguez ("Rodriguez") who prosecuted Roberts' post-conviction relief proceedings, later informed Judge Codey on July 26, 2007, that "at that point they dropped it, though, this is something that we could, I think, maybe look into in the future if, in fact, she believes that this child is a product of the sexual assault." *See* Exhibit KK at 10.

106.  On October 27, 2009, Judge Codey ordered that a paternity test be conducted to determine whether Roberts fathered Ms. Atwell's son.

107.  On December 3, 2009, Bolan submitted buccal swabs from Roberts, Ms. Atwell, and her son, to the NJSP Office of Forensic Sciences, for a paternity test. *See* Exhibit LL. Roberts, Ms. Atwell, and I.A.'s DNA were tested on December 30, 2009, and as expected, Roberts was scientifically determined <u>not</u> to be I.A.'s father. *See* Exhibit MM. Now that defendants finally submitted Ms. Atwell's buccal swab to the laboratory, the DNA Laboratory Report also stated that "the DNA profile of Sheronda Atwell matches the DNA profile" of the vaginal slides taken in 1996 and tested in August 1996. *Id.* at 2. This was the first time since Ms. Atwell submitted her buccal swab on September 12, 2005, that it had been forwarded to the laboratory to confirm that it was in fact her DNA profile that was being tested.

108.  If defendants had advised Roberts or his attorneys that Ms. Atwell believed she became pregnant during the May 8, 1996 rape, or submitted Ms. Atwell's buccal swabs when they were first taken from her, these conclusions would have been reached years sooner than 2009.

## ROBERTS' MOTIONS FOR POST-CONVICTION RELIEF

109.  On February 15, 2006, Roberts filed a *pro se* Motion for Post-Conviction Relief and to withdraw his guilty plea based upon Ms. Atwell's statements that she had never made an identification of her assailant, which indicated that the police report was a fabricated document, and that Martone provided ineffective assistance of counsel by misrepresented the facts to him, and induced him to plead guilty to the kidnapping charge. Roberts re-filed this motion on March 17, 2006.

110.  On April 3, 2006, an order was entered assigning counsel, but, on April 17, 2006, before counsel submitted any papers, Judge Codey again denied Roberts' motion, stating that "[t]he identical motion was already denied by me on January 18, 2001." Judge Codey also concluded that the motion was time-barred.

111.  Roberts appealed Judge Codey's denial of his motion, and on May 22, 2007, the Appellate Division reversed and remanded the case so that Roberts be afforded the assistance of counsel in demonstrating why his motion should not be considered time-barred.

112.  Van Jura was assigned to represent Roberts during his post-conviction relief proceedings.

113.  Judge Codey heard oral arguments on July 26, 2007, and thereafter on July 30, 2007 denied Roberts' motion for post-conviction relief. No testimony had been solicited.

114.  Based upon defendants' misrepresentations, prior to oral arguments, in her July 23, 2007 written memorandum of law to the court, Rodriguez misrepresented to the court that

> At the time of the incident in 1996, the forensic examination of the sex crimes kit would simply reveal whether the samples obtained were positive or negative for semen. The samples in this case revealed that the samples were positive for seminal fluid. At the request of the defendant, the Essex County Prosecutors Office obtained samples from the defendant and contacted the victim, who also provided samples, and located the sex crimes kit. The victim provided the samples on September 12, 2005. The samples and the sex crime kit in this matter were sent to the New Jersey State Police Laboratory for DNA analysis. The DNA examination did not provide conclusive results. The victim fully cooperated with the Essex County Prosecutor's Office in providing a sample.

Exhibit NN at 3.

> Defendant's additional point that the DNA evidence is inconclusive is just that - inconclusive. It is very convenient that almost 10 years after the crime and after the results are known that defendant can claim a more conclusive sample would have exonerated him all those years ago. A more definitive specimen could just have easily, and more likely would have, proven to be quite damning to the defendant.

*Id.* at 12.

115.  Based upon defendants' misrepresentations, Rodriguez also misrepresented to the court that Ms. Atwell's recantation statement was "suspect and not credible" because Ms. Atwell stated that until Douard and Price reached out to her, "no one" had contacted her, yet she had submitted a DNA sample at the Prosecutor's Office two weeks prior to signing the statement. *Id.* at 11-12.

116.  Defendants did not advise Roberts or his attorneys about I.A. who Ms. Atwell believed to be the product of her rape. Defendants did not advise Roberts or his attorneys that they did not submit the complete rape kit to the laboratory for comparison. Defendants did not advise Roberts or his attorneys that they did not submit Ms. Atwell's buccal swabs to the laboratory. Defendants did not advised Roberts or his attorneys that the laboratory repeatedly attempted to obtain the required DNA samples, and defendants did not even provide the laboratory notes to Roberts or his attorneys. Defendants intentionally lead Roberts and his attorneys, (and Judge Codey, as well as the PCR judge) to believe that they submitted all the DNA material within the State's

possession to the laboratory, but that there was simply insufficient material to be tested, the samples had degraded, and that the tests were inconclusive despite everyone cooperation.

117.  Defendants knew that Roberts and his attorneys (and the courts) would rely on their misrepresentations as to the DNA tests and results.

118.  Therefore, during oral arguments on the petition for post-conviction relief on July 26, 2007, Roberts' attorney, on behalf of Roberts, relied upon defendants misrepresentations, and argued that

> MR. VAN JURA: . . . Petitioner [ ] respectfully submits that a timely D.N.A. test would have proved inconclusive, if not exonerating him - - that is, if the test has been done a decade earlier. Thus, an examination of the victim's purported identification of Mr. Roberts was crucial.
> . . .
> THE COURT:      Didn't the Prosecutor's Office actually have Ms. Atwell (phonetic) come in on a subsequent date to try to get the -- more detailed samples for the D.N.A. purposes and also they took a -- sample again from him? That was sent to the State lab. And despite all of that extra work, the -- the results were still inconclusive.
> MR. VAN JURA:      Correct, your Honor. That's why I believe that at the time, if – I'm not sure to the extent the sample had degraded.
> THE COURT:      Right.
> MR. VAN JURA:      It -- it may have degraded less than our technology improved. The -- we submit that it -- it might well have been exonerated.
> THE COURT:      Right.
> MR. VAN JURA:      But, in any case, was -- was inclusive today.

*See* Exhibit KK at 1-3.

119.  Based upon defendants' misrepresentations, at oral arguments on July 26, 2007, Rodriguez misrepresented facts regarding the recantation and identification. She also misrepresented facts regarding the DNA testing, and argued that

> During that time period, your Honor, before your Honor receives the request of 2006, Mr. Roberts and Mr. Duard [sic] requested through the Innocence Project for a D.N.A. analysis of -- of -- of any materials that were kept there.
> As you -- and you understand and I, your Honor, I think you're aware I'm in the Sexual Assault Unit at the -- at the Prosecutor's Office. We get many, many, many requests for D.N.A.

through the Innocence Project. We never refuse one here in Essex County. We take every single -- we have to, first, find the material where it is. At the time period in 1996, Newark had its own laboratory. Conducted its own analysis. And this is the way that it had been done.

During that time period, the State and the County did not have availability to D.N.A., though. D.N.A. was in its beginning stages for the criminal justice system.

What we – what the analysis, including the State Police analysis in 1996 was, they could determine whether the -- there was semen inside the sexual assault kit and whether the person was a secretor or non-secretor and what blood type. And that would have been -- secretor or non-secretor, I believe, during that time period was 55 percent of the population were secretors. And so it was a blood analysis test. They could tell you he was within the 45 percent of -- of the population.

During that time period, the State found the sexual assault kit. Took it down to the State Police lab. They could not -- it was inconclusive as to the seminal part of it. What they found were cells associated with a female. Obviously, the victim in this case was a female.

Now, at this point, unfortunately, your Honor, it was -- Chief Assistant Prosecutor that was doing this particular case, because he handles the Innocence Project cases, but it is my understanding that during this time period, there was -- that report from the New Jersey State Police lab came in August 29th of 2005. **It indicated that, "We cannot tell if there's -- we can tell that there's a female major contributor. We can't give you anything regarding the male, even though there was semen**" -- Newark Police lab indicated that there was semen in that particular case.

The -- even though the New Jersey State Police lab report on 8/29/05 said -- 8/29/05 -- the office nor the Police department nor anyone would have received it earlier than that because it goes through a stringent supervisor review. The report was sent to the Public Defender's Office to Mr. Duard [sic] in October of that year.

In between that time, the victim apparently appeared at the office and indicated that she had an eight year old son that she believed was the product of the sexual assault from Mr. Roberts. And so at that time, she came in on September 12th, 2005. Spoke with the investigators. Wanted this -- this actual test to go forward. And apparently, when we -- when the -- when the office realized that there was nothing to test, at that point they dropped it, though, this is something that we could, I think, maybe look into in the future if, in fact, she believes that this child is a product of the sexual assault.

But at the time, because they could not determine anything and because I think the -- the -- that the -- the Motion itself was just in its four corners regarding whether there was any D.N.A. testing, it was dropped, Judge, in 2005.

*Id.* at 9-11 (emphasis added).

120.  However the rape kit was examined on July 18, 1996, and it tested "positive" for "seminal stains." The forensic scientist who tested the materials in the rape kit stated in his Serology Report that the vaginal swab contained "moderate whole spermatozo + heads," and therefore made the following "**Comments:** Request samples of blood and saliva from the defendant for the purpose of comparison." Notwithstanding, defendants intentionally misrepresented to Rodney, his attorneys, and the courts, that the complete rape kit was submitted for testing but that the DNA material was degraded and the results were inconclusive.

121.  Van Jura however should have known that the DNA test was *not* inconclusive because he had the August 29, 2005 DNA Laboratory Report, which stated that "Rodney Roberts is excluded as a possible contributor to the DNA profile found in [the vaginal slide]." Van Jura should not have argued that the DNA test was inconclusive, and should not have allowed Rodriguez to get away with misrepresenting that fact to Judge Codey.

122.  Given defendants' misrepresentations, Judge Codey found that Ms. Atwell's recantation was "clearly false," and that

> . . . The New Jersey State Police Office of Forensic Sciences DNA Laboratory Report determined that no conclusion could be reached concerning Sheronda Atwell as a possible contributor to the DNA profile obtained from the specimens examined regarding this case.
> The alleged recantation, and the DNA results, are, thus, not legitimate grounds for granting the defendant the relief that he seeks.

*See* Exhibit OO at 4.

123.  Roberts again appealed the court's denial, and on July 17, 2009, the Appellate Division reversed, and remanded the case for a plenary hearing. The Appellate Division found that "if there was actually no positive identification by the victim, there might be additional grounds for relief," and accordingly determined that an evidentiary hearing was necessary given that Ms. Atwell's recantation conflicted with the statement she purportedly gave to police in 1996. *See* Exhibit PP at 14-16.

124.  The Appellate Division also found that Roberts' claims articulated a prima facie case for ineffective assistance of counsel against Martone based upon the facts summarized at *supra* ¶¶ 39-44, which overcame the strong presumption that "defense counsel 'rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment,'" and was therefore entitled to an evidentiary hearing on that basis.

22

> Roberts' argument is premised on the assertion that his defense
> attorney told him that the victim had identified him and that he,
> defense counsel, had verified that assertion, when, in fact, the victim
> had not made such a positive identification. If true, that would, in
> our view, constitute deficient representation.

*Id.* at 12-14.

125.  Van Jura was again assigned to represent Roberts during his post-conviction relief proceedings.

126.  Judge Codey held an evidentiary hearing on October 27, 2009 and April 27, 2010.

127.  Roberts testified at the hearing on October 27, 2009, and, relying on defendants' misrepresentations regarding the DNA results, testified that

> I – I contacted the Innocence Program in New York, tried to get them involved.
>
> I even contacted, I even asked Mr. Douard to initiate a DNA test, which occurred. The Essex County Prosecutor's Office came, took a swab test, sent to the lab, State lab, here in New Jersey.
>
> The results came back that it was inconclusive, that my DNA wasn't in the material that was found, but they couldn't rule me out because of the materials that they were testing had degraded to a certain degree, they couldn't make a full determination.
>
> As a result of that, I -- at that point, I was civilly committed at the Special Treatment Unit.

*See* Exhibit QQ.

128.  On October 27, 2009, Investigator Bolan testified that in September 2006, she had been assigned to the Sexual Assault Unit at the Essex County Prosecutor's Office. She was assigned to an "Innocence Project Case," and to obtain DNA from a victim. She contacted Ms. Atwell, and obtained a buccal swab at the Essex County Prosecutor's Office,

> at this point, Ms. Atwell stated to me that she had a sexual relationship around the same time of the sexual assault. So, there was no reason to take the sample.
>
> Q        So, did you consult with one of these prosecutors?
> A        Oh, absolutely. I spoke with -- I guess, he was director -- Bob -- Roberts Laurino, at the time.
> Q        And at that time, he decided not to take it, a paternity test?
> A        Exactly -- yes.

Exhibit JJ at 2-3.

129.  Det. Eutsey, who had since retired, also testified on October 27, 2009. When asked how Ms. Atwell allegedly identified Roberts as her assailant,

> A      Well, she became emotional. Now, I was -- as far as I can recollect, she identified the individual as a Jeff, and someone she seemed to know as Jeff. And upon viewing the various photos, she stopped at one particular photo and became emotional.
>
> When I queried her as to why she was, you know, she was -- had become emotional, rather, she said that that was the individual and pointed to an individual who was subsequent, you know, subsequently identified by -- in a gallery.

*See* Exhibit RR at 1.

> Q      How did you develop Mr. Roberts as a suspect? Why was -- well, let me -- let me put it a different way.
> A      After -- okay.
> Q      Why was his photo in any group of photos that might be identified?
> A      I would imagine, at that time, we had compiled various photos of individuals, either charged, charged or basically arr -- charged and prosecuted. Prosecuted and convicted of aggravated sexual assaults.

*Id.* at 4.

> Q      Did you have Ms. Atwell sign a -- a photograph of the individual that she identified or --
> A      I would --
> Q      -- that she became emotional over?
> A      I believe I would have.
> Q      Would you have had her sign the front or the back?
> A      I would have had her sign the back, probably, or the front of the -- of the front of the array.
> . . .
> All I can say is simply is the fact that the -- I -- it was made certain to me by her reaction, in addition to my query of her, that the individual responsible for the sexual assault was the individual that she had picked out.

*Id.* at 5.

130.  Det. Eutsey insisted that Ms. Atwell signed the photograph, however he did not know whether it still existed. He testified that because he was retired, he did not have access to the property room. *Id.* at 6-7.

131.  On October 27, 2009 Judge Codey ordered that a paternity test be conducted to determine whether Roberts fathered Ms. Atwell's son. "If it comes back that it's his child, end of case. If it doesn't, then we go in another direction." *See* Exhibit SS.

132.  On April 27, 2010, based upon defendants' misrepresentations Rodriguez falsely argued to the court that Ms. Atwell

> called the Essex County Prosecutor's Office Sex Crimes Unit and had asked for the paternity test because she believed Mr. Roberts was the father of her child. . . . This office refused to do that for her because the matter had been resolved, and that was not something that we were going to go and -- and conduct that type of -- of invasive testing when the matter had already been resolved.

*See* Exhibit TT.

133.  Judge Codey had directed Rodriguez to attempt to locate Roberts' file. Rodriguez stated that

> Okay, I've just spoken with the lieutenant that was assigned to the case. He says that the lieutenant in charge of the sex crimes unit did go through the record room and her record room because this case was not in the robbery homicide, it was in the sexual assault unit. He says we could, we could try it again, but that she was, she actually came in on a weekend on her off time to look for the file itself and could not find it in the sexual assault unit.

*See* Exhibit UU.

134.  On May 19, 2010, Judge Codey again denied Roberts' petition. He found that

## DISCUSSION

> . . .

> By the time of the plea, the police had a sworn statement from the victim, in which she had identified Mr. Roberts as her assailant on the basis of a photographic array.

> . . .

> Mr. Roberts relies on the victim's statement, signed in September 2005 and certified as true in June 2007, that she was never able to identify her assailant, even after viewing the photographic array. In response, the State asserts that there was, in fact, a positive identification of Mr. Roberts as the assailant by the

victim shortly after the assault, which identification was made in writing and under oath to Detective Derrick Eutsey of the Newark Police Department. As search of the Newark Police Department, and Essex County Prosecutor's record, property and storage areas for the photo in question determined that the case file, including the signed photograph is missing in its entirety. . . .

## LEGAL DISCUSSION

. . .

This alleged "recantation" statement must be compared to the sworn statement provided by Ms. Atwell to Detective Eutsey at the time of the incident where she positively identifies the defendant as her assailant, and signs her name and dates the back of Mr. Roberts police photo. I find Detective Eutsey's testimony at the plenary hearing to be truthful and credible. . . .

## DNA

The results of the 12/30/09 DNA Test that was Court ordered . . . is not dispositive of the identification issue in this matter. Ms. Atwell in her 10/27/09 testimony candidly admitted that she was having intimate sexual relations with an individual named Deion Way during the time period of the attack. The present location of Mr. Way is unknown and Ms. Atwell has not seen him in ten years, and has no idea where he currently resides.

The fact that Mr. Roberts is not the father of Ms. Atwell's child does not exclude him as the person who kidnapped her on May 8, 1996, the crime to which he voluntarily plead guilty.

## ADEQUACY OF COUNSEL

The testimony of Charles Martone, A.D.P.D. on April 27, 2010 repudiated all of Mr. Roberts' assertions regarding his alleged inadequate representation of Mr. Roberts. Mr. Martone categorically denied telling Mr. Roberts that he personal spoke to the victim who confirmed the identification of Mr. Roberts as her attacker, or that he conducted his own investigation of the crime. He also denieds that he coerced or forced Mr. Roberts to plead guilty to a crime that he did not commit. I find Mr. Martone to be a credible witness, unlike Mr. Roberts, and accept Mr. Martone's testimony as the truth.

. . .

26

> Finally, even assuming that counsel's performance could in some way be characterized as deficient, which I do not find, his conduct was not so deficient as to create a reasonable probability that these deficiencies materially contributed to defendant's conviction.

*See* Exhibit VV.

135.  Roberts again appealed Judge Codey's decision, and on March 8, 2013, the Appellate Division again reversed, finding that a further evidentiary hearing was needed, expressly noting that

> [b]oth S.A.'s statement and the 2005 DNA tests are newly discovered evidence that cast doubt on the integrity of defendant's conviction for kidnapping. . . . Nevertheless, absent expert testimony as to the DNA reports, we refuse the invitation to exercise original jurisdiction in this case and vacate defendant's guilty plea.

*See* Exhibit WW at 18-19.

136.  The Appellate Division also expressly found that that Van Jura provided Roberts with ineffective assistance of counsel during the October 27, 2009 and April 27, 2010 plenary hearing, and remanded for further proceedings based in part on that fact.

137.  The Appellate Division noted that Judge Codey initially denied Roberts' post-conviction relief petition because he found that Ms. Atwell was clearly mistaken when she stated no one had contacted her prior to Douard and Price, because she submitted a buccal swab at the Prosecutor's Office before signing her September 27, 2005 statement. *Id.* at 15. The Appellate Division found that if Van Jura would have called Douard or Price to testify at the plenary hearing, they could have clarified Judge Codey's confusion regarding the timing of the Ms. Atwell's statement and her visit to the Prosecutor's Office. *Id.* This would have lent credibility to the remainder of Ms. Atwell's statement. Because Van Jura did not call either Douard or Price to testify, Judge Codey again denied Roberts' request for post-conviction relief.

138.  The Appellate Division further found that Van Jura provided deficient representation because Van Jura knew from the August 29, 2005 DNA Laboratory Report, that Roberts was excluded as possible contributor to the DNA sample, yet he allowed Rodriguez to get away with misrepresenting to the court that the DNA test was inconclusive, and also argued that fact to Judge Codey.

> All these reports were available to PCR counsel before the April 2010 hearing that concluded the evidentiary remand. In his summation, however, PCR counsel nonetheless argued that the 2005 DNA results were "inconclusive." We fail to see why he took such a position since the 2005 report, on its face, excluded defendant's DNA from the vaginal specimen. As noted, in his written decision,

the judge referenced only the later DNA paternity testing he had ordered, not the 2005 results.

At the least, the effective representation of defendant at the evidentiary hearing required PCR counsel to call a witness whose qualifications would have permitted any confusion, if it existed, to be put to rest. The failure to do so is inexplicable.

*Id.* at 17-18.

139.  Given Van Jura's deficient representation on "two critical respects," the Appellate Division ordered that Roberts be assigned different PCR counsel. *Id.* at 14, 19.

## DNA EVIDENCE CONCLUSIVELY EXONERATES ROBERTS

140.  After the Appellate Division remanded the case, Roberts was assigned new PCR counsel, Michael Pastacaldi, Esq. ("Pastacaldi"). Judge Codey had retired, and the PCR proceedings were transferred to the Honorable Sherry Hutchins-Henderson, J.S.C.

141.  During a conference in chambers on May 16, 2013, Judge Hutchins-Henderson directed the Prosecutor's Office to attempt to locate the original vaginal slides from the 1996 rape kit.

142.  On June 17, 2013, a mere one month later, Rodriguez advised that in addition to the DNA samples already tested, the original sex crime kit was located, and that it was still sealed. *See* Exhibit XX.

143.  Rodriguez advised Pastacaldi and Judge Hutchins-Henderson that the original sex crimes kit was found in the precinct. However on other occasions she stated that it was located and/or maintained within the Prosecutor's Office.

144.  On July 12, 2013, Rodriguez advised Pastacaldi that she obtained the lab notes from 1996 which states that the rape kit is positive for semen. *See* Exhibit YY at 2-4.

145.  On July 16, 2013, Rodriguez stated to the court that, "now that I know that there's some product there, we believe that, in all fairness, it should be tested." *Id.* at 3. However the prosecutors had this information years earlier, because on December 9, 2004, Dr. Zeiguer, who testified at the initial civil commitment hearing on behalf of the State, testified that "there was a positive semen stain the swabs from the vagina. And the chemist ask [sic] for a sample from a suspect to compare it, . . . I have a laboratory report where they are inviting to obtain saliva or blood from the suspect."

146.  On July 29, 2013, Pastacaldi filed a motion for DNA testing to test the sex crime kit that remained sealed since 1996.

147.  The sex crime kit was submitted to the Office of Forensic Sciences on September 20, 2013, and on October 24, 2013, a DNA Laboratory Report was prepared which stated that Roberts was "excluded" as a possible contributor of the DNA profile found in the sex crimes kit. *See* Exhibit ZZ at 1-2.

148.  On November 20, 2013, Judge Hutchins-Henderson determined that based upon the newly discovered evidence, discovered in the police precinct, which excluded Roberts as Ms. Atwell's rapist on May 8, 1996 based upon DNA evidence, Roberts' guilty plea would be vacated and a new trial would be ordered. *See* Exhibit AAA.

149.  Therefore the following day, Judge Hutchins-Henderson issued the following order:

> THIS MATTER having initially been opened to the Court upon the Petition of RODNEY ROBERTS, for Post-Conviction Relief, and the Petition being denied on May 19, 2010 and then appealed and remanded for another evidentiary hearing to determine whether the new evidence warrants relief, and the Petitioner now being represented by Michael Pastacaldi, Esq., and in opposition by the State of New Jersey, represented by Carla Rodriguez, Assistant Essex County Prosecutor; and having held another evidentiary hearing where additional new exculpatory DNA evidence was considered by this Court and arguments from counsel;
>
> It is **ORDERED** on this 21st day of November, 2013 that the defendant's conviction for kidnapping, contrary to N.J.S.A. 2C:13-1, on the Accusation 96-07-1128 is hereby **VACATED** for reasons discussed on the record on November 20, 2013 based upon the new exculpatory DNA evidence, and;
>
> It is **FURTHER ORDERED** that the plea of Guilty entered on July 15, 1996 on Accusation 96-07-1128 be set aside.

*See* Exhibit BBB.

150.  On December 19, 2013, Roberts filed a *pro se* motion for a speedy trial.

151.  On January 6, 2014, Roberts filed a *pro se* motion for an accelerated review hearing as to his civil confinement.

152.  On February 7, 2014, the charges against Roberts were dismissed on motion of the prosecution, and the dismissal was entered by Judge Hutchins-Henderson on February 20, 2014. *See* Exhibit CCC.

153.  Accordingly, the State moved to dismiss Roberts' petition for civil commitment, and on March 10, 2014, it was

> ORDERED that the petition in the above-captioned matter shall be and hereby is dismissed without prejudice; and it is further

ORDERED that Rodney Roberts shall be released from the STU as soon as possible but no later than 5:00 p.m., on Wednesday, March 12, 2014.

*See* Exhibit DDD.

154.  Roberts was finally released from custody on March 12, 2014.

155.  If defendants had properly managed the evidence and DNA in their possession, Roberts would have been exonerated after his first request for a DNA test.

156.  If defendants had compared Roberts' DNA to the seminal stains in the rape kit after the rape kit was tested, and not misrepresented to Roberts, his attorneys, and the courts for years that the rape kit merely proved inconclusive and that the DNA material had degraded over time, Roberts would not have spent years in prison for a crime he did not commit, and would not have thereafter spent an additional ten years in civil confinement.

157.  Roberts did indeed rely upon defendants' misrepresentations. Based upon defendants' misrepresentations, Roberts argued in multiple *pro se briefs* the courts that the DNA test conducted in 2005 had proven inconclusive and that the DNA material had degraded over time. Furthermore, Roberts' attorneys, arguing on his behalf, subsequently reiterated these argument to the courts. Given defendants' misrepresentations, Roberts and his attorney were not aware that the laboratory was simply not provided the complete DNA test, and that the laboratory had never indicated that DNA material had degraded over time which precluded a proper DNA analysis.

158.  Furthermore, if defendants would have had actually attempted to locate the rape kit, particularly after the Office of Forensic Sciences repeatedly advised that the complete rape kit was not submitted for testing, rather than misrepresenting to Roberts, his attorneys, and the courts that the complete rape kit was tested but that it merely proved inconclusive, Roberts would not have spent years in prison and civil confinement, for a crime he did not commit.

159.  Defendants acted maliciously and/or wantonly in reckless disregard of Roberts' rights. They all continued the criminal proceedings against Roberts, and were responsible for putting false information into the record.

160.  As a direct and proximate result of defendants' actions, Roberts suffered, and continues to suffer, severe mental and emotional distress, humiliation, damage to reputation, and lost employment opportunities and earnings. Roberts lost years of his life while he remained confined in the custody of the State of New Jersey, where there too, he suffered physically, mentally, and emotionally. Roberts' relationships with others, including his children and wife, were permanently impacted, and Roberts also expended significant sums in attorneys' fees.

## CAUSES OF ACTION

### ONE
### 42 U.S.C. § 1983 – Malicious Prosecution (4th Amendment)

161.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1-160 as though fully set forth herein.

162.  Eutsey initiated and continued a criminal proceeding against Roberts, and did so without probable cause.

163.  Eutsey acted maliciously or for a purpose other than bringing Roberts to justice.

164.  The criminal proceedings terminated in Roberts' favor on February 20, 2014.

165.  Because of Eutsey's conduct and the legal proceedings against Roberts, Roberts suffered a significant deprivation of liberty consisted with the concept of seizures until he was released from confinement on March 12, 2014.

### TWO
### 42 U.S.C. § 1983 – Due Process Fabricating/Falsifying Evidence (14th Amendment)

166.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1-165 as though fully set forth herein.

167.  Eutsey fabricated evidence against Roberts in his criminal proceedings to obtain his conviction, and forwarded that information to the prosecutors in this case. Without the fabricated evidence, Roberts would not have been convicted of kidnapping because he would not have been induced to plead guilty to kidnapping, would not have been denied parole, would not have been civilly confined, and would not have been denied post-conviction relief.

168.  Laurino and Bolan falsified evidence against Roberts by submitting that Ms. Atwell's complete rape kit was tested, and that it proved inconclusive and the DNA material had degenerated, and forwarded that information to Rodriguez who prosecuted the post-conviction relief proceedings to ensure that Roberts remain convicted. Without the falsified evidence Roberts would not have been civilly confined, and would not have been denied post-conviction relief. They also forwarded that information to the assistant attorney generals who prosecuted the civil commitment proceedings prior to, and during, the post-conviction relief proceedings.

### THREE
### 42 U.S.C. § 1983 – Due Process Withholding Exculpatory Evidence (14th Amendment)

169.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1-168 as though fully set forth herein.

31

170.  Eutsey failed to inform, and affirmatively concealed from, the prosecutor who negotiated and accepted Roberts' guilty plea, and Rodriguez who prosecuted the post-conviction relief proceedings, of exculpatory information.

171.  Eutsey failed to inform the prosecutor who negotiated and accepted Roberts' guilty plea, or Rodriguez who prosecuted the post-conviction relief proceedings, that Ms. Atwell could not identify her assailant when he interviewed her in 1996.

172.  Eutsey concealed from the prosecutor who negotiated and accepted Roberts' guilty plea, and from Rodriguez who prosecuted the post-conviction relief proceedings, Roberts' mugshot which Eutsey incorporated into the photos he showed to Ms. Atwell. Eutsey concealed the fact that Ms. Atwell had not signed Roberts' mugshot photo.

173.  Eutsey concealed from the prosecutor who negotiated and accepted Roberts' guilty plea, and from Rodriguez who prosecuted the post-conviction relief proceedings, that if Roberts' mugshot had been used to make an identification, it did not accurately reflect Roberts' appearance in May 1996 when Roberts was 29 years old, as his last mugshot was taken in 1986, when he was 19 years old.

174.  Laurino and Bolan failed to inform, and affirmatively concealed from Rodriguez who prosecuted the post-conviction relief proceedings, and from the assistant attorney generals who prosecuted the civil commitment proceedings, exculpatory information.

175.  Laurino and Bolan failed to inform and affirmatively concealed the fact that the complete rape kit which ultimately exonerated Roberts, was not submitted to the Office of Forensic Science, despite its repeated requests for the DNA material. They did so during the civil commitment proceedings which occurred prior to the post-conviction relief proceedings first began, and continued doing so during the subsequent post-conviction relief proceedings.

176.  Laurino and Bolan failed to inform and affirmatively concealed the fact that the DNA material had not degraded over time, but that the critical material had simply not been tested, despite repeated requests from the Office of Forensic Science for the materials.

177.  Laurino and Bolan failed to inform and affirmatively concealed the fact that Ms. Atwell advised that she gave birth to a son nine months after the rape, and that she believed that her son may be the product of her rape.

178.  Laurino and Bolan withheld Ms. Atwell's 2005 buccal swab and failed to timely release it for DNA testing.

179.  Essex County, City of Newark, and the Prosecutor's Office withheld the complete rape kit which ultimately exonerated Roberts, and failed to release it for DNA testing in a timely manner, despite the fact that Roberts requested that the DNA be tested since at least 2002. The complete rape kit, which remained sealed since 1996, was located within the precinct.

180.  Plaintiff withdrew this claim against Laurino, Bolan, and the Prosecutor's Office.

**FOUR**
**42 U.S.C. § 1983 – Due Process Mishandling Exculpatory Evidence (14th Amendment)**

181.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1-180 as though fully set forth herein.

182.  Defendants knew that the complete rape kit and DNA evidence would completely exonerate Roberts.

183.  Defendants mishandled the rape kit and the DNA evidence, and delayed his exoneration until February 20, 2014.

184.  Defendants acted in bad faith and frustrated Roberts' repeated attempts to be exonerated through conclusive DNA evidence.

185.  Plaintiff withdrew this claim against Laurino, Bolan, and the Prosecutor's Office.

186.  Eutsey knew that if Roberts' photograph has been used to make an identification, it did not accurately reflect Roberts' appearance in May 1996 when Roberts was 29 years old, as his last mugshot photograph which would have been at the Newark Police Department's Sexual Assault Section/Division was taken in 1986, when Roberts was 19 years old.

187.  If Roberts' photograph has been used to make an identification, Eutsey knew that the photograph allegedly identified by Ms. Atwell would have therefore exonerated Roberts, and that it constituted exculpatory evidence.

188.  If Roberts' photograph has been used to make an identification, Eutsey mishandled the photograph so that it could not be used to undermine Roberts' conviction, and therefore delayed his exoneration until February 20, 2014.

189.  Eutsey acted intentionally and in bad faith, and frustrated Roberts' repeated attempts to obtain post-conviction relief, particularly where he knew that efforts were being made to locate the photograph allegedly identified.


**FIVE**
**42 U.S.C. § 1983 – Procedural Due Process**

190.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1-189 as though fully set forth herein.

191.  Roberts had a cognizable liberty interest in demonstrating his innocence with the withheld DNA evidence under the State of New Jersey's post-conviction relief statutes and laws, because the laws of the State of New Jersey permitted Roberts to challenge his conviction on the basis of newly discovered evidence, which would, and ultimately did, result in the vacature of his conviction and his release from civil confinement.

192.  Roberts was entitled a fair accounting of the complete rape kit and DNA evidence which was within Essex County, the City of Newark, and the Newark Police Department's possession.

193.  Roberts was not afforded the process he was due by Essex County, the City of Newark, and/or the Prosecutor's Office, because he was prevented from accessing the exculpatory DNA evidence which would, and ultimately did, result in the vacature of his conviction and his release from civil confinement. Essex County, the City of Newark, the Newark Police Department, and/or the Prosecutor's Office undermined the State of New Jersey's procedures by its reckless evidence management.

194.  Roberts diligently and repeatedly tried the State of New Jersey's procedures for obtaining the exculpatory DNA evidence, however Essex County, City of Newark, and/or the Prosecutor's Office's evidence management was so inadequate as to nullify those procedures, which delayed his exoneration until November 21, 2013. Therefore Essex County, the City of Newark, and the Prosecutor's Office perpetuated a practice or custom that is wholly inadequate through the poor administration of its evidence management system, and acted with reckless indifference and/or deliberate indifference to Roberts' constitutional rights.

## SIX
## 42 U.S.C. § 1983 – Access to the Courts (1st Amendment/Due Process)

195.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1-194 as though fully set forth herein.

196.  Defendants wrongfully and intentionally withheld and concealed information which was crucial to Roberts' ability to obtain post-conviction relief and release from civil commitment.

197.  Defendants acted for the purpose of frustrating Roberts' right to proper access and effective use of the courts.

198.  Defendants' wrongful conduct prevented Roberts from adequately petitioning for post-conviction relief and defending against the petitions for civil confinement.

199.  Defendants' wrongful conduct prevented Roberts from obtaining post-conviction relief prior to February 20, 2014, and release from civil confinement prior to March 12, 2014.

200.  Defendants therefore denied Roberts' constitutional right to proper access to, and effectively use of the courts.

201.  This claims was dismissed without prejudice, and Plaintiff will seek to reinstate it in the event it is no longer superfluous.

## SEVEN
### 42 U.S.C. § 1983 - Supervisory Liability

202.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1-201 as though fully set forth herein.

203.  Bolan violated Roberts' constitutional rights as discussed above.

204.  Laurino, not acting in a prosecutorial capacity, directed Bolan to take the actions at issue.

205.  Laurino had knowledge of Bolan's actions which violated Roberts' rights and Laurino acquiesced in the violations.

206.  Laurino is therefore liable for Bolan's actions which violated Roberts' constitutional rights.

## EIGHT
### Pendent State Claims – Malicious Prosecution

207.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1-206 as though fully set forth herein.

208.  Eutsey initiated and continued a criminal proceeding against Roberts, and did so without probable cause.

209.  Eutsey acted maliciously or for a purpose other than bringing Roberts to justice.

210.  The criminal proceedings terminated in Roberts' favor on February 20, 2014.

211.  Because of Eutsey's conduct and the legal proceedings against Roberts, Roberts suffered a significant deprivation of liberty consisted with the concept of seizures until he was released from confinement on March 12, 2014.

## NINE
### Pendent State Claims – Malicious Abuse of Process

212.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1-211 as though fully set forth herein.

213.  Defendants set legal process in motion for an improper ulterior motive.

214.  Defendants committed willful acts in the use of process which perverted the results conduct of the proceeding to accomplish the improper purpose.

215.  Plaintiff withdrew this claim.

## TEN
## Pendent State Claims – Fabricating Evidence

216.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1-215 as though fully set forth herein.

217.  Eutsey fabricated evidence against Roberts in his criminal proceedings to obtain his conviction, and forwarded that information to the prosecutors in this case. Without the fabricated evidence, Roberts would not have been convicted of kidnapping because he would not have been induced to plead guilty to kidnapping, would not have been denied parole, would not have been civilly confined, and would not have been denied post-conviction relief.

218.  Laurino and Bolan falsified evidence against Roberts by submitting that Ms. Atwell's complete rape kit was tested, and that it proved inconclusive and the DNA material had degenerated, and forwarded that information to Rodriguez who prosecuted the post-conviction relief proceedings to ensure that Roberts remain convicted. Without the falsified evidence Roberts would not have been civilly confined, and would not have been denied post-conviction relief. They also forwarded that information to the assistant attorney generals who prosecuted the civil commitment proceedings prior to, and during, the post-conviction relief proceedings.

## ELEVEN
## Pendent State Claims – Mishandling Exculpatory Evidence

219.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1-218 as though fully set forth herein.

220.  Defendants knew that the complete rape kit and DNA evidence would completely exonerate Roberts.

221.  Defendants mishandled the rape kit and the DNA evidence, and delayed his exoneration until February 20, 2014.

222.  Defendants acted in bad faith and frustrated Roberts' repeated attempts to be exonerated through conclusive DNA evidence.

223.  Plaintiff withdrew this claim against Laurino, Bolan, and the Prosecutor's Office.

224.  Eutsey knew that if Roberts' photograph has been used to make an identification, it did not accurately reflect Roberts' appearance in May 1996 when Roberts was 29 years old, as his last mugshot photograph which would have been at the Newark Police Department's Sexual Assault Section/Division was taken in 1986, when Roberts was 19 years old.

225.  If Roberts' photograph has been used to make an identification, Eutsey knew that the photograph allegedly identified by Ms. Atwell would have therefore exonerated Roberts, and that it constituted exculpatory evidence.

226.  If Roberts' photograph has been used to make an identification, Eutsey mishandled the photograph so that it could not be used to undermine Roberts' conviction, and therefore delayed his exoneration until February 20, 2014.

227.  Eutsey acted intentionally and in bad faith, and frustrated Roberts' repeated attempts to obtain post-conviction relief, particularly where he knew that efforts were being made to locate the photograph allegedly identified.


## TWELVE
### Pendent State Claims - Withholding Exculpatory Evidence

228.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1-227 as though fully set forth herein.

229.  Eutsey failed to inform, and affirmatively concealed from, the prosecutor who negotiated and accepted Roberts' guilty plea, and Rodriguez who prosecuted the post-conviction relief proceedings, of exculpatory information.

230.  Eutsey failed to inform the prosecutor who negotiated and accepted Roberts' guilty plea, or Rodriguez who prosecuted the post-conviction relief proceedings, that Ms. Atwell could not identify her assailant when he interviewed her in 1996.

231.  Eutsey concealed from the prosecutor who negotiated and accepted Roberts' guilty plea, and from Rodriguez who prosecuted the post-conviction relief proceedings, Roberts' mugshot which Eutsey incorporated into the photos he showed to Ms. Atwell. Eutsey concealed the fact that Ms. Atwell had not signed Roberts' mugshot photo.

232.  Eutsey concealed from the prosecutor who negotiated and accepted Roberts' guilty plea, and from Rodriguez who prosecuted the post-conviction relief proceedings, that if Roberts' mugshot had been used to make an identification, it did not accurately reflect Roberts' appearance in May 1996 when Roberts was 29 years old, as his last mugshot was taken in 1986, when he was 19 years old.

233.  Laurino and Bolan failed to inform, and affirmatively concealed from Rodriguez who prosecuted the post-conviction relief proceedings, and from the assistant attorney generals who prosecuted the civil commitment proceedings, exculpatory information.

234.  Laurino and Bolan failed to inform and affirmatively concealed the fact that the complete rape kit which ultimately exonerated Roberts, was not submitted to the Office of Forensic Science, despite its repeated requests for the DNA material. They did so during the civil commitment proceedings which occurred prior to the post-conviction relief proceedings first began, and continued doing so during the subsequent post-conviction relief proceedings.

235.  Laurino and Bolan failed to inform and affirmatively concealed the fact that the DNA material had not degraded over time, but that the critical material had simply not been tested, despite repeated requests from the Office of Forensic Science for the materials.

236.  Laurino and Bolan failed to inform and affirmatively concealed the fact that Ms. Atwell advised that she gave birth to a son nine months after the rape, and that she believed that her son may be the product of her rape.

237.  Laurino and Bolan withheld Ms. Atwell's 2005 buccal swab and failed to timely release it for DNA testing.

238.  The complete rape kit, which remained sealed since 1996, was maintained by, and located within the Newark Police Department and/or the Prosecutor's Office.

239.  Laurino, Bolan, Essex County, City of Newark, and the Prosecutor's Office withheld the complete rape kit which ultimately exonerated Roberts, and failed to release it for DNA testing in a timely manner, despite the fact that Roberts requested that the DNA be tested since at least 2002

240.  Plaintiff withdrew this claim against Laurino, Bolan, and the Prosecutor's Office.


### THIRTEEN
### Pendent State Claims – Negligence/Gross Negligence/Recklessness

241.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1-240 as though fully set forth herein.

242.  Defendants owed a duty to Roberts not to fabricate evidence, to properly account for the rape kit and DNA evidence within their possession, not to withhold or conceal that evidence from Roberts, his attorneys, and the courts, not to mislead or misrepresent the facts pertaining to the location and testing of the rape kit and DNA evidence to Roberts, his attorney, or the courts, and not to violate Roberts' constitutional rights.

243.  Defendants breached their duties to Roberts, which proximately caused Roberts' injuries.

244.  Defendants are therefore liable to Roberts due to their negligence, gross negligence, and/or reckless conduct.

## FOURTEEN
## Pendent State Claims – Respondeat Superior/Vicarious Liability

245.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1-244 as though fully set forth herein.

246.  Essex County and City of Newark were the public employers of Eutsey and the Newark Police Department personnel who handled, transported, managed and maintained Roberts' criminal file and the rape kit.

247.  Essex County and City of Newark are therefore liable for Roberts' injuries which were proximately caused by Eutsey and the Newark Police Department personnel who handled, transported, managed and maintained Roberts' criminal file and the rape kit, to the extent their acts do not constitute actual fraud, actual malice, or willful misconduct.

248.  Essex County and Prosecutor's Office were the public employers of Laurino and Bolan.

249.  Essex County and Prosecutor's Office are therefore liable for Roberts' injuries which were proximately caused by Laurino and Bolan, to the extent Laurino and Bolan's acts do not constitute actual fraud, actual malice, or willful misconduct.


## FIFTEEN
## Pendent State Claims – Professional Negligence/Legal Malpractice

250.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1-249 as though fully set forth herein.

251.  Martone represented Roberts on July 16, 1996 during plea negotiations and the plea allocution. Therefore an attorney-client relationship existed between Martone and Roberts.

252.  Martone had a duty to Roberts to exercise a reasonable degree of knowledge and skill that lawyers of ordinary ability and skill possessed and exercised, and to utilize reasonable care and prudence in connection with his responsibilities. Martone was required to take any steps necessary to properly handle the case, properly investigate the facts, not misrepresent the facts or his verification of the facts to Roberts, to advise Roberts of the consequences of his guilty plea, and not to misrepresent to Roberts the consequences of his guilty plea.

253.  Among other things, Martone misrepresented to Roberts that he met with the victim who positively identified Roberts as her assailant and that she was prepared to identify him in court that day, that she had identified him in a photograph, that Martone independently investigated the case and confirmed the victim's identify and the accuracy of the police reports, and that based upon these facts Roberts would lose at trial.

254.  Martone also failed to advise Roberts of the consequences of pleading guilty to the kidnapping charge. Rather, he ensured Roberts that the sexual assault charge would be removed from Roberts' record and that it could not be used to penalize Roberts in future proceedings.

Martone knew of Roberts' prior conviction, and indeed induced Roberts to plead guilty to kidnapping given his criminal history, and therefore Martone knew or should have known that the sexual assault allegations which formed the factual basis for the kidnapping charge, risked exposing Roberts to civil confinement.

255.   Indeed, the Appellate Division found that Roberts' allegations, if true, constituted deficient representation, and granted Roberts post-conviction relief by ordering an evidentiary hearing, based in part on Martone's deficient representation.

256.   Therefore, Martone failed to meet the constitutional threshold for effective representation, and breached the duties he owed to Roberts.

257.   Martone's breach of the duties he owed to Roberts proximately caused Roberts' damages.

258.   Roberts suffered actual damages because negligent representation and his breach of the duties he owed to Roberts. Roberts detrimentally relied on Martone's misrepresentations and was therefore wrongfully convicted. If Martone would not have misrepresented the facts of the case, and the consequences of the guilty plea, to Roberts, Roberts would not have plead guilty to kidnapping and would have proceeded to trial. If Martone would not have misrepresented the facts of the case, and the consequences of the guilty plea, to Roberts, Roberts would have been found not guilty at trial on both the sexual assault and kidnapping charges based upon the DNA evidence which conclusively exonerated him, and because Ms. Atwell would not have been able to identify him at trial. Roberts would not have been denied parole based upon the facts underlying the sexual assault and kidnapping charges, and he would not have been civilly confined against his will.

259.   The claim against Martone based upon the failure to warn of the potential for civil commitment, only, was dismissed.

260.   Van Jura represented Roberts during his post-conviction relief proceedings from June through July 2007, and from October 2009 through May 2010. Therefore an attorney-client relationship existed between Van Jura and Roberts.

261.   Van Jura had a duty to Roberts to exercise a reasonable degree of knowledge and skill that lawyers of ordinary ability and skill possessed and exercised, and to utilize reasonable care and prudence in connection with his responsibilities. Van Jura was required to take any steps necessary to properly handle the case, and to properly investigate the facts. As PCR counsel, Van Jura was required to communicate with Roberts, investigate the claims urged by Roberts as well as additional claims that should be pursued, and then advance all legitimate claims.

262.   Van Jura failed to call Douard or Price to testify in 2009 or 2010 regarding when they first spoke Ms. Atwell in relation to her visit to the Prosecutor's Office, and that her testimony was consistent with the signed statement she provided in 2005. Van Jura knew that Judge Codey denied Roberts post-conviction relief in 2007 in part because he found that Ms. Atwell must have been mistaken as to the timing of that statement, and that her signed statement was not true.

263.  Van Jura also allowed Rodriguez to get away with misrepresenting to Judge Codey that the DNA tests were inconclusive as to whether Roberts could be excluded, and even argued to Judge Codey as well that the DNA tests were inconclusive, despite the fact that he had the 2005 DNA Laboratory Report conclusively excluded Roberts as a contributor to that DNA profile.

264.  Indeed, the Appellate Division found that Van Jura provided deficient representation on "two critical aspects" and granted Roberts post-conviction relief by ordering subsequent post-conviction relief proceedings based in part on Van Jura's deficient representation.

265.  Therefore, Van Jura failed to meet the constitutional threshold for effective representation, and breached the duties he owed to Roberts.

266.  Van Jura's breach of the duties he owed to Roberts proximately caused Roberts' damages.

267.  Roberts suffered actual damages because he was denied post-conviction relief based upon Van Jura's negligent representation and his breach of the duties he owed to Roberts, in 2007 and again in 2010. Because of Van Jura's negligent representation and the breach of the duties he owed to Roberts in 2007, Judge Codey denied Roberts post-conviction relief on July 30, 2007, and Roberts was only afforded additional post-conviction relief proceedings after the Appellate Division remanded his case for a plenary hearing on July 17, 2009. Because of Van Jura's negligent representation and the breach of his duties he owed to Roberts in 2009 and 2010, Judge Codey denied Roberts post-conviction relief on May 19, 2010, and Roberts was only afforded additional post-conviction relief proceedings after the Appellate Division remanded his case for a further proceedings on March 8, 2013.

268.  If Van Jura did not breach his duties to Roberts, Roberts' guilty plea would have been vacated in 2007, and Roberts would have been released from civil confinement. Even if Roberts' guilty plea was not vacated in 2007, it would have been vacated in 2010, and Roberts would not have remained in civil confinement against his will.

269.  Martone and Van Jura were negligent in their representation of Roberts, and committed Legal Malpractice.

270.  Roberts' guilty plea was vacated on November 21, 2013, and he was exonerated on February 2, 2014 when the criminal charges against him were vacated.

271.  Despite the other defendants' actions, Martone and Van Jura's negligent representation of Roberts during his criminal proceedings were substantial contributing factors to Roberts' damages.

**WHEREFORE**, Plaintiff requests the following relief jointly and severally as against all defendants:

1. A trial by jury on all issues;

2. An award of compensatory damages in the amount of thirty-six million dollars ($36,000,000), or an amount to be determined at trial;

3. An award of punitive damages in the amount of thirty-six million dollars ($36,000,000), or an amount to be determined at trial;

4. Disbursements, costs, and attorneys' fees pursuant to 42 U.S.C. § 1988; and

5. Such other and further relief as this Court may deem just and proper.


Dated: Mineola, New York
        December 2, 2016

                                    The Law Office of Anthony M. Grandinette
                                    *Attorneys for Plaintiff*
                                    114 Old Country Road, Suite 420
                                    Mineola, New York 11501
                                    (516) 877-2889


                        By:     s/ Mirel Fisch_____
                                Mirel Fisch, Esq.
                                Mirel.GrandinetteLaw@gmail.com