## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **RODNEY R. ROBERTS,** | Civ. No. 15-7061 (KM) (JBC) |
| **Plaintiff,** | |
| **v.** | **OPINION** |
| **COUNTY OF ESSEX, et al.,** | |
| **Defendants.** | |

**KEVIN MCNULTY, U.S.D.J.:**

Plaintiff Rodney Roberts was arrested in 1996 for the rape and kidnapping of 17-year-old Sheronda Atwell. Shortly after his arrest, Roberts pled guilty to kidnapping in exchange for a seven-year sentence and dismissal of the rape charge. In 2004, after serving this sentence, Roberts was involuntarily committed as a sexually violent predator.

In 2013, DNA analysis was performed on samples from Atwell's 1996 rape kit. The analysis indicated that Roberts did not match the DNA profile of Atwell's assailant. The trial court vacated Roberts's guilty plea in light of these results and the government dismissed the rape and kidnapping charges. Roberts was released from civil confinement in March 2014.

Roberts promptly commenced this action under 42 U.S.C. § 1983[1] with supplemental state law claims against various state actors and entities. Several defendants have since been dismissed from the case. The remaining defendants have filed three motions for summary judgment that are now before the Court.

---

[1]   "42 U.S.C. § 1983 . . . provides a cause of action against state and local officers for 'the deprivation of any rights ... secured by the Constitution and laws.'" *McCray v. Jones*, No. 21-3294, 2022 WL 17485957, at *2 (3d Cir. Dec. 7, 2022).

One motion was filed by the Essex County Prosecutor's Office (ECPO) and two of its employees, Assistant Prosecutor Robert Laurino and Investigator Michelle Bolin. I will refer to these defendants collectively as "the ECPO Defendants". A second motion for summary judgment was filed by Essex County. A third motion for summary judgment was filed by the City of Newark and one of its detectives, Derrick Eutsey. I will refer to Det. Eutsey and Newark together as "the Newark Defendants".

For the reasons set forth below, the ECPO Defendants' and Newark Defendants' motions for summary judgment (DE 214, 223) are granted in part and denied in part, and the motion of Essex County (DE 219) is denied.[2]

---

[2]    Certain key items from the record will be abbreviated as follows:

DE = Docket entry number in this case

Compl. = Amended Complaint (DE 96)

ECPO St. = ECPO Defendants' statement of material facts (DE 214-2)

Resp. to ECPO St. = Roberts's response to ECPO Defendants' statement of material facts (DE 218-107)

Newark St. = Newark Defendants' statement of material facts (DE 223-3)

Resp. to Newark St. = Roberts's response to Newark Defendants' statement of material facts (DE 225-107)

ECPO MSJ = Brief in support of ECPO Defendants' motion for summary judgment (DE 214-1)

Opp. to ECPO MSJ = Roberts's brief in opposition to ECPO Defendants' motion for summary judgment (DE 218-108)

ECPO Repl. = Reply brief in further support of ECPO Defendants' motion for summary judgment (DE 215)

Essex MSJ = Brief in support of Essex County's motion for summary judgment (DE 219-2)

Opp. to Essex MSJ = Roberts's brief in opposition to Essex County's motion for summary judgment (DE 222-108)

Newark MSJ = Brief in support of Newark Defendants' motion for summary judgment (DE 223-1)

Opp. to Newark MSJ = Roberts's brief in opposition to Newark Defendants'

Roberts sues for two essential wrongs: (1) the alleged misrepresentation that the victim had identified him from a photo array; and (2) the failure, in post-conviction proceedings, to produce vaginal swabs which did not contain Roberts's DNA. The rulings herein leave intact these essential claims against the persons who are allegedly primarily responsible, while resisting efforts to spread liability to defendants less directly or knowingly involved.

---

motion for summary judgment (DE 225-108)

Newark Repl. = Reply brief in further support of Newark Defendants' motion for summary judgment (DE 224)

Laur. Dep. = Excerpts from deposition of Robert Laurino (Ex. 14 to DE 218)

Bol. Dep. = Excerpts from deposition of Michelle Bolan (Ex. 15 to DE 218)

Rod. Dep. = Excerpts from deposition of Clara Rodriguez (Ex. 16 to DE 218)

Rod. Dep. II = Excerpts from deposition of Clara Rodriguez (Ex. 38 to DE 225)

Groller Dep. = Excerpts from deposition of Joseph Groller (Ex. I to DE 223)

Rod. PCR Br. = Rodriguez's 2007 brief submitted in opposition to Roberts's PCR petition (Ex. 26 to DE 218)

PCR Tr. = Transcript from July 26, 2007 hearing on Roberts's PCR petition (Ex. 25 to DE 218)

Comm. Order = Order for temporary civil commitment of Roberts dated May 27, 2004 (Ex. 75 to DE 218)

1996 Report = Det. Eutsey's 1996 investigatory report (Ex. B to DE 223)

2009 App.Div. = 2009 decision of the Appellate Division (Ex. 92 to DE 225)

2013 App.Div. = 2013 decision of the Appellate Division (Ex. 40 to DE 222)

Receipt = 1996 "Property & Evidence Receipt" for photograph of Roberts (Ex. D to DE 223)

I.    **Background**[3]

A. **Investigation of the rape and kidnapping of Sheronda Atwell**

In the early morning hours of May 8, 1996, Sheronda Atwell was walking to her aunt's house in Newark, New Jersey when an unknown male grabbed her, dragged her to an empty lot, and raped her. (Newark St. ¶1; Resp. to Newark St. ¶1.) Atwell reported the incident to the Newark police that morning and described her assailant as a 20-year-old black male.[4] (Newark St. ¶5; Resp. to Newark St. ¶5.) After her interview with police, she was taken to a hospital where a rape kit was collected. (Newark St. ¶6; Resp. to Newark St. ¶6.)

Detective Eutsey was assigned to investigate the crime. (Newark St. ¶9; Resp. to Newark St. ¶9.) As part of his investigation, Eutsey met with Atwell and her mother on May 14, 1996. (Newark St. ¶10; Resp. to Newark St. ¶10.) The parties agree that Atwell told Eutsey at this meeting that she did not know her assailant. (Newark St. ¶11; Resp. to Newark St. ¶11.) What happened next, however, is largely disputed. According to the report Eutsey drafted detailing his investigation, Eutsey asked Atwell to review suspect files that contained photographs of black males. (Newark St. ¶12; Resp. to Newark St. ¶12.) The report states that Atwell began to cry upon viewing one of the photographs and that she told Eutsey that this was the person who assaulted her. (*Id.*) The person in the photograph was Roberts, who at the time was 29 years old. (Newark St. ¶13; Resp. to Newark St. ¶13.) Eutsey determined that Roberts had

---

[3]    These undisputed facts are primarily taken from the Newark Defendants' statement of material facts not in dispute, filed pursuant to Local Rule 56.1, and Roberts's response to that statement. The court is not aware of any factual disputes between the Newark Defendants, the ECPO Defendants, and Essex County; indeed, many of the undisputed facts that appear in the Newark Defendants' 56.1 statement similarly appear in the other defendants' 56.1 statements. Given that certain sets of facts bear more heavily on the claims asserted against some of the defendants as opposed to others of the defendants, the 56.1 statements provide varying levels of detail as to such facts. I therefore draw some facts from the ECPO Defendants' 56.1 statement, and Roberts's response to that statement, where more details are required.

[4]    To accurately reflect the record, I have adopted without alteration the racial terminology used at the time to identify or describe the perpetrator in this 25-year-old case.

been convicted of aggravated sexual assault in 1986 but had been released on parole in 1993. (Newark St. ¶¶14, 21; Resp. to Newark St. ¶¶13.)

Eutsey's report contains a signed statement from Atwell asserting that she was able to identify her assailant by viewing a photograph of him and that, after making this identification, she signed and dated a copy of the photograph. (Newark St. ¶¶15-19; Resp. to Newark St. ¶¶15-19.) Atwell's signatures on the statement were "sworn to and subscribed" before another officer, Acting Lieutenant Daly. (*Id.*) On a later date, Eutsey executed a "Property and Evidence Receipt" for the copy of the photograph of Roberts that Atwell purportedly signed, and Lieutenant Daly signed this receipt. (Newark St. ¶26; Resp. to Newark St. ¶26.)

On May 16, 1996, Eutsey submitted Atwell's statement to a prosecutor. (Newark St. ¶22; Resp. to Newark St. ¶22.) Eutsey then appeared before a judge of the Newark Municipal Court, and the judge issued two warrants for Roberts's arrest: one for aggravated assault, and one for kidnapping. (Newark St. ¶23; Resp. to Newark St. ¶23.) According to Eutsey's investigation report, on May 23, 1996, he went to the address listed in Roberts's parole records and determined that the address was "fictitious." (Newark St. ¶24; Resp. to Newark St. ¶24.) The report states that Eutsey then issued an alert to police agencies notifying them that Roberts was wanted pursuant to a warrant. (Newark St. ¶25; Resp. to Newark St. ¶25.)

Eutsey executed another "Property and Evidence Receipt" for Atwell's rape kit, and the receipt indicates that it was received by the Newark Forensic Lab ("Newark Lab") on May 29, 1996. (Newark St. ¶27; Resp. to Newark St. ¶27; Ex. E to DE 223.) Joseph Groller, a chemist at the Newark Lab, examined Atwell's rape kit on that date. (Newark St. ¶29; Resp. to Newark St. ¶29.) Among other things, Groller examined the vaginal swabs microscopically and noted the presence of sperm. (Newark St. ¶30; Resp. to Newark St. ¶30.) Groller then requested blood and saliva samples from a suspect for the purpose of comparison. (Newark St. ¶32; Resp. to Newark St. ¶32.)

After examining the Atwell rape kit, Groller cut the tips off of the vaginal

swabs and placed them in a brown envelope. (Newark St. ¶33; Resp. to Newark St. ¶33.) Groller repackaged the brown envelope into a larger white envelope that he labeled with the name of the victim and other identifying information, and he placed the white envelope into one of the refrigerators in the Newark Lab. (Newark St. ¶¶34-36; Resp. to Newark St. ¶¶34-36.) Groller believed that the rest of the rape kit was returned to the Newark Police Department's property room. (Newark St. ¶37; Resp. to Newark St. ¶37.)

### B. Arrest and conviction of Rodney Roberts

On May 25, 1996, Roberts was arrested in East Orange, New Jersey on a theft charge unrelated to the Atwell case. (Newark St. ¶41; Resp. to Newark St. ¶41.) On June 12, Roberts pled guilty to third-degree theft, which resulted in a violation of his parole from his 1986 conviction. (Newark St. ¶¶41-42; Resp. to Newark St. ¶¶41-42.) Roberts was not released on bail pending sentencing on the theft charge because of the pending rape and kidnapping charges in the Atwell case. (*Id.*)

On June 26, 1996, Roberts was arraigned on and pled not guilty to charges of aggravated sexual assault and kidnapping. (Newark St. ¶42; Resp. to Newark St. ¶42.) Three weeks later, while at the courthouse for a proceeding, Roberts met with his assigned public defender, Charles Martone, who informed Roberts of a plea offer by the prosecution: In exchange for a guilty plea to second-degree kidnapping, the prosecution would dismiss the first-degree aggravated sexual assault charge and recommend that Roberts be sentenced to a term of seven years. (Newark St. ¶¶44-45; Resp. to Newark St. ¶¶44-45.) That seven-year sentence would run concurrently with the two three-year terms that Roberts was then facing for theft and violating the terms of his parole. (*Id.*)

According to Roberts, he told Martone that he was innocent of the Atwell charges and that he would not accept the prosecutor's offer. (Newark St. ¶46; Resp. to Newark St. ¶46.) Martone then left the holding cell area where the two had been conversing and returned approximately 20-25 minutes later with new information. (*Id.*) Martone informed Roberts that he had met Atwell, who was at the courthouse, and that she told him that she had positively identified Roberts

as her assailant and was prepared to do so again in open court that day. (*Id.*)
Martone advised Roberts that his independent investigation confirmed Atwell's
identity as the victim and the accuracy of the police reports in the case. (*Id.*)
Roberts subsequently accepted the plea agreement and was convicted of
kidnapping. (Newark St. ¶47; Resp. to Newark St. ¶47.) He was sentenced by
Judge Eugene Codey to seven years on the kidnapping conviction, to run
concurrently with his three-year sentence(s) for the theft conviction and the
related parole violation. (Newark St. ¶49; Resp. to Newark St. ¶49.)

### C. Parole denials and civil confinement

In April 1998, and again in May 2000, Roberts appeared before the New
Jersey State Parole Board for parole release hearings. Both times, Roberts was
denied parole based upon the allegation that he raped Atwell. (Newark St.
¶¶52-53; Resp. to Newark St. ¶¶52-53.) Roberts appealed the May 2000
decision, which was affirmed on the ground that the Board was entitled to rely
on the charged sexual assault. (*Id.*)

In January 2001, Roberts filed a *pro se* motion to withdraw his guilty
plea in the Atwell case due to ineffective assistance of counsel. (Newark St. ¶54;
Resp. to Newark St. ¶54.) Judge Codey denied the motion. (*Id.*) In June 2003,
Roberts was again denied parole and appealed. The denial was affirmed on the
basis that Roberts would not accept responsibility for the Atwell rape and that
he thus "minimized [his] conduct." (Newark St. ¶55; Resp. to Newark St. ¶55.)

During this period, Roberts underwent several psychological evaluations.
(Newark St. ¶¶58-60; Resp. to Newark St. ¶¶58-60.) The evaluation reports
recommended that he be referred to the Attorney General's office for further
assessment as to whether he met the criteria for civil confinement as a sexually
violent predator, pursuant to N.J. Stat. Ann. § 30:4-27.31. Among other things,
the reports found that Roberts continued to deny responsibility for the Atwell
rape. (*Id.*)

In May 2004, after Roberts had maxed out his criminal sentence, the
Attorney General's office filed a petition for civil commitment, which was

granted temporarily pending a final hearing. (Newark St. ¶62; Resp. to Newark St. ¶62.) Commitment hearings were held over several days in 2004, 2005 and 2006, before Judge Serena Perretti. (Newark St. ¶63; Resp. to Newark St. ¶63.) Roberts was represented at these hearings by Assistant Deputy Public Defender John Douard. (Newark St. ¶62; Resp. to Newark St. ¶62.) At the conclusion of the hearings, Judge Perretti ordered that Roberts be committed to the State of New Jersey Special Treatment Unit as a sexually violent offender. (Newark St. ¶67; Resp. to Newark St. ¶67.) Over the course of the years following his commitment, Roberts was repeatedly found to be a sexually violent predator in need of continued confinement. (Newark St. ¶68; Resp. to Newark St. ¶68.)

### D. 2005 DNA Analysis

During one of the hearings on the initial petition to have Roberts civilly committed, Dr. Luis Zeiguer testified about the rape kit that was collected after Atwell's assault in 1996. (ECPO St. ¶9; Resp. to EPCO St. ¶9.) Dr. Zeiguer explained that the kit was sent to the Newark Lab where a chemist examined it, reported that there was a positive semen stain on the vaginal swabs, and recommended that samples be obtained from a suspect for purposes of comparison. (ECPO St. ¶9; Resp. to EPCO St. ¶9.) It appears that prior to hearing Dr. Zeiguer's testimony, Roberts was not aware that a rape kit had been collected from Atwell, or at least that he was not aware that materials in the kit had tested positive for semen.

In December 2004, after hearing Dr. Zeiguer's testimony, Douard sent a letter to Robert Laurino, who at the time was the director of the Sexual Assault Response Team at ECPO. (ECPO St. ¶10; Resp. to EPCO St. ¶10.) Douard requested that Roberts's DNA be compared to the seminal stains preserved in the Atwell rape kit. (*Id.*)

Michelle Bolan, who was then an investigator at ECPO, was asked to collect a DNA sample from Roberts. Bolan was also asked to ensure that the Atwell rape kit be provided to the New Jersey State Police crime laboratory ("State Lab") for analysis. (ECPO St. ¶¶11-12; Resp. to EPCO St. ¶¶11-12.)

8

Bolan collected a buccal swab from Roberts and then arranged for another ECPO employee to deliver both the rape kit and the buccal swab to the State Lab. (ECPO St. ¶¶13-15; Resp. to EPCO St. ¶¶13-15.) At no point did Bolan open the rape kit, which had been sealed in 1996. (*Id.*) A receipt indicates that both the kit and Roberts's buccal swab were received by the State Lab in March 2005. (ECPO St. ¶16; Resp. to EPCO St. ¶16.)

An entry in the communications log maintained by the State Lab indicates that Joe Petersack, a scientist employed by the lab, called Laurino in April 2005. (ECPO St. ¶21; Resp. to EPCO St. ¶21.) In the comments section of the log, it states: "Regarding items in case. Only things retrieved from Crime Unit were the vaginal slides & the buccal swabs from the suspect. The kit did not contain the vaginal swab, genital swab, or the victim's saliva control. He will look into it & get back to me."[5] (ECPO St. ¶21; Resp. to EPCO St. ¶21.)

The State Lab log indicates that Petersack called Laurino two more times in July 2005. The comments pertaining to the first July call read: "Regarding locating the vaginal swabs. He will look into it and get back to me." (ECPO St. ¶22; Resp. to EPCO St. ¶22.) As for the second July call, the comments read: "With regard to swabs, everything that Newark P.D. had was sent to the lab. I advised him that we were going to scrape more of the slides to try & generate a sample – He agreed that was okay." (ECPO St. ¶23; Resp. to EPCO St. ¶23.)

In August 2005, the State Lab prepared a report detailing the results of the DNA testing that was conducted. (ECPO St. ¶27; Resp. to EPCO St. ¶27.) The report indicated that the only DNA detected from the tested sample was female DNA. (*Id.*) In October 2005, Laurino sent a copy of the report to Douard and informed Douard that the results were "inconclusive" because although Roberts's DNA was not detected, Roberts "could not be ruled out" because the materials "had degraded." (ECPO St. ¶28; Resp. to EPCO St. ¶28.)

In September 2005, Bolan collected a buccal swab from Atwell. (ECPO St.

---

[5]     The parties dispute the precise wording of this comment and others from the State Lab log, but the disputes do not appear to be central to the issues at hand.

¶35; Resp. to EPCO St. ¶35.) The undisputed facts do not indicate whether or when this buccal swab was received by the State Lab.

### E. Atwell's 2005 statements

In conjunction with his efforts regarding the rape kit, Douard arranged to interview Atwell. In late 2004, Douard and Ronald Price, an investigator for the Office of the Public Defender, met with Atwell to discuss the 1996 rape. (Newark St. ¶70; Resp. to Newark St. ¶70.) Atwell told Douard and Price at this meeting that she never made a photo identification of her assailant in 1996 and that she did not even know that anyone had ever been arrested in connection with the assault. (Newark St. ¶71; Resp. to Newark St. ¶71.)

In September 2005, Douard and Price interviewed Atwell again and prepared a statement memorializing what she had told them at the meeting in late 2004. (Newark St. ¶72; Resp. to Newark St. ¶72.) Atwell signed the statement, which asserted that she "told the police officer [she] was not able to make a positive identification" and that she was "unaware that a suspect had been indicted for the assault." (*Id.*) A crossed-out sentence in the statement reads: "I was not contacted thereafter and never made a photo identification or taken to the police station." (*Id.*)

At the same meeting, Atwell provided an oral statement that Price transcribed by hand on the same document as her written statement. (Newark St. ¶73; Resp. to Newark St. ¶73.) The oral statement provided, in relevant part: "I did give as [sic] statement to the police but please note that when I was taken to the police station shortly after the assault, I was shown photos of possible assailants & could not identify any as my assailant." (*Id.*)

### F. PCR efforts

In  February 2006, Roberts filed a *pro se* motion for post-conviction relief and to withdraw his guilty plea. (Newark St. ¶75; Resp. to Newark St. ¶75.) He argued that Martone, his public defender in 1996, provided ineffective assistance of counsel by misrepresenting to him that Atwell had made an identification. (*Id.*) Judge Codey denied Roberts's motion, concluding that it

10

was time barred. (Newark St. ¶76; Resp. to Newark St. ¶76.)

Roberts's appealed the denial, and in 2007 the Appellate Division reversed and remanded the case so that Roberts would be afforded the assistance of counsel in demonstrating why his motion should not be considered time barred. (Newark St. ¶77; Resp. to Newark St. ¶77.) On remand, Assistant Deputy Public Defender Stefan Van Jura was assigned to represent Roberts. (Newark St. ¶79; Resp. to Newark St. ¶79.) Assistant Prosecutor Clara Rodriguez represented the government. Following a hearing, Judge Codey again denied the motion, in part based on his finding that neither Atwell's 2005 statements nor the 2005 DNA report provided legitimate grounds for relief. Roberts appealed this second denial. (Newark St. ¶¶82-83; Resp. to Newark St. ¶¶82-83.)

In a 2009 decision, the Appellate Division reversed a second time and remanded the case for an evidentiary hearing. (*Id.*) At a hearing before Judge Codey in 2009, Atwell testified that she did not recognize Roberts, who was present in the courtroom, and that she did not recall ever making a photo identification of him or anyone else. (Newark St. ¶85; Resp. to Newark St. ¶85.) She also said directly to Roberts, "I want to know why did you confess to something that you didn't do to me? . . . ." (Newark St. ¶88; Resp. to Newark St. ¶88.) Judge Codey denied Roberts's PCR petition following this hearing, and Roberts appealed a third time. (Newark St. ¶¶97-98; Resp. to Newark St. ¶¶97-98.) In a 2013 decision, the Appellate Division again reversed and remanded for a further evidentiary hearing. (*Id.*)

Over the course of Roberts's PCR proceedings, the government attempted to locate the copy of the photograph of Roberts that Atwell had purportedly signed in 1996. (Newark St. ¶100; Resp. to Newark St. ¶100.) The photograph was not located at that time or as a result of subsequent searches conducted after the present lawsuit was filed. (*Id.*; Newark St. ¶101; Resp. to Newark St. ¶101.)

In 2013, after the Appellate Division remanded the case a third time, Rodriguez requested assistance from the Newark police in obtaining the Atwell

rape kit. (ECPO St. ¶¶39-40; Resp. to EPCO St. ¶¶39-40.) Detective Christine Witkowski was assigned to assist. Witkowski eventually learned that the tips from the vaginal swabs in the Atwell rape kit were in a box in one of the refrigerators in the Newark Lab, which had closed in 2010. (Newark St. ¶¶39, 138; Resp. to Newark St. ¶¶39, 138.) The missing tips from the vaginal swabs were subsequently obtained and sent to the State Lab, and DNA analysis indicated that Roberts's DNA did not match the profile of the specimen on the swabs. (ECPO St. ¶¶44-45; Resp. to EPCO St. ¶¶44-45.)

In November 2013, Judge Hutchins-Henderson, who had been assigned to the case after Judge Codey retired, vacated Roberts's guilty plea and ordered a new trial. (ECPO St. ¶46; Resp. to EPCO St. ¶46.) ECPO subsequently dismissed the charges against Roberts, and the State dismissed the civil commitment petition. (*Id.*) Roberts was released from custody on March 12, 2014. (ECPO St. ¶47; Resp. to EPCO St. ¶47.)

## II.    Procedural history

Roberts commenced this action in September 2015. (DE 1.) He filed an amended complaint in December 2016, after the court ruled on motions to dismiss by several of the defendants (DE 64, 92).

In broad terms, the amended complaint alleges that Roberts's constitutional and common law rights were violated as a result of actions taken by the various defendants in connection with the investigation and arrest of Roberts for Atwell's kidnapping and rape, as well as in connection with the handling and testing of the Atwell rape kit in 2005. Roberts seeks compensatory damages, punitive damages, and other relief. (Compl. ¶42.)

Discovery concluded in 2019. (DE 135, 150.) In May 2022, the ECPO Defendants, Essex County, and the Newark Defendants filed their respective motions for summary judgment. (DE 214, 219, 223.) The motions are now fully briefed and appropriate for adjudication.

## III.   Legal standard

Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See*

*Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000) (quoting Fed. R. Civ. P. 56(a)). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met that threshold burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "A fact is material if—taken as true—it would affect the outcome of the case under governing law. And a factual dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *M.S. by and through Hall v. Susquehanna Twp. Sch. Dist.*, 969 F.3d 120, 125 (3d Cir. 2020) (quotation marks and citation omitted).

## IV.   Discussion: Newark Defendants

I first discuss the summary judgment motions of the Newark Defendants, regarding claims arising from the alleged actions of Det. Eutsey of the Newark Police Department.

### A. Malicious prosecution

The Newark Defendants move for summary judgment on Counts 1 and 8, which raise claims against Det. Eutsey for malicious prosecution under 42

U.S.C. § 1983 and state law.

To prevail on a malicious prosecution claim under § 1983, a plaintiff must establish that (1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in the plaintiff's favor; (3) the defendant initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding. *Zimmerman v. Corbett*, 873 F.3d 414, 418 (3d Cir. 2017). Under New Jersey law, a malicious prosecution claim consists of the first four of these elements, without the requirement that the plaintiff was deprived of his or her liberty. *Trabal v. Wells Fargo Armored Serv. Corp.*, 269 F.3d 243, 248 (3d Cir. 2001).

The Newark Defendants first argue that the malicious prosecution claims must fail because Eutsey had probable cause to initiate a criminal proceeding. (Newark MSJ 9-21.) They maintain that when Eutsey applied for a warrant to arrest Roberts, he did so based upon Atwell's photo identification of Roberts. That identification supplied him with probable cause to believe that Roberts was Atwell's assailant.

"Probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Orsatti v. New Jersey State Police*, 71 F.3d 480, 483 (3d Cir. 1995). To demonstrate a lack of probable cause where, as in this case, the arresting officer applied for and was issued a warrant by a judge, a plaintiff must show "(1) that the police officer 'knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant;' and (2) that 'such statements or omissions are material, or necessary, to the finding of probable cause.'" *Wilson v. Russo*, 212 F.3d 781, 786-787 (3d Cir. 2000) (quoting *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997)).

According to the Newark Defendants, there is no evidence that Eutsey knowingly or recklessly made any false material statements or omissions in applying for a warrant for Roberts's arrest. That is of course one valid view of the evidence, but there is another, contrary view. This record presents a triable factual issue requiring denial of summary judgment on the issue of probable cause.

Eutsey's warrant application was based on Atwell's identification of Roberts as her assailant, but whether Atwell actually did identify Roberts in 1996 is a disputed issue of fact. Although Atwell signed a statement in 1996 indicating that she positively identified the male who assaulted her after viewing his picture (1996 Report 11), she subsequently signed a statement in 2005 indicating that she never made such an identification. (Newark St. ¶¶72-73.) The record further reveals that in 2007, Van Jura prepared a certification that Atwell signed confirming the truth of her 2005 statement. (Ex. 85 to DE 225.) Atwell confirmed the truth of her 2005 statement again at her deposition in 2019 (Atwell Dep. 88:22-91:1).

Of course, an officer may reasonably rely on a witness's statement of identification. But there is an issue as to the validity of Atwell's 1996 statement, which was typed up by Eutsey. Atwell testified at her deposition that she "just skimmed through" the statement that Eutsey prepared because her mother was in a rush to leave the police station. (*Id.* at 53:11-54:18.) She also testified that she pre-signed the statement indicating that she made a photo identification before Eutsey had even shown her the mugshots, which, if true, would be highly suggestive of Eutsey's knowledge of the statement's inaccuracy. (*Id.* at 47:14-25.) Later at the deposition, Atwell testified that Eutsey's report, which states that Atwell cried uncontrollably upon seeing a suspect's photo and informed Eutsey that that man was the person who assaulted her, was false. (*Id.* at 175:23-176:23.) Atwell testified that she is "certain" she "didn't pick out Rodney Roberts' photo in 1996." (*Id.* at 177:3-7.)

As the Newark Defendants point out, there is also considerable evidence

15

to suggest that Atwell *did* identify Roberts as her assailant in 1996. Recantations are notoriously unreliable, and Atwell's memory was less than consistent or complete. At various points during her deposition, she also testified that she was not sure whether she made any photo identification in 1996 and that she "just do[es]n't recall" whether she did or did not. (*Id.* at 190:12-191:24; 194:3-8.; 195:4-5.) She also testified that part of her 2005 statement, which suggests that she did not identify anyone as her assailant in 1996, was not truthful. (*Id.* at 207:5-8.)

Viewing this evidence in its entirety, and construing it in the light most favorable to Roberts, I conclude that a reasonable jury could find either way: *i.e.,* that Atwell did or did not identify Roberts from his photo in 1996. While it is obviously very possible, as Eutsey says, to dispute Atwell's credibility, the court may not make any credibility determinations or engage in any weighing of the evidence when ruling on a motion for summary judgment. *See Montone v. City of Jersey City*, 709 F.3d 181, 191 (3d Cir. 2013) (citation omitted). Whether Atwell made an identification in 1996 is an issue for the jury, as factfinder, to decide.

Because there is sufficient evidence in the record for a jury to find that Eutsey made a false statement when applying for a warrant for Roberts's arrest, the next questions are (a) whether any such statement was made knowingly or recklessly, and (b) whether it was material. *See Wilson*, 212 F.3d at 786-787. "An assertion is made with reckless disregard when 'viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported.'" *Id.* at 788 (quoting *United States v. Clapp*, 46 F.3d 795, 801 n.6. (8th Cir. 1995)). A false assertion made in an application for a warrant is material if, upon removing the false assertions, the application would no longer establish probable cause. *Wilson*, *supra* at 789.

Assuming Atwell did not identify Roberts as her assailant in 1996, then Eutsey surely knew or recklessly "must have entertained serious doubts" as to

16

the truth of his statements in his report that she did make such an identification. *See Wilson*, 212 F.3d at 788.

Furthermore, the statements were undoubtedly material, because without the purported photo identification, there was very little linking Roberts to the crime. The Newark Defendants point out that Roberts had previously committed a sexual assault and was not incarcerated at the time of Atwell's attack. (Newark MSJ 19.) Those facts alone do not approach a showing of probable cause. Without the photo identification, no probable cause to arrest Roberts for Atwell's rape existed. A reasonable jury could therefore find (taking, as I must, the plaintiff-favorable view that the statements were false) that Eutsey initiated proceedings against Roberts without probable cause.[6]

The Newark Defendants next argue that Eutsey is entitled to summary judgment on the malicious prosecution claims because there is no evidence that he acted with malice. (Newark MSJ 22-23.) In the context of a malicious prosecution claim, malice is a term of art, which includes "lack of belief by the actor himself in the propriety of the prosecution." *Lee v. Mihalich*, 847 F.2d 66, 70 (3d Cir. 1988). "The element of malice may be inferred from lack of probable cause." *Morales v. Busbee*, 972 F. Supp. 254, 261 (D.N.J. 1997). "As a result,

---

[6]     Roberts argues that there is also sufficient evidence for a jury to find that Eutsey made material omissions when applying for a warrant. Roberts asserts, in the alternative, that if Atwell did in fact identify Roberts from his photo, Eutsey failed to disclose to the judge issuing the warrant that the photo of Roberts that Atwell selected was 10 years old. An omission made in an application for a warrant is material if, after inserting the facts recklessly omitted, the affidavit would no longer established probable cause. *Wilson*, 212 F.3d at 789. Here, even if it were disclosed that the photo was 10 years old, that circumstance would at best go to the weight of the evidence; if Atwell identified her assailant as the person in the photo, that would ordinarily be sufficient to establish probable cause. Without further evidence that Roberts's appearance had so changed that the photo was misleading, Roberts would not have a malicious prosecution claim based on this omission alone. *Cf. Onuekwusi v. Graham*, No. 20-cv-02965, 2021 WL 1085523, at *7 (D.N.J. Mar. 22, 2021) (plaintiff stated a malicious prosecution claim where defendant police officers showed robbery victims a photo of plaintiff that depicted him 70 pounds lighter and 15 years younger and falsely told witnesses that he was associated with the phone number used by the perpetrator). At any rate, given my resolution of the main claim, this alternative theory is not critical to my ruling here.

fact issues precluding a finding on probable cause will generally also preclude a finding on malice." *Sanders v. Jersey City*, 2021 WL 1589464, Civ. No. 18-01057, at *21 (D.N.J. Apr. 23, 2021).

Here, because a reasonable jury could find that Eutsey acted without probable cause in pursuing a warrant for Roberts's arrest, a jury could also find that the element of malice is met. If Atwell never identified Roberts as her assailant, then it is likely that Eutsey himself did not believe there was a basis to initiate criminal proceedings against Roberts. Thus, there is a genuine factual dispute as to whether Eutsey acted with malice.

Finally, the Newark Defendants argue that Roberts cannot succeed on the malicious prosecution claim under § 1983 because he cannot prove that he suffered a deprivation of liberty. (Newark MSJ 21-22.) To satisfy the deprivation of liberty prong for a malicious prosecution claim, a plaintiff must show that he was "seized" within the meaning of the Fourth Amendment. *Liberty Bell Temple III v. Trenton City Police Dep't*, No. 316CV1339PGSLHG, 2019 WL 4750836, at *20 (D.N.J. Sept. 30, 2019) (vacated on other grounds). Time spent in jail is the quintessential deprivation of liberty. *See id.* at 21.

The Newark Defendants point out that when Roberts was charged in the Atwell case, he was already in jail for a theft offense. The Newark Defendants also note that Roberts was eventually sentenced to and did serve three years on that offense. Thus, they argue that Roberts did not suffer a deprivation of liberty solely because of the Atwell prosecution.

Here, the Newark Defendants cite *Curry v. Yachera*, 835 F.3d 373 (3d Cir. 2016). In that case, the Third Circuit affirmed a district court's grant of summary judgment on the plaintiff's malicious prosecution claim because the plaintiff could not show that he had suffered a deprivation of liberty due to the specific charges at issue. *Id.* at 380. When those charges were brought, the plaintiff was already incarcerated for a separate and unrelated offense. *Id.* When the relevant charges were dropped, the plaintiff was still in jail because of the unrelated offense. *Id.* The Third Circuit thus concluded that the

18

plaintiff's liberty was not denied *as a consequence* of the alleged improper charges. *Id.* Any possible deprivation was entirely subsumed by the sentence the plaintiff was already serving.

While the Newark Defendants may well be correct that Roberts was seized and taken into custody on the theft charges before he could be apprehended on the Atwell charges, the facts here are distinguishable from *Curry* because the theft sentence expired while Roberts was in custody, so the remainder of the time he served was pursuant to the kidnapping conviction alone. Roberts was arrested on the theft charges, pled guilty to those charges on June 12, 1996, and was sentenced to three years' imprisonment. (Newark St. ¶ 42) While still incarcerated, he pled guilty to the Atwell kidnapping and was sentenced to seven years' imprisonment. The two sentences ran concurrently, but the kidnapping sentence was far longer than the theft sentence; the sentence on the theft charges expired while the seven-year kidnapping sentence still had four years left to run.[7] (*Id.*) Unlike the plaintiff in *Curry*, then, Roberts was sentenced to serve four additional years in custody solely as a consequence of the charges alleged to have been maliciously brought. And thereafter, he spent 10 years in civil confinement as a sexually violent predator, based solely on the Atwell conviction.

In sum, while the Newark Defendants are correct that part of the time Roberts spent in custody—roughly, the initial three years—was not *solely* due to the Atwell charges, that does not defeat Roberts's § 1983 malicious prosecution claim. I will therefore deny the motion for summary judgment with respect to Counts 1 and 8.

## B. Fabrication of evidence

The Newark Defendants also move for summary judgment on Roberts's fabrication-of-evidence claims against Det. Eutsey, asserted in Counts 2 and 10 under § 1983 and state law. The Third Circuit has held that a police officer may be liable for fabrication where the officer provides false or misleading

---

[7]     For simplicity, I ignore the effect of parole.

information that is thereafter used in a prosecution. *See Halsey v. Pfeiffer*, 750 F.3d 273, 294 (3d Cir. 2014). New Jersey courts have also recognized that the use of fabricated evidence to secure a conviction violates state due process protections. *See State v. Patton*, 362 N.J. Super. 16, 18 (2003). (For a fuller discussion, see Part V.A, *infra*.)

Roberts's fabrication claim is based on essentially the same conduct as the malicious prosecution claims: Eutsey's allegedly false statement in his 1996 report that Atwell identified Roberts as her assailant. The Newark Defendants here repeat their contention that there is no evidence showing that Eutsey fabricated Atwell's 1996 photo identification. (Newark MSJ 9-14.) I have already found that this contention presents issues of fact that bar summary judgment.

I therefore turn to the Newark Defendants' second contention, which is that Roberts is estopped from claiming that the identification was fabricated. The defendants maintain that Roberts made a fabrication claim in his PCR proceedings and that Judge Codey rejected it. According to the Newark Defendants, Roberts is collaterally estopped from relitigating that factual issue. (*Id.* 23-25.)

 Under the doctrine of collateral estoppel, "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *Montana v. United States*, 440 U.S. 147, 153 (1979). Federal law requires that a federal court give state court decisions the same preclusive effect they would be given in courts of the state that rendered the decision. *Delaware River Port Auth. v. Fraternal Ord. of Police*, 290 F.3d 567, 573 (3d Cir. 2002). Hence, it is New Jersey's collateral estoppel doctrine that governs the analysis here.

"New Jersey courts apply a five-pronged test to determine whether collateral estoppel should bar relitigation of an issue: (1) the issue must be identical; (2) the issue must have actually been litigated in a prior proceeding;

(3) the prior court must have issued a final judgment on the merits; (4) the determination of the issue must have been essential to the prior judgment; and (5) the party against whom collateral estoppel is asserted must have been a party or in privity with a party to the earlier proceeding." *Delaware River*, 290 F.3d at 573 (citing *In re Estate of Dawson,* 641 A.2d 1026, 1034–35 (N.J. 1994)). "For purposes of issue preclusion …, 'final judgment' includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect." *Woodrick v. Jack J. Burke Real Est., Inc.,* 703 A.2d 306, 316 (App. Div. 1997) (quoting *Restatement (Second) of Judgements* § 13 (1982)).

Although Judge Codey found in his 2007 decision that Atwell's September 2005 statement was "inherently suspect and untrustworthy," the Appellate Division reversed Judge Codey's decision on grounds that are pertinent here. The Appellate Division held that Judge Codey committed error by making credibility findings as to Atwell's statement based upon papers alone, rather than conducting a plenary hearing. (2009 App. Div. at 9-16.) It therefore vacated and remanded the case, instructing Judge Codey to conduct an evidentiary hearing consistent with its opinion.

Judge Codey conducted such a hearing in 2009 and issued a decision in 2010 which again denied Roberts's PCR motion. (2013 App. Div. at 11.) In this written decision, Judge Codey again found Atwell's 2005 statement to be false. (*Id.*) Again, however, the Appellate Division reversed; it held that counsel had been ineffective, which led to several deficiencies at the hearing, and in light of these deficiencies, it could not defer to Judge Codey's credibility findings. (*Id.*)

Accordingly, Judge Codey's determination of the fabrication issue in both the 2007 and 2010 decisions was rendered non-final by the Appellate Division reversals. *See McLendon v. Cont'l Grp., Inc.,* 660 F. Supp. 1553, 1562 (D.N.J. 1987) (noting that where an appellate court reverses a lower court, the appellate decision "is the operative 'judgment' for preclusion purposes"). Because the resolution of this factual issue was neither final nor essential to a

final judgment, Roberts is not estopped from litigating this issue here.

## C. Mishandling of exculpatory evidence (photo)

The Newark Defendants next argue that they are entitled to summary judgment on Roberts's § 1983 and state law claims against Det. Eutsey, to the extent they are based on the failure to preserve the photo of Roberts that was allegedly shown to Atwell when she made her photo identification in 1996. Roberts asserts that the photograph was taken 10 years before that, when he was 19 years old, and that it therefore did not accurately reflect his appearance at the time of the Atwell rape/kidnapping, when he was 29. According to Roberts, if Atwell did identify her assailant from the photograph, and if the photograph did not resemble Roberts's current appearance, it could have been used to undermine the photo identification and thereby exonerate him. However, the photograph could not be located, despite substantial efforts during the course of Roberts's post-conviction proceedings (Newark St. ¶79)

Roberts's claims relating to Eutsey's handling of the missing photo underly Counts 3, 12, 4, and 11. The summary judgment motion argues these matters in connection with Counts 3 and 12, without reference to Counts 4 and 11. Roberts responds that Counts 3 and 12 are withdrawn as against Eutsey, but says nothing about Counts 4 and 11. (Opp. to Newark MSJ 1.) His brief refers to the missing photo in connection with other claims, but does not appear to argue failure to preserve the photo as a distinct claim for relief. This makes a certain amount of sense, as Roberts's main contention is that the Atwell photo identification of him never occurred at all.[8] To remove doubt, however, I briefly discuss Det. Eutsey's alleged failure to preserve the photograph of Roberts that Atwell purportedly identified in 1996. (DE 96 ¶¶186-189.)

The Supreme Court's decision in *Arizona v. Youngblood* establishes the

---

[8]   Defendants also purport to move for summary judgment on Count 13 (negligence), but the allegations of that Count relate only to the DNA evidence. The opening brief contains no substantive discussion of Count 13, although the responding brief does. I do not address it.

standard for determining whether law enforcement officials have infringed a defendant's due process rights by failing to preserve evidentiary materials that might have exonerated the defendant. 488 U.S. 51. "The *Youngblood* Court held that 'unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.'" *Yarris v. County of Delaware*, 465 F.3d 129, 142 (3d Cir. 2006) (quoting *Youngblood*, *supra* at 58). To establish bad faith, the defendant must show that the police knew of the exculpatory value of the evidence at the time it was destroyed. *Id.*

In *Yarris,* the Third Circuit extended *Youngblood,* a pre-conviction case, to encompass post-conviction failures to preserve exculpatory evidence. *Id.* The Court of Appeals reasoned that "the *Youngblood* decision did not indicate that it was limited to its temporal context, as it sought to govern applicability of the Due Process Clause in 'what might loosely be called the area of constitutionally guaranteed access to evidence' and resolve the violation it described broadly as 'the failure of the State to preserve evidentiary material.'" *Id.* Accordingly, the *Youngblood* test could apply to Eutsey's alleged failure to preserve the photograph. Whether it occurred before or after Roberts's conviction, it allegedly had the effect of obstructing Roberts's quest for post-conviction relief.

Eutsey argues that Roberts cannot succeed on a due process mishandling-of-evidence claim for several reasons. While rejecting two threshold contentions,[9] I find that Eutsey's substantive position has merit.

---

[9]     First, Eutsey contends that because Roberts had no trial, he cannot have any claim based on non-preservation of evidence. (Newark MSJ 27.)  Nothing in the *Youngblood* decision so holds. Roberts's claim is not that he was denied a fair trial; rather, his claim is that he was denied the ability to use the potentially exculpatory photograph in his post-conviction proceedings.

Second, Eutsey argues that Roberts is estopped from bringing this claim because he "could have raised the issue of suggestiveness [of the photograph] during his post-conviction relief proceedings," but failed to do so. (Newark MSJ 28.) The point of Roberts's claim, though, is that without the photograph, he *could not* make out a claim of "suggestiveness" (or the contrary) and thus exonerate himself. I therefore reject Eutsey's estoppel argument.

Primarily, Eutsey argues that there is no evidence that he was culpably involved in the disappearance of the photograph. According to the defendants, Eutsey submitted the photograph to the Newark police property room in 1996 and had no access to the photograph thereafter. (Newark MSJ 28.) Roberts demurs; Eutsey, he says, never actually submitted the photograph to the property room in the first place. (Resp. to Newark St. ¶26.) But Roberts has failed to point to any evidence sufficient to raise a jury issue on this factual point. There is no deposition testimony or affidavit regarding the manner in which the evidence was mislaid. The Newark Defendants have produced a "Property and Evidence Receipt" (the "Receipt"), regular on its face, indicating that it was attached to a sealed envelope containing the photograph and that the photograph was logged in. Roberts notes that the Receipt mistakenly states that the photograph is of a male identified as the perpetrator of an assault upon a 15-year-old female, whereas Atwell was 17 years old at the time. (Resp. to Newark St. ¶26.) That mistake, according to Roberts, suggests that no one took care to ensure that the photograph was actually logged in. I conclude that a mistake on the Receipt regarding the age of the victim is too slim a basis for a jury finding that Eutsey, in bad faith, withheld or destroyed the photo.

Finally, there is no independent evidence that the photo could or would have been exculpatory. Atwell's photo identification would be undermined only if there was a showing that the photo did not reasonably reflect Roberts's appearance in 1996. Of course that is conceivable. But there was no evidentiary showing that his appearance had changed so substantially between the ages of 19 and 29 as to undermine the accuracy of the photo identification, assuming it occurred.

As I say, it appears that Roberts is not pressing these claims. I consider these arguments in an excess of caution, however, and grant summary judgment on Counts 4 and 11, but only insofar as they assert *Youngblood*-style federal or state law claims against Eutsey (or, derivatively, against the City of Newark) based on the failure to preserve the photos. I note that Counts 3 and 12 have been withdrawn by Roberts as against Eutsey.

### D. Qualified immunity

As a separate ground for summary judgment, the Newark Defendants argue that Eutsey is entitled to qualified immunity on all of the federal and state law claims raised against him. (Newark MSJ 28-31.)

I begin with immunity under § 1983. "To overcome qualified immunity, a plaintiff must plead facts sufficient to show that: (1) the official violated a statutory or constitutional right; and (2) the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Faragalla v. Jersey City*, No. 2:17-CV-03604-KM-MAH, 2020 WL 5812798, at *7 (D.N.J. Sept. 30, 2020) (citation omitted). Having already determined that there is sufficient evidence for a reasonable jury to find that Eutsey committed the constitutional violations of fabricating evidence or maliciously prosecuting Roberts, I consider only whether these rights were "clearly established" at the time Eutsey acted. "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)). While a case directly on point is not required, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, *supra.*

Beginning with fabrication of evidence, the Third Circuit held in 1985 that "any reasonable state actor" would know that "by fabricating evidence for use in a criminal prosecution, [the] state actor would violate a defendant's constitutional rights . . . ." *Halsey*, 750 F.3d at 295. Thus, as early as 1985, and certainly in 1996 when Eutsey applied for a warrant based on the allegedly fabricated identification of Roberts by Atwell, the right to be free from a prosecution based on fabricated evidence was "clearly established."

As for malicious prosecution, in *Gallo v. City of Philadelphia*, the Third Circuit held that government actors were not immune from malicious prosecution claims based on conduct that occurred in 1994. 161 F.3d 217, 220

(3d Cir. 1998), as amended (Dec. 7, 1998). The *Gallo* decision noted that malicious prosecution had been recognized as a constitutional tort before 1994. *Id.* It follows that the federal constitutional right to be free from a malicious prosecution was "clearly established" in 1996, when the events in this action occurred. Eutsey therefore does not enjoy qualified immunity with respect to the § 1983 constitutional claims.

As to the state law claims, the New Jersey Tort Claims Act (TCA) immunizes public employees from liability for actions taken "in good faith in the execution or enforcement of any law." *See* N.J. Stat. Ann. 59:3-3. In order to benefit from this immunity, "a public employee must demonstrate either that he acted with objective reasonableness or establish that he acted with subjective good faith." *Villari v. Twp. of Wall*, No. CIV. A. 06-0004 FLW, 2009 WL 2998135, at *14 (D.N.J. Sept. 15, 2009). *See Marley v. Borough of Palmyra*, 473 A.2d 554, 566 (Law. Div. 1983) ("[a]n employee claiming immunity under N.J.S.A. 59:3–3 must prove "good faith") (abrogated on other grounds). The Newark Defendants have not met this burden, and they incorrectly argue in their brief that it is Roberts's burden to prove that Eutsey did not act in good faith. (Newark MSJ 31.) Eutsey is therefore not entitled to summary judgment on the state law claims on grounds of qualified immunity either.

## E. *Monell* claims against City of Newark

### i. Procedural due process

Count 5 asserts a claim against the City of Newark for violating Roberts's procedural due process rights by maintaining an inadequate evidence management system that prevented Roberts from accessing key components of the Atwell rape kit for many years. (Compl. ¶¶191-194.) This claim is raised pursuant to *Monell v. Dep't of Soc. Servs. of City of New York*, in which the Supreme Court held that a municipality may be held directly liable under § 1983 for a constitutional injury caused by an official policy or custom of the municipality. 436 U.S. 658, 694 (1978). The Newark Defendants argue that Roberts cannot succeed in proving *Monell* liability because there is no evidence

of a pattern of evidence mismanagement within the Newark Police Department. (Newark MSJ 38.) They also argue that the claim fails because there is no evidence of bad faith conduct and they are entitled to qualified immunity under § 1983.

As stated, *Monell* liability may attach on the basis of an official policy or custom. As to policy, a municipality is liable where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690. "As to custom, municipalities may be sued for 'constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision[-]making channels.'" *Costantino v. City of Atl. City,* 152 F. Supp. 3d 311, 319 (D.N.J. 2015) (quoting *Monell*, *supra*). "Liability based on a custom rather than a formal adopted policy proceeds on the theory that the relevant practice is so widespread as to have the force of law." *Costantino, supra.*

The record suggests that during the time the Atwell rape kit was tested, the Newark Lab maintained an internal policy and practice of removing materials that tested positive for bodily fluid stains and storing them separately from the rest of the kit. Joseph Groller, the forensic chemist who examined the Atwell rape kit in 1996, testified at his deposition in 2019 about this practice. (Groller Dep. 154:9-159:3). He explained that when he tested an item from a sex crimes kit and received a "positive result," he would withdraw it from the kit, repackage it in a smaller envelope, and place that envelope in one of the refrigerators in the lab. (*Id.*) Groller stated that he did this "generally for all the rape kits that [he] tested" (*id.*), and that he was advised to do this by his superiors. (*Id.* at 190:1-16.) Groller further explained that after a kit was analyzed, and the positive material, if any, was removed and placed in a refrigerator, the remainder of the kit was picked up from the lab by Newark police personnel and stored in a separate location. (*Id.* at 95:9-96:16.)

The record further suggests that officials outside of the Newark Lab were not made aware of this practice of storing material that tested positive for bodily fluid separately from the rest of the rape kit. Rodriguez, who was supervisor of the ECPO Sex Crimes Unit at one point and regularly communicated with detectives of the Newark Police Department regarding locating evidence, testified that prior to 2013, even she never knew that the Lab kept this material separate from the rape kits it tested. (Rod. Dep. II 316:13-317:24.) There is also evidence that Laurino was made aware in 2005 that the Atwell rape kit submitted to the State Lab was missing the vaginal swabs, and that Laurino communicated with Newark police about the missing swabs, which nevertheless were not located at that time. The State Lab communication log indicates that Laurino told a State Lab employee that he would "look into" the missing swabs and get back to him. (Newark St. ¶122.) Several weeks later, Laurino told the employee that "everything that Newark P.D. had was sent to the lab." (Newark St. ¶124.) One could reasonably infer from these communications that Laurino and perhaps even the Newark police to whom he spoke were unaware that the positive-test materials were stored separately.

Based on this evidence, a reasonable jury could find that a practice existed in the Newark Police Department of storing positive-test swabs from a rape kit in a separate location from the rest of the kit, but without making that policy generally known, defeating much of its purpose. Moreover, a jury could conclude that this flawed policy obstructed Roberts's access to exculpatory DNA evidence, thus amounting to a procedural due process violation. *See Newton v. City of New York*, 779 F.3d 140, 155 (2d Cir. 2015) (city's poor administration of its evidence management system amounted to due process violation where it prevented plaintiff from accessing exculpatory DNA evidence for over a decade). *See* Part V.B, *infra* (concluding that Roberts had a protected liberty interest in demonstrating his innocence with newly discovered evidence).

The Newark Defendants cite the Third Circuit's decision in *Yarris* in support of their argument that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not

constitute a denial of due process. (Newark MSJ 34.) Roberts's procedural due process claim is not based on the failure to preserve the Atwell rape kit, however. The critical component of the rape kit was preserved, but it was stored in such a manner that it could not be located for many years. A failure-to-preserve claim under *Youngblood* requires a showing of bad faith, but a procedural due process claim based on evidence mismanagement does not. As the Second Circuit recognized in *Newton*, the concerns that led the Supreme Court to require a bad faith showing with respect to claims based on the failure to preserve *potentially* exculpatory evidence, now irretrievably destroyed, are not present when it comes to a claim that an inadequate evidence management system deprived an individual of access to existing evidence that eventually exonerated him. *Newton* 779 F.3d at 157-158. Any reasonable system for "preserving" evidence must be set up so that the preserved evidence can be located and recovered.

Finally, the City of Newark is not entitled to qualified immunity with respect to the procedural due process claim, as qualified immunity under § 1983 is available only to individual government actors, not to government entities. *Harper v. Cnty. of Delaware*, 779 F. App'x 143, 147 (3d Cir. 2019). I will therefore deny the motion for summary judgment on Count 5 as to the City of Newark.[10]

### ii. Vicarious tort liability

Count 14 alleges a state law vicarious liability claim against the City of Newark for any non-intentional torts committed by Eutsey and the Newark Police Department personnel who handled Roberts's criminal file and the rape

---

[10]    The Newark Defendants have attached to their reply brief a set of guidelines from the Attorney General on the retention of evidence in criminal cases that was published in 2010. From this, they infer that there was no requirement that the City preserve the DNA evidence in the Atwell case prior to 2010. (Newark Repl. 28-29.) In response, Roberts submitted a letter to the court indicating that the guidelines were not produced in discovery, despite Roberts's request for all documents pertaining to the handling and storing of sex crimes evidence. I will not consider on this motion evidence not produced in discovery and attached to a reply brief. Its potential admissibility at trial I leave for another day.

kit. (Compl. ¶¶245-247.)[11] The Newark Defendants move for summary judgment on this count on the ground that the City is entitled to good faith immunity under the TCA.

Pursuant to the TCA, "[a] public entity is not liable for an injury resulting from an act or omission of a public employee where the employee is not liable." N.J. Stat. Ann. § 59:2-2(b). As noted above, the TCA grants immunity to a public employee for actions taken "in good faith in the execution or enforcement of any law." *See* N.J. Stat. Ann. 59:3-3.

Here, the Newark Defendants have not demonstrated that Eutsey or any other Newark personnel upon whose conduct the vicarious liability claim rests are themselves entitled to good faith immunity. Because the burden is theirs to establish such an entitlement, this argument fails. *See* Part IV.D, *supra.*

## V.   Discussion: ECPO Defendants and Essex County

I discuss here the motions relating to the acts of the ECPO Defendants, *i.e.,* the summary judgment motions of Assistant Prosecutor Laurino and Investigator Bolan, as well as the related motions of Essex County and ECPO, which are directed at their derivative liability for the acts of Laurino and Bolan.

### A. Fabrication of evidence

The ECPO Defendants move for summary judgment on Counts 2 and 10, which assert claims of fabrication of evidence under 42 U.S.C. § 1983 and state law against Laurino and Bolan. As discussed in Part IV.b, *supra*, both the Third Circuit and New Jersey courts have recognized that a defendant may have a stand-alone due process claim where fabricated evidence was used to secure the defendant's conviction. *See Halsey*, 750 F.3d at 294; *Patton*, 362 N.J. at 18.

The Third Circuit has cautioned that, under federal law, evidence "that is

---

[11]    While the City of Newark argues that it is entitled to immunity from vicarious liability as to any intentional tort claims under state law, the point is moot. Roberts clarified in his responsive brief that he is not asserting such intentional tort claims against the City. (Opp. to Newark MSJ 70, n.27.)

incorrect or simply disputed should not be treated as fabricated merely because it turns out to have been wrong." *Halsey*, 750 F.3d at 295. Rather, for a fabricated-evidence claim to succeed, "[t]here must be 'persuasive evidence supporting a conclusion that the proponents of the evidence' are aware that the evidence is incorrect or that the evidence is offered in bad faith." *Black v. Montgomery Cnty.*, 835 F.3d 358, 372 (3d Cir. 2016), as amended (Sept. 16, 2016) (quoting *Halsey, supra*). New Jersey courts have not indicated that any less culpable mental state will support a fabrication of evidence claim under New Jersey law. *See Patton*, 362 N.J. at 49 (holding that "the use of police-fabricated evidence to induce a confession that is then used at trial to support the voluntariness of a confession is per se a violation of due process").

The complaint alleges that Laurino and Bolan falsified evidence against Roberts by telling Assistant Prosecutor Rodriguez that Atwell's complete rape kit was tested in 2005 and that the results of the testing were inconclusive. (Compl. ¶ 168.) According to Roberts, Rodriguez relied upon these misrepresentations when she prosecuted the PCR proceedings in 2007. (Opp. to ECPO MSJ 9, 12.) Rodriguez wrote in her 2007 PCR brief that Atwell's DNA sample was sent to the State Lab, and that the lab also tested the Atwell rape kit, but the analysis did not provide conclusive results (Rod. PCR Br. 3, 12). These statements were literally true, but substantively misleading. The kit that was tested was missing the vaginal swab tips, *i.e.,* the very portions which would contain the seminal stains and thus the male assailant's DNA.[12]

The ECPO Defendants argue that summary judgment is appropriate on the fabrication claims as to them. Even assuming *arguendo* that misconduct occurred at the police level, they say, the record is devoid of any evidence that either Laurino or Bolan misrepresented to Rodriguez that the rape kit tested in

---

[12]   Roberts maintains that these statements were also false because Atwell's own buccal swab had not been submitted to the State Lab, so there was no way to confirm that female DNA in the rape kit was hers. The whole premise of Roberts's motion, however, is that the Atwell rape kit did not contain *his* DNA, which is not disputed at this point. To find that this was not Atwell's rape kit would only undermine Roberts's contentions.

2005 was complete. (ECPO MSJ 19-20.) Roberts argues in response that there is sufficient evidence for a jury to find that both Laurino and Bolan spoke with Rodriguez about Atwell's rape kit at some point prior to the 2007 PCR proceedings, and that neither informed Rodriguez that portions of the rape kit were not submitted for testing.

To begin with, the record is clear that Rodriguez was in the dark about the fact that portions of the rape kit were missing from the sample that was tested by the State Lab in 2005. Rodriguez testified at a 2019 deposition that she did not know in 2007 that the vaginal swab tips were stored separately from the rest of the kit. (Rod. Dep. 117:2-118:2.) Rather, at that time she believed that the entire kit was tested and that the inconclusive results were due to the fact that the material had degraded. (Rod. Dep. 123:13-124:25.) Rodriguez further testified that she never knowingly misrepresented any facts to Judge Codey in 2007. (Rod. Dep. 67:14-17.) The question thus becomes whether Rodriguez's misrepresentations regarding what was tested can be attributed to knowingly false statements or omissions by Bolan or Laurino.

As for Bolan, Rodriguez testified that, although she does not recall having a conversation with Bolan about Atwell's rape kit, she would have spoken to Bolan "[i]f she was part of this case." (Rod. Dep. 95:10-11.). Rodriguez testified that she does recall speaking with Bolan about a request Atwell made for a paternity test in 2005, and the evidence suggests that this request occurred at the time when Bolan met with Atwell to collect a buccal swab from her. (*Id.* at 95:16-23; ECPO St. ¶35.) Bolan testified at her deposition, however, that she does not believe she ever told Rodriguez that the buccal samples she had collected from Atwell were not submitted to the State Lab for testing in 2005. (Bolan Dep. 130:15-19). As to the more critical issue of the missing swab tips, there is nothing in the record of the interactions between Bolan and Rodriguez.

With respect to Laurino, there is a bit more. Both Laurino and Rodriguez testified at their depositions that they spoke frequently with one another about DNA cases. Rodriguez testified that given their working relationship she "must

have spoken with [Laurino] at some point" about the Roberts matter. (Rod. Dep. 123:6-9, 127:1-3; Laur. Dep. 99:4-12). Rodriguez did not recall Laurino ever telling her that the rape kit submitted for testing was not complete. She also did not recall Laurino ever relaying to her that the State Lab had reached out to him regarding the completeness, or not, of the materials it had received. (Rod. Dep. 131:18-25, 132:18-22, 133:11-15.)

Viewing this evidence in the light most favorable to Roberts, a reasonable jury could find that Laurino and Bolan had conversations of some kind with Rodriguez about the Roberts matter and the DNA testing that was done. Absent, however, is any evidence from which a jury could reasonably conclude that Laurino or Bolan ever told Rodriguez that Atwell's complete rape kit was tested, which would have been false.

Perhaps recognizing this, Roberts argues that Laurino and Bolan are liable for fabrication of evidence based on omissions—*i.e.,* that they *failed* to tell Rodriguez that the rape kit that was tested was incomplete.

Roberts cites a string of cases for the proposition that a fabrication-of-evidence claim can be based upon a government actor's omission of material information. (Opp. to ECPO MSJ 5-6.) Several of the cited cases do not stand for such a proposition, however. In *Halsey*, police officers fabricated the plaintiff's confession to a crime. 750 F.3d 273, 278. The Third Circuit noted that there were "omission[s] of critical facts" in the purported confession, but these omissions were relevant only in the sense that they demonstrated that the confession had been fabricated, because it was ultimately "inconsistent with . . . significant facts" about the crime that eventually emerged. *Id.* at 284. The omissions themselves were not treated as material.

Similarly, in *Dennis v. City of Philadelphia*, the plaintiff asserted both a fabrication claim and a deliberate deception claim, and it was only the latter that was based upon the defendant police officers' concealment of physical evidence and failure to correct a witness's mistaken testimony about that physical evidence, which in a sense could be considered an omission. 379 F.Supp.3d 420, 425 (E.D. Pa. 2019). The fabrication claim was based upon an

officer's false testimony at trial, not on that arguable omission. *Id.* Finally, *Siehl v. City of Johnstown* concerned fabricated results in forensic reports with no omissions of material information alleged. 365 F. Supp. 3d 587, 601-602 (W.D. Pa. 2019).

Two of the cases Roberts cites do suggest that a fabrication claim can be based upon a material omission, but the facts in those cases are readily distinguishable. In *Jaslar v. Zavada*, police officers "made false statements and omitted pertinent facts in their probable cause affidavit," which was the basis for the arrest and filing of charges against the plaintiff. No. 3:CV-05-2080, 2009 WL 82553, at *1 (M.D. Pa. Jan. 12, 2009). And in *Morse v. Fusto*, the defendants created a spreadsheet that misleadingly omitted certain information, and the spreadsheet was presented to a grand jury and used to indict the plaintiff. 804 F.3d 538, 542-543 (2d Cir. 2015). In both cases, the omissions were made in the context of a piece of evidence that, as a whole, was deemed to be fabricated in part due to the omitted information. That evidence was presented to a judge or grand jury, and the defendants were unmistakably the source of it.

Here, by contrast, there is nothing from which a reasonable jury could conclude that either Laurino or Bolan was the source of the misleading evidence that Rodriguez presented at the PCR proceedings. At most, the record generally shows that Rodriguez might have spoken with each of them about the case at some point. It does not show that Laurino or Bolan participated in the PCR litigation, even as sources of information, or that that they directly or indirectly made any representations to the PCR court. Nor is there any evidence that Rodriguez relied on the accuracy or completeness of her conversations with Laurino or Bolan in prosecuting the PCR proceedings. Put differently, the only relevant evidence is that Rodriguez relied on the State Lab report, which itself did not indicate that there was anything missing from the rape kit. While Rodriguez mentioned the State Lab report during oral argument on the PCR petition, it does not appear that she ever referenced her conversations with Laurino or Bolan. (PCR Tr. at 18:10-19:2.)

To be sure, Roberts has presented a case that Rodriguez's presentation in the PCR proceedings was misleading, because she did not disclose that the rape kit that was tested did not include the critical swab tips. What is lacking is any evidence that either Laurino or Bolan was responsible for that omission or fabrication. *See generally Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012) (liability for fabricating evidence requires that the evidence be "used to deprive the defendant of her liberty in some way").

I will therefore grant summary judgment on the fabrication of evidence claims and dismiss Counts 2 and 10 against Laurino and Bolan.[13]

### B. Procedural due process

The ECPO Defendants also move for summary judgment on Count 5, which asserts a § 1983 procedural due process claim against Laurino and Bolan. Unlike the fabrication of evidence claim, which focuses on a prosecutor's misrepresentations to the court, this claim focuses on misrepresentations to the criminal defendant. Under current law, Roberts might possess such a claim, but Laurino and Bolan are entitled to qualified immunity because that right was not clearly established as of 2005.

"To state a claim under § 1983 for deprivation of procedural due process rights, a plaintiff must allege that (1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the procedures available to him did not provide 'due process of law.'" *Hill v. Borough of Kutztown*, 455 F.3d 225, 233–34 (3d Cir. 2006) (citing *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000)). Roberts maintains that Laurino and Bolan deprived him of the process he was due in his post-conviction proceedings by providing him with inaccurate information about the materials that were submitted for DNA testing in 2005. (Opp. to

---

[13]     In light of this resolution, I need not address the ECPO Defendants' argument that they are entitled to absolute prosecutorial immunity with respect to Roberts's claim that they fabricated evidence. (ECPO MSJ 20-23.) *See generally Yarris*, 465 F.3d at 137 (discussing limitations on scope of prosecutorial immunity for post-conviction actions).

ECPO MSJ 27).

Beginning with the factual component of this claim, a reasonable jury could find that Laurino provided Roberts with inaccurate information regarding the scope of the DNA testing that was performed in 2005. Laurino was apparently told several times by the State Lab that the vaginal swab tips were missing from the kit, but Laurino did not share this critical information with Douard when he informed Douard of the results of the analysis. (ECPO St. ¶ 20-23). Rather, Laurino "forwarded a copy of th[e] report to Douard on October 6, 2005, stating that the results were 'inconclusive' because although Roberts's DNA was not on the slides, Roberts 'could not be ruled out' because the materials 'had degraded.'" (ECPO St. ¶28.)

That Laurino misinformed Roberts about the scope of the testing that was done in 2005, however, does not necessarily amount to a procedural due process violation. As stated, procedural due process rights only attach where there is a constitutionally protected liberty interest and a person is deprived of that interest. *See Hill*, 455 F.3d at 233–34. A key issue, then, is whether Roberts had a protected liberty interest in having the entirety of the Atwell rape kit tested in 2005. The answer is yes, but the analysis is somewhat complex.

In *Dist. Attorney's Off. for Third Jud. Dist. v. Osborne*, the Supreme Court held that there is no freestanding right to obtain post-conviction access to the state's evidence for DNA testing. 557 U.S. 52, 55-56 (2009). However, where state law creates a post-conviction right to access potentially exculpatory DNA evidence, procedural due process protections do attach, although they are less extensive than those that attach in the pre-trial context. *Id.* 68-69. The Court explained that "when a State chooses to offer help to those seeking relief from convictions," due process does not "dictate the exact form such assistance must assume." *Id.* at 69 (quoting *Pennsylvania v. Finley,* 481 U.S. 551, 559 (1987). "The State accordingly has more flexibility in deciding what procedures are needed in the context of postconviction relief." *Osborne, supra* at 69. Given this flexibility, due process is violated only where the state's procedures for

36

post-conviction relief "are fundamentally inadequate to vindicate the substantive rights provided." *Id.*

Roberts cites to two cases in support of his procedural due process claim under *Osborne*. In *Newton*, the Second Circuit upheld a jury verdict that New York City's inadequate evidence management system violated the plaintiff's right to due process in his post-conviction proceedings. 779 F.3d at 142. The plaintiff, who was convicted of rape and other crimes, requested DNA testing under New York's then-newly enacted statute permitting post-conviction DNA testing. The plaintiff was told that the rape kit in his case could not be located and was likely destroyed. A decade later, the rape kit was found and tested, and the plaintiff was exonerated. *Id.* at 144-145. The Second Circuit concluded that the plaintiff's statutory right to obtain post-conviction DNA testing created a corresponding procedural right to a "a faithful accounting of the evidence in the City's possession." *Id.* at 151. The Court deemed it reasonable for a jury to conclude that the inadequacy of the City's evidence-management system deprived the plaintiff of procedural due process.

Similarly, the Eastern District of North Carolina denied the City of Goldsboro's motion to dismiss a complaint alleging a procedural due process claim based upon its police department's evidence retention policies which delayed the plaintiff's exoneration. *See Dail v. City of Goldsboro*, No. 5:10-CV-00451-BO, 2011 WL 2837067, at *6 (E.D.N.C. July 14, 2011). In *Dail*, the plaintiff was also told upon seeking post-conviction DNA testing that the rape kit taken from the victim had been destroyed. *Id.* at 2. Over a decade later, the evidence from the case was found and tested, which led to his release from custody. *Id.*

Although the facts in *Newton* and *Dail* are similar to the facts here, there is a difference: the plaintiffs in those cases were serving terms of imprisonment when they sought DNA testing under their respective states' post-conviction relief statutes. Roberts, on the other hand, had finished serving his sentence by the time he sought DNA testing. (Comm. Order 2) Douard requested DNA

testing on Roberts's behalf to use in opposing the civil commitment petition filed against Roberts (ECPO St. ¶¶7-10), and Roberts later pursued post-conviction relief for the purpose of securing his release from civil confinement as a sexually violent predator.

This distinction makes a difference, because although New Jersey law permits a person to seek post-conviction DNA testing, in 2005 that right was only available to an individual "who was convicted of a crime and is currently serving a term of imprisonment." N.J. Stat. § 2A:84A-32a (2001).[14] Roberts himself appears to recognize that this statute did not apply to him when he sought DNA testing in 2005, as he states in one of his opposition briefs that "Laurino voluntarily agreed to assist" in obtaining a DNA comparison and was not complying with or enforcing any law in doing so. (DE 222 11, 15.)

Nonetheless, under current law, Roberts could have a viable procedural due process claim based on this record. In *Osborne*, the Supreme Court held in 2009 that the defendant had a protected liberty interest in accessing the State of Alaska's evidence for DNA testing despite the fact that Alaska did not have a statute authorizing post-conviction DNA analysis at the time. 557 U.S. at 64. The Court concluded that a liberty interest existed because Alaska (a) had a general post-conviction relief statute that allowed a prisoner to challenge his or her conviction on the basis of newly discovered evidence, and (b) permitted discovery in post-conviction proceedings to access evidence in the state's possession. *Id.*

Under *Osborne*, Roberts would have a protected liberty interest in accessing the Atwell rape kit for DNA testing, even if New Jersey's DNA testing statute did not explicitly grant such a right. Like Alaska, New Jersey has (and had in 2005) a procedure permitting criminal defendants to seek post-conviction relief. *See* N.J. Ct. R. 3:22-2. Moreover, New Jersey law permits a

---

[14]     The statute has since been amended to permit an individual who was convicted of a crime and "has completed serving the sentence for that conviction" to seek DNA testing of evidence upon a showing of "just cause." N.J. Rev. Stat. § 2A:84A-32a (2016).

convicted person to seek a new trial on the basis of newly discovered evidence "at any time." *See* N.J. Ct. R. 3:20-2. A new trial motion will be granted if it can be shown that the evidence is material, would have been likely to change the jury's verdict, and was not previously available. *State v. Behn*, 868 A.2d 329, 342 (App. Div. 2005).

While there was no freestanding right to discovery in post-conviction proceedings in New Jersey, the trial court has and had inherent power to order discovery in such proceedings "when justice so requires." *State v. Szemple*, 247 N.J. 82, 97 (2021) (citation omitted). The New Jersey Supreme Court held long ago that "where a defendant presents the PCR court with good cause to order the State to supply the defendant with discovery that is relevant to the defendant's case and not privileged, the court has the discretionary authority to grant relief." *State v. Marshall*, 148 N.J. 89, 270 (1997).

By creating a procedure for post-conviction relief and authorizing discovery in post-conviction procedures upon a showing of good cause, New Jersey chose "to offer help to those seeking relief from convictions," and not just those who were currently serving a term of imprisonment. *Id.* at 69. Thus, in 2005, Roberts had a substantive right to challenge the validity of his conviction with DNA evidence, and he was entitled to adequate procedures in order to vindicate this right. *Id.* By analogy to *Newton*, that right carried with it a corresponding procedural right to a "a *faithful* accounting of the evidence in the City's possession." 779 F.3d at 151 (emphasis added). And it is fair to read "faithful" to mean "accurate."[15]

The ECPO Defendants argue that even if the evidence does support a procedural due process claim against Laurino, Laurino is entitled to qualified immunity. (ECPO MSJ 24.) As discussed more thoroughly in Part.IV.d, *supra*, "[t]he doctrine of qualified immunity protects government officials 'from liability

---

[15]     Further tipping the balance as to what process is due was Roberts's confinement as a sexually violent predator. While no longer literally serving a criminal sentence, he was behind bars as a result of this conviction, and he can perhaps be forgiven for failing to appreciate the distinction.

for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan,* 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

*Osborne,* the Supreme Court case establishing that federal due process protections accompany a state-created right to post-conviction DNA testing, was decided in 2009. The alleged due process violations in this case occurred in 2005. Hence, while Roberts had a right under New Jersey law to post-conviction DNA testing in 2005, his corresponding federal procedural due process rights were not yet "clearly established."

Qualified immunity protects Laurino under these circumstances. *See Dail*, 2011 WL 283706 at *7 (qualified immunity shielded government defendants from procedural due process claim under *Osborne* because *Osborne* was decided after the alleged unconstitutional conduct occurred). Accordingly, I will grant summary judgment on the procedural due process claim and dismiss Count 5 against Laurino and Bolan.

### C. Supervisory liability

Count 7 alleges that Laurino is vicariously liable for the constitutional violations of his subordinate, Bolan. Because I am granting summary judgment as to Bolan on both of Roberts's constitutional claims against her, *see* Parts V.A and V.B, *supra*, I will also grant summary judgment to Laurino on the derivative claim against him for supervisory liability.

### D. Negligence

Count 13 raises a state law negligence claim against Laurino and Bolan based on the same conduct as the procedural due process claim. The ECPO Defendants move for summary judgment on this claim as well.

To sustain a cause of action for negligence, a plaintiff must prove four elements: (1) a duty of care, (2) a breach of that duty, (3) proximate cause, and (4) damages. *Polzo v. Cnty. of Essex*, 196 N.J. 569, 584 (2008). The ECPO Defendants argue that Roberts's negligence claim fails because neither Laurino

40

nor Bolan breached a legal duty to Roberts by not ensuring that all components of the Atwell rape kit were received by the State Lab and tested. (ECPO MSJ 29.)

Whether and to what extent a defendant owes a legal duty are generally questions of law for the court. *Clohesy v. Food Circus Supermarkets, Inc.*, 149 N.J. 496, 502 (1997) (citations omitted). Because "[d]uty is a fluid concept," there is no exact rule that determines when one owes a legal duty to another to prevent harm. § 11:3. Duty of care, 56 N.J. Prac., Personal Injury Law § 11:3 (2022-2023 ed.), quoting *Tighe v. Peterson*, 356 N.J. Super. 322, 330 (App. Div. 2002), judgment aff'd, 175 N.J. 240, 814 A.2d 1066 (2002). The foreseeability of harm is a significant consideration, but it does not establish the existence of a duty in itself. *Carvalho v. Toll Bros. & Devs.*, 143 N.J. 565, 572 (1996). "Once the foreseeability of an injured party is established, considerations of fairness and policy govern whether the imposition of a duty is warranted." *Id.* at 573 (citation omitted). "The assessment of fairness and policy 'involves identifying, weighing, and balancing several factors—the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution.'" *Id.*, quoting *Hopkins v. Fox & Lazo Realtors*, 132 N.J. 426, 439 (1993).

Considerations of foreseeability, fairness, and public policy counsel that Laurino did owe a duty to Roberts to accurately represent the scope of the DNA testing that was performed in 2005. Although, as stated, Laurino had no statutorily imposed obligation to locate the Atwell rape kit for Roberts and submit it for testing, he agreed to do so, and he created the appearance that he *had* done so. He testified to speaking with Douard about the DNA testing that Roberts was requesting and to informing Douard of the inconclusive results of the State Lab's analysis. (Laur. Dep. 146:10-12, 233:22-235:2). The evidence suggests, however, that Laurino never told Douard that the Lab reached out to Laurino several times to say that components of the rape kit were missing and thus could not be tested. Instead, Laurino represented to Douard that the

requested DNA analysis had been completed.

The harm that Roberts would suffer from Laurino's misrepresentation was foreseeable. Laurino testified that he knew Roberts was facing civil commitment and understood that Roberts was contesting his involvement in the Atwell rape in order to demonstrate that civil commitment was not warranted. Having agreed to help Roberts obtain the DNA testing he sought, and later having represented to Roberts that the requested testing was completed and the materials had degraded, rendering the results inconclusive, Laurino could have foreseen that Roberts would rely on this representation and no longer pursue DNA analysis as a means to exonerate himself.

Fairness and public policy similarly weigh in favor of finding a duty under the circumstances. As a government actor, Laurino was in a position of trust and authority. He was the "go-to guy" at the Essex County Prosecutor's Office regarding DNA analysis, such that it was reasonable for Douard and Roberts to rely on his representations. (Laurino Dep. 73:19-23.) Moreover, Laurino could have easily exercised reasonable care in the situation; all he had to do was inform Douard that components of the rape kit were missing. Had he done so, instead of lulling Douard, Roberts likely would have continued his efforts to locate the relevant evidence and ensure that it was tested. Finally, there is a strong public interest in overturning wrongful convictions through the use of DNA analysis. That interest would be served by imposing a duty on a government actor who voluntarily agrees to assist a defendant in obtaining DNA analysis to accurately represent the scope of the testing that is ultimately performed.

To be clear, I do not find that Laurino had a statutory duty in 2005 to ensure that the missing components of the rape kit were located and ultimately tested. The duty I am recognizing is much narrower. All that was required was that Laurino, when informing Douard as to the status of the DNA testing, exercise reasonable care under the circumstances.

I also conclude that a reasonable jury could find that Laurino breached this duty of care and that the breach caused foreseeable harm to Roberts. The

42

evidence shows that Van Jura, who represented Roberts in his PCR proceedings in 2007 and 2009-10, spoke with Douard about the 2005 State Lab report and asked whether there was "a better specimen that wasn't tested." (Resp. to ECPO St.  ¶26.) Douard replied, "I think it should be considered the best sample, apart from any speculation of misconduct on the part of the prosecutor." (*Id.*) At his deposition in 2019, Van Jura testified that he "had no reason to believe that what was tested wasn't everything," and thus he relied on the 2005 report in arguing in the PCR proceedings that the DNA analysis was inconclusive because the material had degraded, but a timely DNA analysis would have exonerated Roberts (*Id.*) Had Van Jura known that the entire rape kit was not tested in 2005, he "would have looked at the case differently." (*Id.*) A jury could therefore find that all of the elements of negligence are met with respect to Laurino's misrepresentation to Douard about the scope of the DNA testing done in 2005.[16]

I do not find, however, that Bolan owed Roberts a similar duty. Although Bolan was apparently tasked with ensuring that the Atwell rape kit was provided to the State Lab, and with collecting Atwell's buccal swab and submitting it to the Lab as well (ECPO St. ¶¶11-12; Resp. to ECPO St. ¶18), there is no evidence to suggest that Bolan ever communicated with Douard or any other lawyer representing Roberts. There is also no evidence to suggest that Bolan knew that the rape kit that was submitted to the lab was missing

---

[16]     The ECPO defendants assert in their reply brief that even if Roberts has developed a prima facie case of negligence, summary judgment is still appropriate because they are entitled to qualified immunity and/or absolute prosecutorial immunity under New Jersey law. (ECPO Repl. 16-17.) In ruling on a summary judgment motion, a court may not consider a new argument made for the first time in reply papers where the non-movant does not have a meaningful opportunity to respond. *See Alston v. Forsyth*, 379 F. App'x 126, 129 (3d Cir. 2010) (reversing grant of summary judgment which was based on an argument raised for the first time in reply). Because the ECPO defendants did not raise these immunity defenses to Roberts's negligence claim in their moving brief, and because Roberts did not have an opportunity to respond to their reply brief, I will not reach the merits of these arguments. *See also Halsey*, 750 F.3d at 288 (at summary judgment stage the burden of establishing entitlement to the affirmative defense of qualified immunity falls on the defendant-movant).

key components; it is undisputed that it was sealed and that Bolan never opened it. (ECPO St. ¶¶13-15; Resp. to EPCO St. ¶¶13-15.)[17]

I will therefore deny summary judgment on Count 13 as to Laurino and grant summary judgment on the same count as to Bolan.

### E. Vicarious liability of ECPO and Essex County

Both ECPO and Essex County move for summary judgment on Count 14, which alleges that both entities are vicariously liable for the state law violations of Laurino and Bolan. Having granted summary judgment as to both Laurino and Bolan on the state law claim for fabricating evidence and as to Bolan on the state law negligence claim, I consider only whether there is sufficient evidence in the record for a jury to find ECPO and Essex County vicariously liable for Laurino's alleged negligence. *See Entrot v. BASF Corp.*, 359 N.J. Super. 162, 193 (App. Div. 2003) (whether an employer is vicariously liable for the tortious conduct of an employee is usually a question of fact for the jury).

Pursuant to the TCA, "[a] public entity is liable for injury proximately caused by an act or omission of a public employee within the scope of his employment in the same manner and to the same extent as a private individual under like circumstances." N.J. Rev. Stat. § 59:2-2 (2013). The TCA defines a "public entity" as including "the State, and any county, municipality, district, public authority, public agency, and any other political subdivision or public body in the State." N.J. Rev. Stat. § 59:1-3 (2013). Thus, established principles of law such as the doctrine of *respondeat superior* govern the analysis of whether ECPO and Essex County—both of which are "public entities" under

---

[17]     True, a reasonable jury could conclude that Bolan knew that Atwell's buccal swab never made it to the Lab, as it was her job to ensure that it did reach the lab. But given that Bolan herself never agreed to help Roberts (she was merely assigned tasks as the investigator on the case), and given that she never represented to Roberts that she completed the assigned tasks, I find that her relationship with Roberts is too attenuated to justify imposing a duty on her to inform Roberts about what was actually submitted for testing. In any event, the identity of Atwell's own buccal swab is far from central to the case, and doubts about the rape kit's authenticity would, if anything, undermine Roberts's position here. *See* pp. 17, 31 & n. 6, 12*, supra.*

the TCA—may be found vicariously liable for Laurino's purportedly negligent conduct. *Wright v. State*, 169 N.J. 422, 435 (2001) (citing N.J. Rev. Stat. § 59:2-2 (2013)).

I begin with ECPO. "Under *respondeat superior,* an employer can be found liable for the negligence of an employee causing injuries to third parties, if, at the time of the occurrence, the employee was acting within the scope of his or her employment." *Carter v. Reynolds*, 175 N.J. 402, 408-09 (2003) (quoting *Lehmann v. Toys 'R' Us, Inc.,* 132 *N.J.* 587, 619 (1993)). Because Laurino was an employee of ECPO during the relevant time period, the analysis centers on whether he was acting within the scope of his employment when he assisted Roberts with the DNA testing Roberts requested. New Jersey courts evaluate whether an employee's conduct falls within the scope of employment by considering whether (a) the conduct is of the kind the employee is employed to perform, (b) the conduct occurs substantially within the authorized time and space limits of the employment, and (c) the conduct is carried out, at least in part, for the purpose of serving the employer. *See Carter*, 175 N.J. at 411 (citing *Restatement (Second) of Agency* § 228 (1958)).

In support of their motion for summary judgment, the ECPO Defendants argue only that Roberts's vicarious liability claim against ECPO fails as a matter of law because neither Laurino nor Bolan is liable to Roberts under New Jersey law. (ECPO MSJ 30). The ECPO Defendants do not appear to dispute that Laurino acted within the scope of his employment when he engaged in this allegedly negligent conduct.

 I find that there are sufficient facts in the record for a jury to conclude that Laurino acted within the scope of his employment when he agreed to locate the Atwell rape kit for Roberts and submit it to the State Lab for testing. During the relevant time period, Laurino was employed as the Deputy Chief Assistant Prosecutor at ECPO (Laurino Dep. 19:8-14). He testified that he was also the office "point person for the state lab with respect to testing sexual assault kits," meaning that he was the liaison between the Lab and ECPO. (*Id.*

45

at 26:4-25.) When a request for DNA testing was made to ECPO, Laurino was the person in the office who would handle it. (*Id.* at 149:1-925, 150:1-4.) According to Laurino, facilitating the testing of DNA evidence in post-conviction cases is consistent with his ethical obligations as a prosecutor, given that "the primary role of the prosecutor is to do justice." (*Id.* at 66:22-25, 67:1-7.) Laurino explained that if such a request was made by someone who did not file a motion under New Jersey's post-conviction DNA testing statute, ECPO would agree to facilitate the testing "on a voluntary nature." (*Id.* at 49:4-12.) Accordingly, a jury could reasonably find that Laurino's assistance, though in some sense voluntary, occurred in the scope of his employment at ECPO and therefore that ECPO is vicariously liable for Laurino's alleged negligence.

Whether Essex County may be held vicariously liable for Laurino's purportedly negligent conduct is a more difficult question. As both the Third Circuit and the New Jersey Supreme Court have observed, county prosecutors in New Jersey possess a "dual or hybrid" status in that they serve both the county and the State. *See Wright*, 169 N.J. at 455; *Coleman v. Kaye*, 87 F.3d 1491, 1499 (3d Cir. 1996). On the one hand, "[i]t is well established that when county prosecutors execute their sworn duties to enforce the law by making use of all the tools lawfully available to them to combat crime, they act as agents of the State." *Coleman, supra.* "On the other hand, when county prosecutors are called upon to perform administrative tasks unrelated to their strictly prosecutorial functions, such as a decision whether to promote an investigator, the county prosecutor in effect acts on behalf of the county that is the situs of his or her office." *Id.*

Consequently, the New Jersey Supreme Court has stated that a county cannot be held vicariously liable for the actions of a county prosecutor "related to the investigation and enforcement of the criminal laws of the State." *Wright*, 169 N.J. at 452. The Court has further instructed "that the test for determining in which capacity a county prosecutor acts should 'focus on whether the function that the county prosecutors and their subordinates were performing

46

during the alleged wrongdoing is a function that traditionally has been understood to be a State function and subject to State supervision in its execution.'" *Gramiccioni v. Dep't of L. & Pub. Safety*, 243 N.J. 293, 312 (2020) (quoting *Wright*, 169 N.J. at 454).[18]

Essex County argues that it may not be held vicariously liable for the allegedly tortious conduct of Laurino because the record shows that Laurino was at all times acting in a law enforcement capacity on behalf of the State. (Essex County MSJ 7.) I disagree.

Laurino testified at his deposition that in agreeing to assist Roberts in obtaining a DNA test, he did not investigate Roberts's criminal case. (Laurino Dep. 154:4-15.) Laurino explained that the prosecution in the case "had been completed" and "it was not reopened." (*Id.*) The case was in a sense reopened when Roberts sought post-conviction relief in 2007, but that occurred after Laurino assisted with the DNA testing, and Laurino was not involved in the eventual PCR prosecution. This evidence suggests that Laurino was not investigating or enforcing New Jersey's criminal laws when he assisted with the requested testing in an allegedly negligent manner. *Wright*, 169 N.J. at 452.

Nor was Laurino acting pursuant to the post-conviction DNA testing statute. As discussed above, the statute in 2005 did not apply to individuals in civil confinement. Laurino was therefore under no State statutory obligation to assist Roberts with the testing he requested.

The record also suggests that the State did not supervise ECPO's facilitation of DNA testing in any manner. Laurino testified that in 2004 and 2005, the New Jersey Attorney General's Office did not oversee ECPO's policy or practice regarding arranging for DNA testing, nor did anyone from the Attorney General's Office supervise ECPO's practice of arranging for such

---

[18]    Essex County's arguments that Laurino and Bolan are entitled to qualified immunity and/or absolute prosecutorial immunity from claims arising under 42 U.S.C. § 1983 are not on point, as Roberts has made it clear that the only claim against the County is one for vicarious liability for the underlying state law tort claims. (Essex MSJ 9-12; Opp. to Essex MSJ 1.) The County does not argue that Laurino and Bolan are entitled to qualified immunity and/or absolute immunity under state law.

testing. (Laurino Dep. 71:18-22, 75:8-11.) With regard to the Roberts matter specifically, Laurino testified that no one from the Attorney General's Office had any role or say in his decision to agree to Douard's request for assistance. (Laurino Dep. 149:1-9, 150:5-10.) Laurino explained that "it's not the kind of thing that [the Attorney General's Office] would be involved in." (*Id.*)

In light of this evidence, a reasonable jury could find that Laurino's allegedly negligent conduct was not "a part or an aspect of prosecutorial performance over which the State would exercise supervision." *See Gramiccioni*, 243 N.J. at 314. Accordingly, Essex County may be held vicariously liable for the conduct at issue.[19]

### F. Damages

The ECPO defendants argue that Roberts cannot recover damages for pain and suffering on his state law claims because the TCA prohibits an award of damages against a public employee or entity for pain and suffering resulting from an injury, except in the case of permanent loss of a bodily function, permanent disfigurement, or dismemberment. N.J. Stat. Ann. § 59:9-2(d). (ECPO MSJ 30-32.) Roberts acknowledges this limitation but maintains that he can still recover for pain and suffering on his claims under § 1983. While this is true as a legal proposition, as to the ECPO defendants the § 1983 claims are being dismissed.

---

[19]     The fact that the Attorney General's Office agreed to defend and indemnify the ECPO Defendants in this action does not alter the conclusion that the County, rather than the State, is vicariously liable for Laurino's alleged negligence. Pursuant to the TCA, the Attorney General is required to defend an action brought against a "State employee," upon that employee's request, for conduct that occurred in the scope of his or her employment. N.J. Rev. Stat. § 59:10A-1 (2013). That the Attorney General agreed to defend the ECPO Defendants in this matter suggests that, in the view of the Attorney General, the ECPO defendants were acting as "State employees" when they committed at least one of the violations that Roberts alleges. But it does not tell us *which* of the alleged violations the Attorney General considers to be actions of the State. Given that Roberts raised fabrication of evidence claims against the ECPO Defendants, and given that fabricating evidence appears closely related to the law enforcement function of prosecutors, it is entirely possible that the Attorney General deemed the actions that gave rise to the fabrication claim to be actions of "State employees" and based the decision to defend in this matter solely on that.

The ECPO Defendants also argue that the court should grant summary judgment on any claims against them for damages for lost wages, as Roberts has failed to provide any competent evidence that supports a claim for such damages. (ECPO MSJ 33.) In particular, he has not provided any data or expert opinion about the supposed past employment he would have enjoyed and how much income he allegedly would have received. (*Id.*)

The ECPO Defendants cite to a number of cases in support of their argument that expert testimony is required to proceed on a claim for lost wages. These cases concern a different issue: the calculation of damages for future economic loss. *See, e.g. Elcock v. Kmart Corp.*, 233 F.3d 734, 754 (3d Cir. 2000) ("An expert's testimony regarding *future earnings loss* must be accompanied by a sufficient factual foundation before it can be submitted to the jury.") (citation omitted); *Benjamin v. Peter's Farm Condo. Owners Ass'n*, 820 F.2d 640, 642 (3d Cir. 1987) ("This Court has required more than speculative opinion when determining damages for *prospective earnings loss.*"); *Evans v. BV Shipping Co. Lombok Strait*, No. CIV.07-3139RMB/KMW, 2009 WL 3233524, at *3 (D.N.J. Oct. 5, 2009) ("Without the testimony of an expert . . . an award of *future lost income* would be speculative and is therefore impermissible.") (emphasis added in all). I am not persuaded that Roberts must support his claim for past lost wages with the opinion of an expert. *See Burris v. Richards Paving, Inc.,* 461 F. Supp. 2d 244, 251 (D. Del. 2006) (an expert witness is not always necessary when addressing a claim for past lost wages).

I will allow the claim for lost wages as a component of damages. It must, of course, be supported with admissible evidence.

## VI.   Conclusion

For the reasons set forth above, the motions for summary judgment of the ECPO Defendants (DE 214) and the Newark Defendants (DE 223) are granted in part and denied in part, and the motion for summary judgment of Essex County (DE 219) is denied.

In particular, summary judgment is granted as to Bolan on Counts 2, 5,

49

10, and 13; summary judgment is granted as to Laurino on Counts 2, 5, 7, and 10 and denied as to Laurino on Count 13;[20] summary judgment is denied as to ECPO and Essex County on Count 14; summary judgment is granted as to Eutsey on Counts 4 and 11 and denied as to Eutsey on Counts 1, 2, 8, and 10; and summary judgment is denied as to the City of Newark on Counts 5 and 14.

In sum, the following claims remain:

- Count 1 (§ 1983 malicious prosecution) against Eutsey
- Count 2 (§ 1983 fabrication of evidence) against Eutsey
- Count 5 (procedural due process) against the City of Newark
- Count 8 (state law malicious prosecution) against Eutsey
- Count 10 (state law fabrication of evidence) against Eutsey
- Count 13 (negligence) against Laurino and Eutsey
- Count 14 (vicarious liability) against ECPO, Essex County, and the City of Newark, as to the above counts.

An appropriate order will issue.

Dated: December 30, 2022

/s/ Kevin McNulty

_____
**KEVIN MCNULTY**
**United States District Judge**

---

[20]     As a result of my ruling, all of the federal claims against Laurino will be dismissed, but a state law negligence claim remains. I will exercise my discretion to retain supplemental jurisdiction over that state claim in the interest of judicial economy, as this case has been ongoing for over seven years, the parties have exchanged substantial discovery, and the court has jurisdiction over all other defendants. *See Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) (where the federal claims that provided the basis for original jurisdiction are dismissed, the court should ordinarily "decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so").